1   ERIC R. HAVIAN [CA Bar No. 102295]
    ehavian@constantinecannon.com
2   MICHAEL J. RONICKHER [CA Bar No. 261335]
    mronickher@constantinecannon.com
3   LEAH L. JUDGE [CA Bar No. 302406]
    ljudge@constantinecannon.com
4   CHRISTOPHER C. MCLAMB [CA Bar No. 312523]
    cmclamb@constantinecannon.com
5   CONSTANTINE CANNON LLP
    150 California Street, 16th Floor
6   San Francisco, California 94111
    (t) (415) 639-4001
7   (f) (415) 639-4002

8   AVI KUMIN [CA Bar No. 218893]
    (admission pending)
9   kumin@kmblegal.com
    MATTHEW LAGARDE [D.C. Bar No. 888304029]
10  (*pro hac vice* forthcoming)
    lagarde@kmblegal.com
11  KATZ, MARSHALL & BANKS, LLP
    1718 Connecticut Avenue, NW, 6th Floor
12  Washington, DC 20009
    (t) (202) 299-1140
13  (f) (202) 299-1148

14  Attorneys for *Qui Tam* Plaintiff-Relator

**FILED**

**MAR 0 3 2019**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
        DEPUTY CLERK

# SEALED

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

[UNDER SEAL],

                    Plaintiffs,

        vs.

[UNDER SEAL,

                    Defendants.

Case No. 2:19-CV-0405 KJM AC

COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]; THE CALIFORNIA FALSE CLAIMS ACT [Cal. Gov't Code § 12650 *et seq.*]; AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT [Cal. Ins. Code § 1871.7]

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

BY FAX

1   ERIC R. HAVIAN [CA Bar No. 102295]
    ehavian@constantinecannon.com
2   MICHAEL J. RONICKHER [CA Bar No. 261335]
    mronickher@constantinecannon.com
3   LEAH L. JUDGE [CA Bar No. 302406]
    ljudge@constantinecannon.com
4   CHRISTOPHER C. MCLAMB [CA Bar No. 312523]
    cmclamb@constantinecannon.com
5   CONSTANTINE CANNON LLP
    150 California Street, 16th Floor
6   San Francisco, California 94111
    (t) (415) 639-4001
7   (f) (415) 639-4002

8   AVI KUMIN [CA Bar No. 218893]
9   (admission pending)
    kumin@kmblegal.com
10  MATTHEW LAGARDE [D.C. Bar No. 888304029]
    (*pro hac vice* forthcoming)
11  lagarde@kmblegal.com
    KATZ, MARSHALL & BANKS, LLP
12  1718 Connecticut Avenue, NW, 6th Floor
    Washington, DC 20009
13  (t) (202) 299-1140
    (f) (202) 299-1148
14
    Attorneys for *Qui Tam* Plaintiff-Relator
15

16                  **UNITED STATES DISTRICT COURT**

17              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

18

19  UNITED STATES OF AMERICA and        Case No. **2 1 9 - CV - 0 4 0 5 KJM AC**
    STATE OF CALIFORNIA *ex rel.* DENNIS
20  KOGOD,
                                         COMPLAINT FOR VIOLATIONS OF THE
21                                       FEDERAL FALSE CLAIMS ACT [31 U.S.C.
                        Plaintiffs,      § 3729 *et seq.*]; THE CALIFORNIA FALSE
22                                       CLAIMS ACT [Cal. Gov't Code § 12650 *et
                                         seq.*]; AND THE CALIFORNIA
23          vs.                          INSURANCE FRAUDS PREVENTION ACT
                                         [Cal. Ins. Code § 1871.7]
24  Z&S MANAGEMENT CORP. DBA 360
    BEHAVIORAL HEALTH; CALIFORNIA
25  PSYCHCARE, INC.; LEILI ZARBAKHSH;
    and DW HEALTHCARE PARTNERS,          **FILED IN CAMERA AND UNDER SEAL**
26                                       **PURSUANT TO 31 U.S.C. § 3730(b)(2)**
                        Defendants.
27                                       **JURY TRIAL DEMANDED**

28

I.    **INTRODUCTION**

1.      Relator Dennis Kogod brings this action to recover damages and civil penalties on behalf of the United States of America and the State of California arising from false and/or fraudulent statements, records, and claims made or caused to be made by Defendants and/or their agents and employees from at least January 1, 2012, to the present (the "relevant time period") in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("the federal FCA"), the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* ("the California FCA"), and the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq.* ("the IFPA").

2.      This case involves defendants who have unlawfully profited for over a decade from the provision of substandard care to some of the most vulnerable Californians:  individuals living with autism spectrum disorder ("ASD").

3.      ASD is the fastest growing and most prevalent developmental disability in the state.  As the need for care has grown, public and private health coverage for treatment has expanded significantly.  Since the 1970s, California has provided care to people with ASD through a series of community-based Regional Centers regulated by the California Department of Developmental Services.  In 2011, the state expanded access to autism care by enacting the Autism Private Health Insurance Mandate bill (SB 946), which requires private insurance plans to cover autism services, including behavioral health treatment.  Since 2014, Medi-Cal has covered behavioral health treatment for individuals with autism under 21 years of age.

4.      Unfortunately, the expansion of coverage for autism therapy has created corresponding opportunities for profiteering providers to claim fraudulent reimbursements.

5.      The primary behavioral treatment for people living with ASD is Applied Behavior Analysis ("ABA"), a science-based intervention with rigorous requirements that is covered by both public and private insurers in California.

-2-

1       6.    Board Certified Behavior Analysts ("BCBAs") are essential to ABA therapy. To

2   become a BCBA, a therapist must have a graduate degree in an applicable discipline such as

3   behavioral analysis, obtain significant supervised experience with patients, and pass a rigorous

4   examination and certification program. As such, BCBAs are highly trained and educated

5   providers with the expertise necessary to evaluate an individual with ASD and develop an

6   appropriate ABA treatment plan. BCBAs are therefore required by both law and payor contracts

7   to directly supervise ABA therapy throughout treatment.

8       7.    Critically, ABA treatment must be ongoing, individualized, and dynamic to be

9   effective. The BCBA must supervise the implementation of the treatment plan through periodic

10   in-person interaction with the patient. First-hand experience with the patient is necessary for the

11   BCBA to assess the patient's progress, develop new goals, and modify interventions as

12   appropriate. Typically, a formal re-evaluation by the BCBA must occur at least every six-

13   months.

14       8.    Regardless of the payor, Californians with ASD are legally entitled to receive

15   ABA therapy directed and supervised by BCBAs, as required by both California law and

16   relevant provider agreements.

17       9.    As described below, Defendants have flouted these requirements and delivered

18   substandard care without the required BCBA supervision for years.

19       10.    Defendants knew that they did not have sufficient BCBAs to serve their existing

20   patient population, yet they nonetheless continued to accept new patients month after month,

21   disregarding the legal and contractual requirements for the care they agreed to provide—and for

22   which they sought reimbursement. As a result, despite the requirements, some patients went

23   years without ever interacting with a BCBA, the professionals with the experience and

24   qualifications needed to assess their needs and develop an appropriate ABA treatment plan.

25   Other patients received some BCBA supervision, but not the amount required. Defendants then

26   falsified records to conceal the supervision issues, often claiming supervision by unknowing

27                                 -3-

28       COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
    CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1  BCBAs of patients the BCBAs had never seen. In some instances, the BCBAs did not even

2  service the area where the patients lived.

3       11.    Separately, both Medi-Cal managed care plans and private insurers require ABA

4  providers to collect co-payments from patients as a means of curbing wasteful overutilization. In

5  violation of its provider agreements and anti-kickback laws, Defendants have intentionally

6  refused to collect co-payments across the board, regardless of a patient's ability to pay.

7       12.    As a result, Defendants have submitted or caused to be submitted claims for

8  services provided in violation of these laws and agreements to Medi-Cal, the Department of

9  Developmental Services, private insurers, and TRICARE. Defendants knew their claims

10  violated these payors' requirements but nonetheless billed these payors and/or their various

11  subcontractors as if the services had been directed, supervised, and provided by properly licensed

12  and qualified individuals, and as if co-payments had been collected.

13       13.    The United States, the State of California, and private insurers would not have

14  paid these claims had they known about Defendants' violations.

15       14.    Defendants' conduct violated the federal False Claims Act, the California False

16  Claims Act, and the California Insurance Frauds Prevention Act.

17       15.    The federal False Claims Act was originally enacted during the Civil War.

18  Congress substantially amended the Act in 1986—and again in 2009 and 2010—to enhance the

19  ability of the United States government to recover losses sustained due to fraud against it.

20  Congress amended the Act after it found that fraud in federal programs was pervasive and that

21  the Act, which Congress characterized as the primary tool for combating government fraud,

22  needed modernization. Congress intended that the amendments would create incentives for

23  individuals with knowledge of fraud against the government to disclose the information without

24  fear of reprisals or government inaction, and to encourage the private bar to commit legal

25  resources to prosecuting fraud on the government's behalf.

26

27                        -4-

16.     In relevant part, the federal FCA prohibits: (a) knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; and (d) conspiring to violate these provisions. 31 U.S.C. § 3729(a)(1)(A)–(C), (G).

17.     The federal FCA's "reverse false claims" provision imposes liability when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). As part of the Patient Protection and Affordable Care Act, Congress enacted a statutory requirement that a person who "has received an overpayment" must "report and return the overpayment" no later than "60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d). The statute defines "overpayment" as "any funds that a person receives or retains under [Medicare or Medicaid] to which the person, after applicable reconciliation, is not entitled." *Id.* § 1320a-7k(d)(4)(B). The Statute also provides that any overpayment retained beyond the 60-day deadline constitutes an "obligation" under the federal FCA. *Id.* § 1320a-7k(d)(3).

18.     Any person who violates the federal FCA is liable for a civil penalty of up to $21,562.80 for each violation, plus three times the amount of the damages the United States sustains. *Id.* § 3729(a)(1).

19.     The federal FCA allows any person having information about a violation to bring an action on behalf of the United States, and to share in any recovery. *Id.* § 3730(b). The statute requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit. *Id.*

-5-

1       20.     The California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, prohibits

2    similar conduct as the federal FCA, allows plaintiffs to bring an action on the State's behalf, and

3    provides analogous remedies to those provided in the federal FCA.  The California FCA also

4    attaches liability when a "beneficiary of an inadvertent submission of a false claim, subsequently

5    discovers the falsity of the claim, and fails to disclose the false claim to the state or the [relevant]

6    political subdivision within a reasonable time after discovery of the false claim."  Cal. Gov't

7    Code § 12651(a)(8).  As set forth below, Defendants' actions alleged in this Complaint also

8    violate the California False Claims Act.

9       21.     The California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq.*,

10   prohibits similar conduct as that prohibited by the federal FCA and the California FCA, but does

11   so with respect to fraud against private insurers.  To combat this fraud, the IFPA permits the

12   State or any "interested person" on behalf of the State, including a relator in a *qui tam* action, to

13   civilly enforce provisions of the Penal Code that bar the submission of false claims for payment

14   under a "contract of insurance."  Cal. Ins. Code § 1871.7(e).

15      22.     Similar to the FCA statutes, the IFPA provides that any person who violates a

16   provision of California Penal Code sections 549, 550, or 551 is liable for civil penalties up to

17   $10,000, plus an assessment of up to three times the amount of each claim for compensation, as

18   defined in the contract of insurance.  *Id.* § 1871.7(b).  The IFPA also allows any person having

19   knowledge of illegal conduct specified in Insurance Code § 1871.7 to bring an action and share

20   in any recovery.  *Id.* § 1871.7(e), (g).

21      23.     The federal Anti-Kickback Statute forbids accepting "any remuneration

22   (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in

23   kind" to induce or reward any person for referring, recommending, or arranging for the purchase

24   of any item or service for which payment may be made under a federally funded healthcare

25   program.  42 U.S.C. § 1320a-7b(b).  The federal Anti-Kickback Statute applies not only to

26   payments to providers in a position to refer federal healthcare business, but to patients

27                                          -6-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
     CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    themselves.  When a government healthcare program such as Medicare or Medicaid requires a

2    patient to make a co-payment for a service, routine waiver of that co-payment by a provider,

3    without consideration of a patient's ability to pay, may be illegal remuneration under the federal

4    Anti-Kickback Statute.

5        24.    California Business and Professions Code section 650 likewise prohibits the

6    payment of kickbacks to healthcare providers or others in exchange for their directing how and

7    where patients receive healthcare services. *See* Cal. Bus. & Prof. Code § 650.  The California

8    IFPA similarly prohibits the payment of kickbacks in connection with claims submitted to

9    private insurers.  Cal. Ins. Code § 1871.7(a).

10        25.    Claims tainted by kickbacks are false claims for the purposes of the federal False

11    Claims Act, the California False Claims Act, and the California IFPA.  Neither the United States

12    nor the State of California would pay claims for services if they knew they were tainted by

13    kickbacks.

14    **II.**    **THE PARTIES**

15        **A.**    **Relator**

16        26.    Relator Dennis Kogod is a citizen of the United States and resident of the State of

17    California.  He is an experienced senior healthcare executive who has served as Chief Executive

18    Officer and Executive Chairman of Defendant 360 Behavioral Health since April 1, 2018.  For

19    the preceding sixteen years, Relator held senior positions at DaVita, Inc., and Gambro

20    Healthcare, providers of dialysis services and population health management.

21        **B.**    **Z&S Management Corp., dba 360 Behavioral Health, and Related Entities**

22        27.    Defendant Z&S Management Corporation is a California corporation doing

23    business as 360 Behavioral Health and located in Van Nuys, California.  Z&S Management

24    Corporation ("Z&S") was incorporated with the California Secretary of State in December 2008

25    by Dr. Ali Sadehghi; at the time, Z&S was wholly owned by Dr. Sadehghi and his wife,

26    Defendant Dr. Leili Zarbakhsh.  In the name of the corporation, "Z" refers to Dr. Zarbakhsh and

27                                                     -7-

28

1   "S" refers to Dr. Sadeghi.  Until recently, Z&S had four operational subsidiaries that provided

2   services for individuals with ASD and their families:  California Psychcare, Inc.; Autism

3   Response Team; Respite Works; and Behavior Respite in Action.

4          28.    Defendant California Psychcare, Inc., is a California corporation located in Van

5   Nuys, California.  Dr. Sadeghi incorporated California Psychcare with the California Secretary

6   of State in July 2003; at the time, the company was wholly-owned by Drs. Sadehghi and

7   Zarbakhsh.  California Psychcare provides behavioral services for children and adults, including

8   ABA therapy to individuals living with ASD, for which it claims reimbursements from private

9   and public payors.

10         29.    Today, California Psychcare is a subsidiary of Z&S.  This complaint collectively

11  refers to Defendant Z&S and its various subsidiaries, including California Psychcare, as "360

12  Behavioral Health."

13         **C.    DW Healthcare Partners**

14         30.    Defendant DW Healthcare Partners ("DW Healthcare") is a Canadian private

15  equity firm that formed a Delaware limited partnership located in Park City, Utah.  DW

16  Healthcare acquired Z&S and its various subsidiaries, including California Psychcare, on March

17  31, 2018.  The newly-acquired company was then rebranded as "360 Behavioral Health."

18  Relator believes DW Healthcare may hold 360 Behavioral Health within a subsidiary entity,

19  possibly "DW Healthcare Partners IV."

20         **D.    Leili Zarbakhsh**

21         31.    Defendant Dr. Leili Zarbakhsh is a resident of the State of California.  Dr.

22  Zarbakhsh and her late husband, Dr. Sadeghi, founded California Psychcare in 1997.  Dr.

23  Zarbakhsh then solely owned Z&S and its subsidiaries until she sold them to Defendant DW

24  Healthcare in March 2018 for approximately $97 million.  Despite selling the company, Dr.

25  Zarbakhsh has maintained an active leadership role, serving as the Executive Clinical Director of

26  360 Behavioral Health.

27                                                -8-

1   **III.    JURISDICTION AND VENUE**

2       32.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345,

3   1367(a), and under 31 U.S.C. § 3732(b), which provides this court with jurisdiction over state

4   law claims arising from the same transactions or occurrences as an action brought under the

5   federal False Claims Act.

6       33.    Under 31 U.S.C. § 3730(e)(4), and the analogous provisions of the California

7   False Claims Act and the California Insurance Frauds Prevention Act, there has been no

8   statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Even

9   if there had been any such public disclosure, Relator is the original source of the allegations

10  because he has direct, independent, and material personal knowledge of the information that

11  forms the basis of this Complaint, and voluntarily disclosed that information to the government

12  before filing.

13      34.    The Court may exercise personal jurisdiction over Defendants under 31 U.S.C.

14  § 3732(a) because Defendants provide substantial services in the Eastern District of California,

15  specifically in Kern County, and therefore transact business in the Eastern District of California.

16      35.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b)

17  & (c) because Defendants regularly conduct and/or conducted business within the Eastern

18  District of California, maintained employees and offices in this District, and, as a result of the

19  statutory violations alleged herein, submitted false claims and/or caused false claims to be

20  submitted in this District.

21  **IV.    APPLIED BEHAVIORAL ANALYSIS**

22      36.    ABA is a decades-old, science-based therapy that applies the study of learning

23  and behavior to real-world situations faced by individuals with ASD.  ABA therapy seeks "to

24  increase behaviors that are helpful and decrease behaviors that are harmful or affect learning."

25

26

27                                    -9-

28  COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
    CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    Autism Speaks, *What is Applied Behavior Analysis?*.[1]  California law defines ABA therapy as

2    "the design, implementation, and evaluation of systematic instructional and environmental

3    modifications to promote positive social behaviors and reduce or ameliorate behaviors which

4    interfere with learning and social interaction."  Cal. Welf. & Inst. Code § 4686.2(d)(1).

5        37.    ABA is widely considered a best practice for treating ASD and has been endorsed

6    by the U.S. Surgeon General.  Dep't of Public Health, *Mental Health: A Report of the Surgeon*

7    *General* 164 (1999) ("Thirty years of research demonstrated the efficacy of applied behavioral

8    methods in reducing inappropriate behavior and in increasing communication, learning, and

9    appropriate social behavior.").[2]

10       38.    ABA therapy promotes communication and social skills, focus, and academic

11   performance by reinforcing positive behaviors while discouraging negative ones.  An ABA

12   program is highly individualized.  It is customized around the abilities, preferences, and needs of

13   the patient and requires careful planning and implementation from highly-skilled professionals.

14   Autism Speaks, *supra*.

15       39.    BCBAs are the foundation of the patient-specific ABA treatment program.  Once

16   a patient is diagnosed with ASD, the BCBA performs a detailed assessment of the patient's

17   skills, needs, interests, preferences and family situation, known as a functional behavioral

18   assessment ("FBA").  The BCBA then creates a treatment plan with specific treatment methods

19   and goals and oversees the implementation of the plan throughout the patient's treatment.

20       40.    Treatment under the plan is provided by both the BCBA and other therapists,

21   including registered behavioral technicians ("RBTs") and Board Certified Assistant Behavior

22   Analysts ("BCaBAs").  RBTs are often colloquially referred to as behavioral therapists, line

23   therapists, or behavioral techs.  RBTs and BCaBAs work at the direction and under the

---

[1] https://www.autismspeaks.org/applied-behavior-analysis-aba-0 (last visited Mar. 4, 2019)

[2] https://profiles.nlm.nih.gov/ps/access/NNBBHS.pdf

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1 | supervision of the BCBA, who alone has the education, training, and experience necessary to
2 | develop and routinely reevaluate the patient's treatment plan to ensure its effectiveness.

3 |     41.    The supervision requirement of ABA therapy ensures that the BCBA regularly
4 | interacts with the patient, the patient's family members, and the therapy staff to assess the
5 | patient's progress and adjust the treatment plan and goals as needed. *See* Autism Speaks, *supra*.
6 | This face-to-face interaction provides the basis for the BCBA's mandatory periodic reevaluation
7 | of the patient's treatment plan, typically at six-month intervals.

8 |     42.    BCBAs are certified by the Behavior Analyst Certification Board ("Certification
9 | Board"). Certification Board, *BCBA Requirements*. [3] To become a BCBA, an individual must
10 | hold a master's degree or PhD in psychology, education, or behavior analysis; complete at least
11 | 750 hours of supervised experience; and pass a national certification exam. *Id.* These rigorous
12 | requirements ensure that patients only receive care supervised by providers who can properly
13 | address their needs. A BCBA with doctoral-level training in behavior analysis is referred to as a
14 | BCBA-D and, like a BCBA, supervises the work of BCaBAs, RBTs, and others who directly
15 | provide ABA treatment. Certification Board, *Board Certified Behavior Analyst – Doctoral*.[4]

16 |     43.    The Certification Board is a non-profit credentialing and standard-setting
17 | organization that regulates the provision of behavioral analysis services. Like most
18 | professionals, BCBAs must comply with ethical rules, promulgated and enforced by the
19 | Certification Board. *See generally* Certification Board, *Professional and Ethical Compliance*
20 | *Code for Behavior Analysts* (2014).[5] BCBAs also must meet continuing education requirements
21 | to keep abreast of developments in their field. Certification Board, *Maintaining BCBA*
22 | *Certification.*[6]

23 |

24 | [3] https://www.bacb.com/bcba/bcba-requirements/ (last visited Mar. 4, 2019)
 | [4] https://www.bacb.com/bcba-d/ (last visited Mar. 4, 2019)
25 | [5] https://www.bacb.com/wp-content/uploads/BACB-Compliance-Code-english_181218.pdf
26 | [6] https://www.bacb.com/maintain/maintaining-bcba/ (last visited Mar. 4, 2019)
27 |
28 | COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1       44.     As noted, BCBAs supervise other therapists throughout the ABA program,

2 including RBTs and BCaBAs, who lack the extensive education, training, and certification

3 requirements of the BCBA. BCaBAs must possess a bachelor's degree in any discipline;

4 complete specific coursework required by the Certification Board; obtain certain experience; and

5 pass a Certification Board-administered BCaBA exam. *See* Certification Board, *BCaBA*

6 *Requirements*.[7] RBTs, in contrast, are paraprofessionals. RBTs must be at least 18 years old;

7 possess a high school diploma or national equivalent; complete 40 hours of training; pass a

8 background check; and pass the Certification Board-administered RBT Competency Assessment

9 and RBT examination. Certification Board, *Registered Behavior Technician*.[8]

10       45.     The Certification Board code of ethics specifically addresses the BCBA's

11 supervisory duties. Among other requirements, a BCBA must "take on only a volume of

12 supervisory activity that is commensurate with their ability to be effective." Certification Board,

13 *Professional and Ethical Compliance Code for Behavior Analysts* § 5.02. Moreover, a BCBA

14 may "delegate to their supervisees only those responsibilities that such persons can reasonably be

15 expected to perform competently, ethically, and safely." *Id.* § 5.03(a).

16       46.     The Certification Board also maintains official Practice Guidelines for Healthcare

17 Funders and Managers (the "Certification Board Guidelines") that reflect the consensus of

18 subject matter experts on the appropriate provision of ABA therapy. *See generally* Certification

19 Board, *Applied Behavior Analysis Treatment of Autism Spectrum Disorder: Practice Guidelines*

20 *for Healthcare Funders and Managers* (2d ed. 2014).[9]

21       47.     The Certification Board Guidelines directly address BCBA case supervision,

22 which it also refers to as "clinical direction," emphasizing that "ABA treatment requires

23 comparatively high levels of case supervision to ensure effective outcomes because of (a) the

24

25 [7] https://www.bacb.com/bcaba/bcaba-requirements/ (last visited Mar. 4, 2019)

   [8] https://www.bacb.com/rbt/ (last visited Mar. 4, 2019)

26 [9] https://www.bacb.com/wp-content/uploads/2017/09/ABA_Guidelines_for_ASD.pdf

27

28

1  individualized nature of treatment, (b) the use of a tiered service-delivery model, (c) the reliance

2  on frequent collection and analysis of client data, and (d) the need for adjustments to the

3  treatment plan." *Id.* at 31.

4        48.    The Certification Board Guidelines also distinguish between direct and indirect

5  case supervision.  Direct case supervision involves contact with the patient or caregivers.

6  Common direct case supervision activities include "directly observ[ing] treatment

7  implementation for potential program revision"; "monitor[ing] treatment integrity to ensure

8  satisfactory implementation of treatment protocols"; and "directing staff and/or caregivers in the

9  implementation of new or revised treatment protocols (client present)." *Id.* at 32.  Indirect case

10  supervision does not involve contact with a patient or caregiver.  Common indirect case

11  supervision activities include "develop[ing] treatment goals, protocols, and data collection

12  systems"; "evaluat[ing] client progress towards treatment goals"; and "adjust[ing] treatment

13  protocols based on data." *Id.*

14        49.    As the Certification Board Guidelines make clear, "[b]oth direct and indirect case

15  supervision activities [by BCBAs] **are critical to producing good treatment outcomes** and

16  should be included in service authorizations. . . . On average, direct supervision time [by

17  BCBAs] accounts for 50% or more of case supervision." *Id.* at 31 (emphasis added).

18        50.    The Certification Board Guidelines also set forth the appropriate "dosage of case

19  supervision" by BCBAs.  According to the Certification Board, "Although the amount of

20  supervision for each case must be responsive to individual client needs, **2 hours [of supervision**

21  **by BCBAs] for every 10 hours of direct treatment** is the general standard of care.  When

22  **direct treatment is 10 hours per week or less, a minimum of 2 hours per week** of case

23  supervision is generally required." *Id.* at 34 (emphasis in original).  The Certification Board

24  explains that "[t]his ratio of case supervision hours to direct treatment hours reflects the

25  complexity of the client's ASD symptoms and the responsive, individualized, data-based

26  decision-making which characterizes ABA treatment." *Id.*  The supervising BCBA has

27                                           -13-

1    discretion to increase or decrease the proportion of supervision hours to direct treatment hours

2    based on the individualized needs of the patient. *Id.*; *see also* Certification Board, *Clarifications*

3    *Regarding Applied Behavior Analysis Treatment of Autism Spectrum Disorder: Practice*

4    *Guidelines for Healthcare Funders and Managers* at 3 (2d ed. 2019).[10]

5         51.    The Certification Board Guidelines also address a BCBA's caseload. They state

6    that BCBAs "should carry a caseload that allows them to provide appropriate case supervision to

7    facilitate effective treatment delivery and ensure consumer protection." Certification Board,

8    *BACB Guidelines* at 35. Caseload size is determined by several factors, including "complexity

9    and needs of the clients in the caseload"; "total treatment hours delivered to the clients in the

10   caseload"; and "availability of support staff for the Behavior Analyst (for example, a BCaBA)."

11   *Id.* at 35. If a BCBA is supervising "focused treatment,"[11] the recommended caseload is 10-15

12   cases when the BCBA does not have the support of a BCaBA and 16-24 cases where the BCBA

13   has such support. *Id.* If a BCBA is supervising "comprehensive treatment,"[12] the recommended

14   caseload is 6-12 cases when the BCBA does not have the support of a BCaBA and 12-16 cases

15   where the BCBA has such support. *Id.*

16   **V.    STATUTORY, REGULATORY, AND CONTRACTUAL REQUIREMENTS**

17        52.    Most of the Californians to whom 360 Behavioral Health provides ABA therapy

18   receive coverage through Medi-Cal, Regional Centers overseen and funded by the State

19   Department of Developmental Services, private insurance, or TRICARE. Laws, regulations, and

20

21   [10] https://www.bacb.com/wp-content/uploads/Clarifications_ASD_Practice_Guidelines_2nd_
     ed.pdf.

22   [11] Focused treatment "generally ranges from **10-25 hours per week** of direct treatment (plus

23   direct and indirect supervision and caregiver training)." Certification Board, *BACB Guidelines* at
     25 (emphasis in original).

24   [12] Comprehensive treatment "often involves an intensity level of **30-40 hours of 1:1 direct**

25   **treatment to the client per week,** not including caregiver training, supervision, and other
     needed services." Certification Board, *BACB Guidelines* at 25 (emphasis in original).

26

27                                          -14-

28

1  guidance specifically govern all these payors' coverage of ABA therapy.  These legal and

2  regulatory requirements flow down to providers like 360 Behavioral Health that contract to

3  provide ABA therapy to individuals with ASD.

4      53.    Separately, these payors also impose their own additional requirements on

5  contracted ABA providers that govern those providers' delivery of ABA services.

6      54.    Whether based in statute, regulation, or contract, the legal frameworks governing

7  the provision of ABA therapy share a core requirement:  ABA therapy must be planned, directed,

8  and supervised by a qualified individual.  Generally, this individual is a BCBA.

9      **A.    Medi-Cal**

10     55.    The Medicaid program, established by Title XIX of the Social Security Act, 42

11 U.S.C. § 1396 *et seq.,* is a cooperative federal-state program created to provide medical

12 assistance to needy families and individuals.  Under the Medicaid program, the federal

13 government provides funds to states to offset some of the expense of furnishing medical services

14 to low-income persons.  The program is jointly financed by the federal and state governments,

15 and states administer the program according to federal guidelines.  In the 2016-2017 fiscal year,

16 federal funding covered approximately two-thirds of Medi-Cal spending.  Public Policy Institute

17 of California, *Funding the Medi-Cal Program* (2017) at 5;[13] *see also* 42 U.S.C § 1396d(b).

18     56.    States that wish to receive federal funds through Medicaid must submit a "State

19 Plan," which varies from state to state, for approval by the Department of Health and Human

20 Services.  *Id.* § 1396.  The state must designate a single state agency to be responsible for

21 administration and supervision of the state plan.  *Id.* § 1396a(a)(5).

22     57.    In California, the Medicaid program is called "Medi-Cal," and it is administered and

23 supervised by the Department of Health Care Services ("DHCS") (formerly, the "California

24 Department of Health Services").  Cal. Welf. & Inst. Code §§ 10740, 14000 *et seq.*

25

26 _____
   [13] https://www.ppic.org/content/pubs/report/R_0317SMR.pdf

27                                          -15-

28 _____
   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
   CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    58.    Since July 2014, Medi-Cal has required coverage of Behavioral Health Treatment
2    ("BHT"), including ABA, for individuals under the age of 21, pursuant to section 1905(a)(4)(B)
3    of the Social Security Act, which sets forth the Early and Periodic Screening, Diagnostic and
4    Treatment ("EPSDT") benefit. *See* DHCS, *California State Plan Amendment 14-026* (July 7,
5    2014).[14]

6    59.    The EPSDT benefit provides comprehensive screening, diagnostic, treatment, and
7    preventive health care services for children under age 21 who are enrolled in Medi-Cal, ensuring
8    that children who are eligible for EPSDT services receive appropriate preventive, dental, mental
9    health, developmental, and specialty services. The EPSDT benefit is more robust than the Medi-
10   Cal benefit package provided to adults.

11   60.    Medi-Cal beneficiaries served by 360 Behavioral Health generally are enrolled in
12   a Medi-Cal managed care plan. Beneficiaries enrolled in a Medi-Cal managed care plan receive
13   ABA services from providers contracted with their plan.

14   61.    Medi-Cal is administered on a county-by-county basis, and each county offers
15   different managed care plans. Approximately 10.8 million Medi-Cal beneficiaries in all 58
16   California counties receive their health care through a managed care model.

17   62.    Medi-Cal managed care plans are also governed by the Knox-Keene Health Care
18   Services Plan Act, Cal. Health & Safety Code § 1340 *et seq.*, and regulations promulgated
19   thereunder by the California Department of Managed Health Care ("DMHC").

20   63.    In delivering ABA services, Medi-Cal managed care plans are responsible for
21   ensuring that the providers with which they contract comply with all applicable state and federal

26   [14] https://www.dhcs.ca.gov/formsandpubs/laws/Documents/SPA14-026.pdf

27   -16-

1  laws and regulations and other contractual requirements, as well as guidance from DHCS, which

2  includes "All Plan Letters."[15] DHCS, *All Plan Letter 15-025* (Dec. 3, 2015).[16]

3       64.    Medi-Cal, through DHCS, provides a monthly supplemental payment to managed

4  care plans for each reported Medi-Cal beneficiary in that given month who received ABA

5  services in accordance with the requirements outlined in the operative All Plan Letter and any

6  provider contracts. *Id.* at 9.

7       65.    To be reimbursed by Medi-Cal, managed care plans must ensure that ABA

8  treatment is provided pursuant to an approved behavioral treatment plan **"developed by** a . . .

9  'qualified autism service provider.'" *Id.* at 7 (emphasis added); *see also* Cal. Health & Safety

10 Code § 1374.73(c)(1)(C). "The behavioral treatment plan must be reviewed, revised and/or

11 modified no less than once every six months by a qualified autism service provider." DHCS, *All*

12 *Plan Letter 15-025, supra*, at 7; *see also* Cal. Health & Safety Code § 1374.73(c)(1)(C).

13      66.    Treatment under a plan "may be **administered by"** a "qualified autism service

14 provider"; a "qualified autism service professional" who is supervised and employed by the

15 qualified autism service provider; or a "qualified autism service paraprofessional" who is

16 supervised and employed by a qualified autism service provider. DHCS, *All Plan Letter 15-025*,

17 *supra*, at 7 (emphasis added); *see also* Cal. Health & Safety Code § 1374.73(B).

18      67.    A **"qualified autism service provider"** ("QAS provider") is either

19         •  **"A person who is certified by a national entity, such as the Behavior
20            Analyst Certification Board**, with a certification that is accredited by the
              National Commission for Certifying Agencies, and who designs, supervises, or
21            provides treatment for pervasive developmental disorder or autism, provided
              the services are within the experience and competence of the person who is
22            nationally certified." **or**

23 [15] All Plan Letters ("APLs") are the means by which Medi-Cal conveys to managed care plans
24 information or interpretation of changes in policy or procedure at the federal or state levels, and
   provides instruction to contractors, if applicable, on how to implement these changes on an
25 operational basis.

26 [16] https://www.dhcs.ca.gov/formsandpubs/Documents/MMCDAPLsandPolicyLetters/APL2015/
   APL15-025.pdf

27                                              -17-

28 COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
   CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

- **"A person licensed as a physician and surgeon, physical therapist, occupational therapist, psychologist, marriage and family therapist, educational psychologist, clinical social worker, professional clinical counselor, speech-language pathologist, or audiologist** pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, who designs, supervises, or provides treatment for pervasive developmental disorder or autism, provided the services are within the experience and competence of the licensee."

Cal. Health & Safety Code § 1374.73(c)(3) (emphasis added).

68.    A **"qualified autism service professional"** ("QAS professional") is an individual "who meets **all** of the following criteria":

- "Provides behavioral health treatment, which may include clinical case management and case supervision **under the direction and supervision of a qualified autism service provider."**

- **"Is supervised by a qualified autism service provider."**

- **"Provides treatment pursuant to a treatment plan developed and approved by the qualified autism service provider."**

- "Is a behavioral service provider who meets the education and experience qualifications described in Section 54342 of Title 17 of the California Code of Regulations for an **Associate Behavior Analyst, Behavior Analyst, Behavior Management Assistant, Behavior Management Consultant, or Behavior Management Program."**[17]

- "Has training and experience in providing services for pervasive developmental disorder or autism pursuant to Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code or Title 14 (commencing with Section 95000) of the Government Code."

- "Is employed by the qualified autism service provider or an entity or group that employs qualified autism service providers responsible for the autism treatment plan."

Cal. Health & Safety Code § 1374.73(c)(4) (emphasis added).

---

[17] Section 54342 of Title 17 of the California Code of Regulations governs ABA services provided through Regional Centers. These regulations are addressed *infra*.

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

69.    **"A qualified autism service paraprofessional"** ("QAS paraprofessional") is "an unlicensed and uncertified individual who meets **all** of the following criteria":

- **"Is supervised by a qualified autism service provider or qualified autism service professional** at a level of clinical supervision that meets professionally recognized standards of practice."

- **"Provides treatment and implements services pursuant to a treatment plan developed and approved by the qualified autism service provider."**

- "Meets the education and training qualifications described in Section 54342 of Title 17 of the California Code of Regulations."

- "Has adequate education, training, and experience, as certified by a qualified autism service provider or an entity or group that employs qualified autism service providers."

- "Is employed by the qualified autism service provider or an entity or group that employs qualified autism service providers responsible for the autism treatment plan."

Cal. Health & Safety Code § 1374.73(c)(5) (emphasis added).

70.    Notably, supervision requirements are incorporated into the definition of a QAS professional and paraprofessional, meaning even an otherwise qualified individual cannot perform these functions in the absence of direct or indirect QAS provider supervision.

71.    California State Plan Amendment 14-026 expands upon these statutory requirements. Amendment 14-026 requires that BHT intervention services, including ABA treatment, "be **provided, observed and directed** under an approved behavioral treatment plan **developed by** a qualified autism service provider." *See* DHCS, *California State Plan Amendment 14-026* (emphasis added). To ensure that the patient's plan meets his or her present needs, the QAS provider must reevaluate that plan at least every six months, and prior authorization is required for all services. *Id.*

-19-

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72.     Amendment 14-026 also explains why ongoing direction and observation is essential to the success of any treatment plan: "Observation and direction is for the direct benefit of the child and provides real time response to the intervention. This is necessary to ensure the delivery of BHT that is consistent with the goals and objectives outlined in the BHT plan to ensure that the child is making progress and responding appropriately to BHT." *Id.*

73.     Medi-Cal managed care plans incorporate and expand upon the foregoing requirements and definitions in contracts with behavioral health providers like Defendant 360 Behavioral Health. These contracts specifically prescribe the level of supervision a BCBA must provide to professionals and paraprofessionals who directly administer ABA treatment pursuant to the BCBA-developed treatment plans.

74.     For example, 360 Behavioral Health's current contract with Blue Shield of California's Promise Health Plan, a Medi-Cal managed care plan for San Diego County (previously known as "Care1st Health Plan"), requires that "supervision standards follow [Certification Board] guidelines (i.e., 2 hours of supervision for every 10 hours of direct intervention), with more supervision authorized if deemed medically necessary." Exhibit 1 at Attachment B, p 29 n.11. The contract further requires that "at least 25% of supervision must be completed by a BCBA." *Id.* at Attachment A, p 22-23.

75.     Medi-Cal managed care provider contracts also set forth medical billing codes that providers must use to represent that certain services have been delivered and to receive reimbursement for those services. These codes are either Healthcare Common Procedure Coding System ("HCPCS") codes, current procedural terminology ("CPT") codes, or some combination of the two. By submitting a bill with a code for a service that (i) was not rendered or (ii) was not

-20-

1  rendered consistent with the contractual or statutory requirements for the code's usage, a

2  provider makes an expressly and/or impliedly false statement.

3       76.    Medi-Cal managed care contracts also require providers to use certain billing

4  code modifiers to indicate the type of provider—e.g., a BCBA, BCaBA or RBT—who delivered

5  the ABA service.  Some contracts further require that providers use billing codes and modifiers

6  to denote that appropriate BCBA supervision has occurred.  By submitting a bill with a code or

7  modifier that (i) does not correspond to the service provider's qualifications or (ii) indicates that

8  supervision has occurred when it has not, a provider makes an expressly and/or impliedly false

9  statement.

10       77.    Separately, Medi-Cal managed care plans require their contracted providers to

11  collect co-payments from plan beneficiaries for certain ABA services rendered.  *See, e.g.*,

12  Exhibit 1 at Article III, § 3.3 ("Collection of Co-Payments: Provider shall collect all applicable

13  co-payments from Plan Members").  Submitting a claim for payment implicitly represents that

14  the provider has complied with its contractual obligation to collect co-payments; if the provider

15  has not collected the co-payment, the claim is implicitly false.

16  **B.**    **Commercial Insurance**

17       78.    Since July 1, 2012, the State of California has required private insurers to cover

18  "behavioral health treatment for pervasive developmental disorder or autism."  Cal. Ins. Code

19  § 10144.51(a)(1).  Coverage must include ABA therapy.  *Id.* § 10144.51(c)(1).

20       79.    As with Medi-Cal, ABA therapy must be provided pursuant to a treatment plan

21  developed by a QAS provider.  *Id.* § 10144.51(c)(1)(C).

22       80.    As with Medi-Cal, "treatment is provided under a treatment plan prescribed by a

23  qualified autism service provider and is administered" by either a QAS provider; a QAS

-21-

1  professional supervised by the QAS provider; or a QAS paraprofessional supervised by a QAS

2  provider or professional. *Id.* § 10144.51(B).

3      81.    As with Medi-Cal managed care plans, commercial insurers incorporate and

4  expand upon these statutory requirements in contracts with ABA providers.

5
6      82.    For example, Aetna's "Provider and Facility Participation Criteria" manual states:

7  "Services must be provided directly or supervised by individuals licensed by the state or certified

8  by the Behavior Analyst Certification Board as board-certified behavior analysts (BCBAs)."

9  Aetna, *Provider and Facility Participation Criteria* 32-33 (2018).[18]  This manual further requires

10 that there "must be supervision of the unlicensed or noncertified paraprofessionals" and that:

11
       Policies and procedures for the supervision of paraprofessionals must be
12     documented. A minimum of one hour of face-to-face supervision is required of the
       unlicensed or noncertified paraprofessional by a BCBA or licensed psychologist
13     (or behavioral health professional) for each 10 hours of applied behavior analysis
       by the supervised provider. In addition, the supervisor must be onsite with the child
14     at least one hour a month, face to face, to provide direct supervision of the
       paraprofessional.
15 *Id.* at 33. Aetna's "Provider and Facility Participation Criteria" also specifically incorporates the

16 requirements of Cal. Health & Safety Code § 1374.73(a) as additional California-specific autism

17 provider criteria. *Id.* at 45.

18     83.    Similarly, Aetna's ABA "Applied Behavior Analysis Medical Necessity Guide"

19 states: "Services must be provided directly or billed by individuals licensed by the state or

20 certified by the Behavior Analyst Certifying Board unless state mandates, plan documents or

21 contracts require otherwise." Aetna, *Applied Behavior Analysis Medical Necessity Guide* at 2

22 (2015).[19]

23

24
_____
25 [18] http://www.aetna.com/healthcare-professionals/documents-forms/provider-facility-
   participation-criteria.pdf

26 [19] http://www.aetna.com/healthcare-professionals/documents-forms/applied-behavioral-
   analysis.pdf
27                                          -22-

84.     And Aetna's "Outpatient Behavioral Health (BH) – ABA Treatment Request" precertification form requires providers to check a box indicating the "essential elements are met" including "Service providers are appropriately licensed/certified."[20]

85.     As with Medi-Cal managed care contracts, contracts between private insurers and providers set forth medical billing codes that providers must use to represent that certain ABA services have been delivered and to receive reimbursement for those services.  By submitting a bill with a code for a service that (i) was not rendered or (ii) was not rendered consistent with the contractual or statutory requirements for the code's usage, a provider makes an expressly and/or impliedly false statement.

86.     As with Medi-Cal managed care, some private insurance contracts further require that providers use billing codes and modifiers to indicate the type of provider—e.g., a BCBA, BCaBA, or RBT—who delivered the ABA service.  Some contracts further require that providers use billing codes and modifiers to denote that appropriate BCBA supervision has occurred.  By submitting a bill with a code or modifier that (i) does not correspond to the service provider's qualifications or (ii) indicates that supervision has occurred when it has not, a provider makes an expressly and/or impliedly false statement.

87.     Separately, private insurers require their contracted providers to collect co-payments from plan beneficiaries for ABA services rendered.  Submitting a claim for payment implicitly represents that the provider has complied with its contractual obligation to collect co-payments; if the provider has not collected the co-payment, the claim is implicitly false.

---

[20] http://www.aetna.com/pharmacy-insurance/healthcare-professional/documents/outpatient-behavioral-health-BH-ABA-assessment-precert.pdf

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1

**C.    California Department of Developmental Services**

2

88.    The California Department of Developmental Services ("DDS") administers the

3

Lanterman Developmental Disabilities Services Act.  The Lanterman Act provides for the

4

coordination and provision of services and support that enable people with developmental

5

disabilities to lead more independent, productive, and integrated lives.

6

7

89.    DDS carries out its responsibilities through 21 community-based, non-profit

8

corporations known as Regional Centers.  Regional Centers contract with DDS to provide or

9

coordinate services and supports for individuals with developmental disabilities, including ASD.

10

90.    Historically, Regional Centers have served as the primary safety net for these

11

Californians.  Since 2016, however, children under 21 with ASD receiving ABA services from a

12

Regional Center have been transitioned to Medi-Cal managed care plans to receive the EPSDT

13

benefit.  DHCS, *All Plan Letter 15-025, supra.*

14

15

91.    For fiscal year 2018-2019, the State of California allocated $6.9 billion to

16

Regional Centers for the coordination and provision of developmental services.  DDS, *Final*

17

*Enacted Budget* (July 2018).[21]  The funding is a mix of both state and federal monies.  *Id.*

18

92.    Regional Centers contract with vendors who directly provide ABA services to

19

individuals with ASD.  Title 17 of the California Code of Regulations governs the Regional

20

Center system and the vendors with which the Centers contract.

21

22

93.    Among other things, Title 17 requires vendors to:

23

- "Maintain records of services provided to consumers in sufficient detail to verify
delivery of the units of service billed."  17 C.C.R. § 54326(a)(3).

24

25

26

[21] https://www.dds.ca.gov/Budget/Docs/2018_2019DDSHighlightsFinalEnactedBudget_201807
.pdf

27

28

- "Make available any books and records pertaining to the vendored service, including . . . portions of any personnel records that are necessary to ensure staff qualifications comply with the requirements contained in Section 56724, and Section 56770 or 56792 of these regulations . . . ." *Id.* § 54326(a)(4).

- "Bill only for services which are actually provided to consumers and which have been authorized by the referring regional center." *Id.* § 54326(a)(10).

- "Not bill for consumer absences for nonresidential services. . . ." *Id.* § 54326(a)(11).

- "Agree to accept the rate established, revised or adjusted by the Department as payment in full for all authorized services provided to consumers . . ." *Id.* § 54326(a)(12).

- "Comply with all applicable staffing ratio requirements." *Id.* § 54326(a)(13).

- "[M]aintain complete service records to support all billing/invoicing for each regional center consumer in the program," *id.* § 50604(d), which "records shall be supported by source documentation," *id.* § 50604(e).

94.    Title 17 also requires vendors to be "vendored separately for each type of service provided." *Id.* § 54326(a)(8). Title 17 sets forth "service codes" and definitions for the following types of vendors:

- "**Behavior Analyst – Service Code 612.** Behavior Analyst means an individual who assesses the function of a behavior of a consumer and designs, implements, and evaluates instructional and environmental modifications to produce socially significant improvements in the consumer's behavior through skill acquisition and the reduction of behavior. Behavior Analysts engage in functional assessments or functional analyses to identify environmental factors of which behavior is a function. A Behavior Analyst shall not practice psychology, as defined in Business and Professions Code section 2903. **A regional center shall classify a vendor as a Behavior Analyst if an individual is recognized by the national Behavior Analyst Certification Board as a Board Certified Behavior Analyst.**" *Id.* § 54342(a)(11) (emphasis added).

- "**Behavior Management Consultant – Service Code 620**. (A) A regional center shall classify a vendor as a behavior management consultant if the vendor designs and/or implements behavior modification intervention services and meets the following requirements:

-25-

(1) Individuals vendored as a behavior management consultant prior to, or as of, December 31, 2006, that have not previously completed twelve semester units in applied behavior analysis, shall have until December 31, 2008 to complete twelve semester units in applied behavior analysis and possess a license and experience as specified in 3. through 7. below.

(2) Individuals vendored as a behavior management consultant on, or after, January 1, 2007, shall, prior to being vendored, have completed twelve semester units in applied behavior analysis and possess a license and experience as specified in 3. through 7. below.

(3) Possesses a valid license as a psychologist from the Medical Board of California or Psychology Examining Board; or

(4) Is a Licensed Clinical Social Worker pursuant to Business and Professions Code, Sections 4996 through 4998.7; or

(5) Is a Licensed Marriage and Family Therapist pursuant to Business and Professions Code, Sections 4980 through 4984.7; or

(6) Is any other licensed professional whose California licensure permits the design and/or implementation of behavior modification intervention services.

(7) Have two years experience designing and implementing behavior modification intervention services." *Id.* § 54342(a)(13).

- **"Associate Behavior Analyst - Service Code 613**. A regional center shall classify a vendor as an Associate Behavior Analyst if the vendor assesses the function of a behavior of a consumer and designs, implements, and evaluates instructional and environmental modifications to produce socially significant improvements in the consumer's behavior through skill acquisition and the reduction of behavior, **under direct supervision of a Behavior Analyst or Behavior Management Consultant**. Associate Behavior Analysts engage in descriptive functional assessments to identify environmental factors of which behavior is a function. Associate Behavior Analysts shall not practice psychology, as defined in Business and Professions Code Section 2903. **A regional center shall classify a vendor as an Associate Behavior Analyst if an individual is recognized by the National Behavior Analyst Certification Board as a Board Certified Associate Behavior Analyst**." *Id.* § 54342(a)(8) (emphasis added).

- **"Behavior Management Assistant - Service Code 615**. A regional center shall classify a vendor as a behavior management assistant if the vendor designs and/or implements behavior modification intervention services **under the direct supervision of a behavior management consultant**; or if the vendor assesses the

-26-

function of a behavior of a consumer and designs, implements, and evaluates instructional and environmental modifications to produce socially significant improvements in the consumer's behavior through skill acquisition and the reduction of behavior, **under direct supervision of a Behavior Analyst or Behavior Management Consultant, and** meets either of the following requirements: (A) Possesses a Bachelor of Arts or Science Degree and has either: 1. Twelve semester units in applied behavior analysis and one year of experience in designing and/or implementing behavior modification intervention services; or 2. Two years of experience in designing and/or implementing behavior modification intervention services. (B) Is registered as either: 1. A psychological assistant of a psychologist by the Medical Board of California or Psychology Examining Board; or 2. An Associate Licensed Clinical Social Worker pursuant to Business and Professions Code, Section 4996.18." *Id.* § 54342(a)(12) (emphasis added).

• **"Behavior Management Technician (Paraprofessional) - Service Code 616**. . . . The Behavior Management Technician (Paraprofessional) shall practice **under the direct supervision of a certified Behavior Analyst or a Behavior Management Consultant who is within the same vendored group practice**. The Behavior Management Technician (Paraprofessional) implements instructional and environmental modifications to produce socially significant improvements in the consumer's behavior through skill acquisition and the reduction of behavior. The Behavior Management Technician (Paraprofessional) shall meet the following requirements: (1) Has a High School Diploma or the equivalent, has completed 30 hours of competency-based training designed by a certified behavior analyst, and has six months experience working with persons with developmental disabilities; or (2) Possesses an Associate's Degree in either a human, social, or educational services discipline, or a degree or certification related to behavior management, from an accredited community college or educational institution, and has six months experience working with persons with developmental disabilities." *Id.* § 54342(b) (emphasis added).

95.    As the foregoing definitions make clear, services performed by Associate Behavior Analysts, Behavior Management Assistants, and Behavior Management Technicians (paraprofessionals) **must be directly supervised** by either a certified Behavior Analyst or a Behavior Management Consultant.  Typically, the individual fulfilling this supervisory role is a BCBA.

96.    The non-profit entities that manage Regional Centers enter into contracts with providers of ABA services, like 360 Behavioral Health.  When providers bill Regional Centers

for ABA services, they use the codes discussed above to indicate who rendered the service. When a provider uses one of the above service codes to bill a Regional Center's managing entity, but the service was not actually rendered by an individual who meets the regulatory definition associated with the code—including any supervision requirements—that provider makes an expressly and/or impliedly false statement.

97.    California law permits either a Regional Center or DDS to "recover from the provider funds paid for services when the department or the regional center determines that either of the following has occurred: (1) The services were not provided in accordance with the regional center's contract or authorization with the provider, or with applicable state laws or regulations [or] (2) [t]he rate paid is based on inaccurate data submitted by the provider on a provider cost statement." Cal. Welf. & Inst. Code § 4648.1(e).  California law also permits a Regional Center to "terminate payments for services . . . if it determines that the provider has not complied with provisions of its contract or authorization with the regional center or with applicable state laws and regulations." *Id.* § 4648.1(d).

**D.    TriCare**

98.    TRICARE, administered by the U.S. Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1071 *et seq.*; 32 C.F.R. § 199.4(a).  TRICARE covers ABA services for beneficiaries with ASD through the Comprehensive Autism Care Demonstration ("ACD") project.  TRICARE Operations Manual ("TOM") 6010.59-M, Ch. 18, § 4.1 (Jan. 4, 2019).

99.    In California, TRICARE contracts with HealthNet Federal Services to administer ABA treatment.  HealthNet Federal Services, in turn, contracts with providers like 360 Behavioral Health to deliver that treatment.

-28-

1    100.    Just like the State of California, TRICARE requires ABA providers to comply

2   with specific treatment, supervision, and documentation guidelines in order to receive

3   reimbursement.  Corporate providers of ABA services to TRICARE beneficiaries, like 360

4   Behavioral Health, expressly agree to comply with the requirements set forth in Chapter 18,

5   Section 4 of the TRICARE Operations Manual.  Exhibit 2 (Participation Agreement for

6   Comprehensive Autism Care Demonstration Corporate Services Provider).

7

8    101.    As with the State of California, TRICARE requires providers to perform a one-

9   on-one assessment of a patient at the outset of treatment to create a patient-specific treatment

10   plan.  TOM, 6010.59-M, Ch. 18, §§ 4.4.2, 4.8.5.1.

11    102.    An "**authorized ABA supervisor**" must complete the assessment, develop the

12   treatment plan, and update the treatment plan based on periodic reassessments.  *Id.* §§ 4.4.2,

13   4.45; *id.* § 4.8.1.2.2.2 ("[A]n authorized ABA supervisor will plan, deliver, and/or supervise an

14   ABA program.").  TRICARE defines "authorized ABA supervisor" as a Licensed Behavior

15   Analyst, BCBA, BCBA-D, "or other master's level or above TRICARE authorized ABA

16   providers practicing within the scope of their state licensure or state certification."  *Id.* § 4.4.7.

17   Because California does not yet have its own behavior analyst licensing requirements, TRICARE

18   authorized ABA supervisors in the state must be BCBAs or BCBA-Ds. *See id.* §§ 4.6.1.2,

19   4.6.1.3.

20

21    103.    As with the State of California, TRICARE permits less-qualified individuals to

22   directly administer ABA treatment services to patients, when proper supervision is provided.

23   Direct care can be administered by **assistant behavior analysts**, whom TRICARE expressly

24   defines as "**supervised**" Licensed Assistant Behavior Analysts, BCaBAs, and Qualified Autism

25

26

27                                        -29-

Service Practitioners.[22]  *Id.* § 4.4.6 (emphasis added).  Assistant behavior analysts "must work under the supervision of an authorized ABA supervisor." *Id.* § 4.6.2.5.

104.    **Behavior technicians** ("BTs") also may deliver ABA services.  "Behavior technician" "refers to high-school graduate level paraprofessionals who deliver one-on-one ABA services to beneficiaries **under the supervision of the authorized ABA supervisor,** and includes RBTs [Registered Behavior Technicians], ABATs [Applied Behavior Analyst Technicians], and BCATs [Board Certified Autism Technicians]." *Id.* § 4.4.10 (emphasis added).

105.    For any given patient, either an authorized ABA supervisor or assistant behavior analyst must provide ongoing, direct supervision of behavior technicians "for a minimum of 5% of the total hours spent providing one-on-one ABA services per a 30 consecutive day period." *Id.* § 4.4.13.  This direct supervision must include "at least two face-to-face, synchronous contacts per a 30 consecutive day period during which the supervisor observes the BT providing service."  *Id.*  At least one of these sessions must be conducted in person.  *Id.*

106.    BTs may not conduct ABA assessments or establish treatment plans.  *Id.* § 4.6.3. "Claims for BTs who are not properly supervised in accordance with ACD requirements **will be denied**."  *Id.* (emphasis added); *see also id.* § 4.6.2.4. ("Only direct supervision, where the authorized ABA supervisor directly observes the assistant behavior analyst providing services with the beneficiary or the beneficiary's parents/caregivers, will be reimbursed.").

---

[22] "Qualified Autism Service Practitioner" is a certification offered by the Qualified Applied Behavior Analysis Credentialing Board.  Among other things, Qualified Autism Service Practitioners must possess at least a bachelors degree; complete 180 hours of ABA coursework; and perform fieldwork under the supervision of a BCBA.  QABA, *QASP Certification* (last visited Mar. 4, 2019), https://qababoard.com/qualified-autism-services-practitioner-credential/.

107.    Authorized ABA supervisors "[s]erve as direct supervisors of the assistant behavior analysts and BTs and ensure that the quality of the ABA services provided by assistant behavior analysts and BTs meets the minimum standards promulgated by the applicable certifying body recommendations, rules, and regulations." *Id.* § 4.6.1.10.

108.    TRICARE also imposes strict documentation requirements for ABA services. *See generally id.* §§ 4.17.0-4.17.4.3. For each session with a patient, rendering clinicians must maintain narrative summaries that relate to the goals and objectives outlined in the beneficiary's treatment plan. TRICARE Policy Manual, Ch. 1, § 5.1 (Apr. 2015). "Failure to adequately document medical care will result in complete or partial denial of the claim." U.S. Dep't of Def. Inspector Gen., *TRICARE North Region Payments for Applied Behavior Analysis Services for the Treatment of Autism Spectrum Disorder* 4 (Mar. 14, 2018).[23]

109.    As they do with other payors, providers like 360 Behavioral Health use CPT and other medical codes to bill the TRICARE program for ABA services.[24] For example, providers use CPT 0359T to bill for the ABA assessment and treatment plan; CPT 0360T and CPT 0361T to bill for supervised fieldwork; and CPT 0364T and CPT 0365T to bill for direct, one-on-one ABA services. *See* TOM, 6010.59-M. Ch. 18, §§ 4.12.0-4.12.6.

110.    Claims for payment to TRICARE must identify the provider who rendered the service using one of three HIPAA taxonomy designations: 103K00000X Behavior Analyst for

---

[23] https://www.oversight.gov/sites/default/files/oig-reports/DODIG-2018-084.pdf

[24] Effective January 1, 2019, TRICARE adopted the American Medical Association's new CPT Category I codes for ABA services. TRICARE, *West Region Provider Handbook* 85 (Jan. 2019), https://www.tricare-west.com/content/dam/hnfs/tw/prov/resources/pdf/Op2_HNFS_Jan2019_West_Prov_Hndbk.pdf

master's level and above; 106E00000X Assistant Behavior Analyst; 106S00000X Behavior Technician. *Id.* § 4.11.5.

111.    By submitting a bill to TRICARE or its subcontractors using a CPT or billing code for a service that (i) was not rendered; or (ii) was not rendered consistent with TRICARE's requirements for the code's usage, a provider makes an expressly and/or impliedly false statement.

112.    Similarly, by submitting a bill to TRICARE or its subcontractors using a CPT or billing code that (i) does not correspond to the service provider's qualifications or (ii) indicates that supervision has occurred when it has not, a provider makes an expressly and/or impliedly false statement.

**E.    The Federal Anti-Kickback Statute and State Analogues**

113.    By routinely waiving patient co-payment obligations without regard to ability to pay, Defendants have provided unlawful kickbacks to patients within the meaning of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), California Business and Professions Code section 650, and the California IFPA, Cal. Ins. Code § 1871.7(a).  Claims tainted by kickbacks are false claims for the purposes of the federal False Claims Act, the California False Claims Act, and the California IFPA.

114.    The federal Anti-Kickback Statute is designed to remove the influence of money on healthcare decisions, including by prohibiting the provision of remuneration to patients to induce them to utilize services.  Specifically, the federal Anti-Kickback Statute forbids offering or paying "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" to induce or reward any person for referring,

-32-

1  recommending, or arranging for the purchase of any item or service for which payment may be

2  made under a federally funded healthcare program.  42 U.S.C. § 1320a-7b(b).

3      115.    The federal Anti-Kickback Statute applies not only to payments to providers in a

4  position to refer federal healthcare business, but to patients themselves.  When a government

5  healthcare program such as Medicare and Medicaid requires a patient to make a co-payment for

6  a service, routine waiver of that co-payment by a provider, without consideration of a patient's

7  ability to pay, may be illegal remuneration under the federal Anti-Kickback Statute.  *See* U.S.

8  Dep't of Health & Human Servs., Office of the Inspector Gen., Special Fraud Alert (Dec. 19,

9  1994) (stating that co-payment waivers "must not be used routinely; [they] should be used

10  occasionally to address the special financial needs of a particular patient").  As explained by the

11  OIG, "[r]outine waiver of deductibles and copayments by charge-based providers, practitioners

12  or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback

13  statute, and (3) excessive utilization of items and services paid for by Medicare."  *Id.*

14

15

16      116.    Claims to Medicare and Medicaid for reimbursement for services that are tainted

17  by kickbacks constitute false claims under the federal False Claims Act.  42 U.S.C. § 1320a-

18  7b(g).

19      117.    California Business and Professions Code section 650 likewise prohibits the

20  payment of kickbacks to healthcare providers or others in exchange for their directing how and

21  where patients receive healthcare services.  *See* Cal. Bus. & Prof. Code § 650.  Like the federal

22  statute, this prohibition logically extends to the prevention of bribery of patients to induce them

23

24  to use a provider's services, such as by waiving co-payment obligations.

25      118.    Neither the United States nor the State of California would pay claims for services

26  if they knew they were tainted by kickbacks.

27                                          -33-

28

119.   The California IFPA similarly prohibits the payment of kickbacks in connection with claims submitted to private insurers. Cal. Ins. Code § 1871.7(a). Much like the federal Anti-Kickback statute, California IFPA's prohibition on kickbacks seeks to prevent overutilization. A patient who receives a kickback in the form of a co-payment waiver is more likely to utilize unnecessary services, thereby causing ratepayers to pay higher rates.

120.   Private insurers, like federal and state governments, would not pay claims if they knew they were tainted by illegal kickbacks.

## VI.   FACTUAL ALLEGATIONS

121.   Since at least 2012, Defendants have been engaged in two distinct fraudulent schemes. First, Defendants have knowingly failed to provide the required BCBA direction and supervision of ABA services they rendered, yet they nonetheless made claims for reimbursement for those services to private insurance, Medi-Cal, state Regional Centers, and TRICARE that expressly and/or impliedly represented that they had done so. This misconduct includes both Defendants' knowing failure to have BCBAs assess patients and reevaluate appropriate treatment plans and to have BCBAs provide required supervision of the paraprofessionals delivering treatment. As described below, this misconduct results in the submission of both expressly and impliedly false claims for payment to private and public payors.

122.   Second, Defendants have knowingly failed to collect or attempt to collect co-payments from patients covered by Medi-Cal and private insurance plans, without regard to patients' ability to pay. Claims to public or private payors that are tainted by these kickbacks are false claims.

-34-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.    Background on 360 Behavioral Health**

**1.    History and Private Equity Acquisition**

123.    Dr. Ali Sadeghi and Dr. Leili Zarbakhsh, husband and wife, have been providing behavioral health services to individuals living with autism for approximately 20 years through a variety of corporate entities, including California Psychcare and Z&S. Drs. Sadeghi and Zarbakhsh ran a small business with limited internal controls and business infrastructure. For a brief period following Dr. Sadeghi's unexpected death in February 2017, Dr. Zarbakhsh solely managed California Pyschcare and/or Z&S.

124.    At some point in 2017, private equity firm DW Healthcare sought to purchase Z&S and its affiliates from Dr. Zarbakhsh. DW Healthcare eventually acquired the company on March 31, 2018. It paid approximately $60 million for Z&S and its affiliates under Dr. Zarbakhsh's control and $27 million for property owned by Dr. Zarbakhsh and/or Z&S.

125.    DW Healthcare renamed its newly-acquired company "360 Behavioral Health." However, California Psychcare continues to operate under that name as a subsidiary of 360 Behavioral Health/Z&S, running the company's ABA programs.

126.    Seeking to quickly finalize the acquisition, DW Healthcare performed inadequate due diligence before the purchase. As Relator learned from principals at DW Healthcare, the firm was willing to forgo thorough due diligence given the asset's relatively low price. Behavioral health care is a trending area for private equity investment, and the price DW Healthcare paid for the asset was considered a "steal." DW Healthcare paid 6x EBITDA for Z&S and its affiliates; a few months later, another private equity firm paid 26x EBITDA for a similar asset.

-35-

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

127.    Even though DW Healthcare had nearly a year to perform due diligence, it waited to do so until the last minute.  Shortly before the deal was finalized, DW Healthcare hired the Marwood Group to prepare a due diligence report and Oswald Financial to evaluate human resources.  Neither firm, however, had access to the data needed to perform sufficient diligence under a short timeline.  These brief investigations yielded only two concerns involving employee wages and health benefits—not the pervasive supervision and co-pay failures addressed in this Complaint.  Indeed, DW Healthcare had also considered purchasing Z&S when Dr. Sadeghi was alive, but never conducted the appropriate due diligence to discover these pervasive failures.

### 2.    Relator's Arrival at the Company

128.    Management consulting firm Korn Ferry recruited Relator for the CEO position at 360 Behavioral Health.  Korn Ferry first contacted Relator in January 2018, when DW Health Care was still exploring the potential acquisition.  Over the following weeks, Relator met with the DW Healthcare team, including managing directors Rod Boone and Aly Champsi, who assured Relator there were no due diligence concerns.  Instead, DW Healthcare told Relator that Z&S and its affiliates were healthy companies, simply in need of more robust infrastructure.

129.    After meeting Dr. Zarbakhsh in mid-March 2018, Relator assumed the role of CEO and Executive Chairman of the Board of Directors of 360 Behavioral Health on April 1, 2018.  The Board consisted of four managing directors from DW Healthcare, including Rod Boone and Aly Champsi, and Sandra Bocela of OPTrust, a Canadian company that administers public pension plans.

-36-

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1

### 3.     Organization and ABA Service Delivery Model

2      130.     360 Behavioral Health provides services through at least two subsidiaries:

3   California Pyschcare and Behavior Respite in Action ("BRIA"). The company now provides all

4   of its ABA services through California Pyschcare.

5
      131.     360 Behavioral Health provides ABA services to approximately 2,500 individuals
6
7   with autism in at least eleven California counties: Imperial County; Kern County; Los Angeles

8   County; Orange County; Riverside County; San Bernardino County; San Diego County; San

9   Joaquin County; San Luis Obispo County; Santa Barbara County; and Santa Clara County. 360

10   Behavioral Health maintains at least one physical office, called a "center," in each of these

11   counties. The company currently operates approximately 25 centers.

12
      132.     360 Behavioral Health employs or contracts with approximately 4,000 individuals
13
14   to both manage and directly provide ABA services. The vast majority of 360 Behavioral

15   Health's 4,000 staff members are paraprofessionals, such as RBTs, who work part time and

16   directly provide services to patients.

17      133.     As of October 2018, the company employed four Regional Directors: Stephanie

18   Richardson, Niki Mostadim, Jessica Robles, and Marina Simonyan. Regional Directors manage

19   the 360 Behavioral Health centers and direct services provided within their region. The Regional
20
21   Directors reported to Theresa Howell and Aysa Schaffer, the two Clinical Supervisors of

22   California Psychcare.

23      134.     360 Behavioral Health currently employs roughly 75 BCBAs. When Relator

24   became CEO in April 2018, the company employed roughly 50 BCBAs.

25      135.     Today, approximately 55% of the individuals who receive ABA services from

26   360 Behavioral Health participate in a Medi-Cal managed care plan, have private insurance

27                                          -37-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
         CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    coverage, or are enrolled in TRICARE. Approximately 40% of 360 Behavioral Health's

2    patients' care is funded by a Department of Developmental Services Regional Center. The

3    funding for the remaining 5% is derived from school districts. As to TRICARE, 360 Behavioral

4    Health serves a small group of individuals at Ridgecrest Naval Base in Ridgecrest, California.

5
6    136.    In order to deliver care to Medi-Cal recipients, 360 Behavioral Health contracts[25]

7    (i) directly with a Medi-Cal managed care plan or (ii) with a behavioral health subcontractor of a

8    Medi-Cal managed care plan. 360 Behavioral Health similarly contracts directly with private

9    insurance plans, or with a behavioral health subcontractor of a private insurance plan, to provide

10   care to patients who are privately insured. In some instances, however, 360 Behavioral Health

11   provides services to individuals based solely on patient-specific Letters of Authorization from

12   Medi-Cal managed care plans and private insurance plans.

13
14   137.    When 360 Behavioral Health provides services to individuals through DDS-

15   funded Regional Centers, it does so pursuant to contracts with those Regional Centers or their

16   managing entities. Similarly, when 360 Behavioral Health provides services to TRICARE

17   beneficiaries, it does so through subcontracts with a TRICARE-contracted provider.

18   138.    At a minimum, 360 Behavioral Health contracts with the following specific

19   entities to deliver ABA services: North Los Angeles Regional Center; Tri-Counties Regional

20   Center; Inland Regional Center; Eastern Los Angeles Regional Center; Regional Center of

21   Orange County; San Diego Regional Center; Frank D. Lanterman Regional Center; San Gabriel

22   Valley/Pomona Regional Center; South Central Los Angeles Regional Center; Kern Regional

23   Center; Harbor Regional Center; Blue Cross; Blue Shield; Care First; Molina Healthcare; Inland

24
25   _____

26   [25] All contracts with private and public payors for ABA services are technically executed by
     California Psychcare.

27                                              -38-

1  Empire Health Plan; Kaiser; Kern Family Health Care; Beacon Health; CalOptima; Magellan

2  Health; Aetna; United Behavioral Health; Cigna; Self-Insured Schools of California; and "ABC

3  Per Choice"; and Cenpatico. These payors generated more than \$46 million in revenue for 360

4  Behavioral Health in 2018 alone.

5
6      139.    As discussed above, all of the contracts under which 360 Behavioral Health

7  provides services contain at least two common requirements: (1) ABA therapy must be designed,

8  directed, and routinely re-evaluated by a BCBA and (2) a designated minimum portion of ABA

9  therapy must be supervised by a BCBA.

10     **B.    Fraudulent Conduct[26]**

11
          **1.    360 Behavioral Health bills for ABA services that lacked appropriate
12            BCBA direction and supervision.**

13     140.    Since at least 2012, 360 Behavioral Health has failed to meet the legally and

14  contractually mandated standard of care for ABA therapy. Instead, it has regularly billed Medi-

15  Cal, private insurers, Regional Centers, and other payors for ABA services that were not directed

16  or supervised by BCBAs as required.

17
18     141.    Every contract under which 360 Behavioral Health provides ABA services

19  contains two core requirements: (1) a BCBA must direct treatment by performing an FBA,

20  creating a treatment plan, and regularly reassessing that treatment plan based on the patient's

21  progress and needs; and (2) a BCBA must supervise a certain percentage of direct behavioral

22  therapy provided by less-qualified individuals.

23
24
25
_____

26  [26] Unless specifically noted, references to 360 Behavioral Health include the company as it was
     constituted before and after DW Healthcare's acquisition in March 2018.

27                                          -39-
_____

28     COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
          CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

142.     For example, 360 Behavioral Health has a contract with Blue Shield of California's Promise Health Plan, a Medi-Cal managed care plan for San Diego County (previously known as Care1st Health Plan).  Exhibit 1.  The contract expressly incorporates the definitions of QAS provider, QAS professional, and QAS paraprofessional set forth in section 1374.73(c) of the California Health & Safety Code.  *Id.* at Article I, §§ 1.27-1.29.

143.     The contract requires 360 Behavioral Health to complete an FBA in order to develop a treatment plan for each patient.  *Id.* attach. A-1, § 1.1.5.  It also requires 360 Behavioral Health to reassess the patient every five months to develop a new treatment plan.  *Id.* attach. A-1, § 1.1.7.  The contract makes clear that only a QAS provider may perform, and bill, for these services.  Specifically, the contract contains a chart listing billing codes H0031, "Mental Health Assessment by non-physician*," and H0032, "Mental health service plan development by non-physician*."  *Id.* attach. B at 27.  The chart also indicates that only a "QAS Provider"—i.e., a BCBA or BCBA-D—may perform, and thus bill, for these services.  *Id.*  The contract further requires 360 Behavioral Health to use the billing modifier "HO" to indicate when supervision has been provided by a BCBA.  *Id.* attach. B at 29.

144.     360 Behavioral Health does not in fact provide a BCBA to assess each of Care1st's patients and develop unique treatment plans.  Nonetheless, 360 Behavioral Health bills Care1st using the codes H0031 an H0032, and the modifier HO, falsely representing that a BCBA performed these services, making the billed codes false statements.

145.     The contract also requires 360 Behavioral Health to provide "Therapeutic behavioral services (Direct Care)" to patients with ASD.  *Id.* attach. A at 23.  The contract requires 360 Behavioral Health to use the code H2019 to bill for these Direct Care services, defined as, among other things, "implementation of ABA based methodologies, treatment plan or

-40-

1  *protocol as designed by the supervising BCBA or BCBA-D*." *Id.* (emphasis added). The

2  contract explains that these Direct Care services can be performed by either a QAS provider,

3  professional, or paraprofessional. *Id.* attach. B at 28.  360 Behavioral Health uses QAS

4  paraprofessionals to provide these Direct Care services without the supervision of a BCBA or

5  BCBA-D, making the billed codes false statements.

6

7       146.    The contract also requires 360 Behavioral Health to provide "Supervision of

8  BCaBA and/or ABA Paraprofessional," and to use the code H0046 to bill for this supervision.

9  *Id.* attach. A at 22-23. The contract further requires 360 Behavioral Health to use the billing

10  modifier "HO" to indicate when supervision has been provided by a BCBA.  *Id.* attach. B at 29.

11  The contract sets forth the following terms of supervision:

12

13      5.1. Clinical direction, supervision, and management across **all phases including assessment, development, and implementation of the treatment**, and discharge.

14      5.2. Summarize and analyze data

15      5.3. **Directly observe therapy**

    5.4. **Meet and evaluate performance of direct line staff**

16      5.5. **Evaluate client progress towards treatment goals**

    5.6. Supervise implementation of treatment

17      5.7. Adjust treatment protocols based on data

18      5.8. Monitor treatment integrity

    5.9. Ensure satisfactory implementation of treatment protocols

19      5.10. 75% of Supervision can be completed by a QAS Professional

    5.11. **At least 25% of Supervision must be completed by a BCBA**

20      5.12. **80% of the monthly supervision hours billed must be with the client and/or parent/care-giver present.**

21      5.13. Services are to be requested in units – 1 hour is equal to 1 unit.

22  *Id.* attach. A at 22-23 (emphasis added).

23

24       147.    360 Behavioral Health does not provide BCBA supervision of Direct Care

25  services it renders to each of Care1st's patients in compliance with the contract's supervision

26

27      -41-

28  COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1  requirements. Nonetheless, 360 Behavioral Health bills Care1st using H0046 and modifier HO,

2  falsely representing that it has provided this supervision.

3     148.    Additionally, when 360 Behavioral Health bills for Direct Care services using the

4  code CPT H2019, it makes a false representation that the care has been provided pursuant to a

5  treatment plan designed and supervised by a BCBA. Using this code also amounts to an implied

6

7  false representation that the Direct Care services were supervised by a BCBA in accordance with

8  contractual, regulatory, and statutory requirements.

9     149.    360 Behavioral Health's contracts with other payors—including Medi-Cal

10  managed care plans, private insurers, Regional Centers, and TRICARE—contain BCBA

11  supervision requirements similar to those required by Care1st. As with Care1st, when billing

12  payors under these contracts, 360 Behavioral Health (1) uses billing codes and modifiers to

13

14  falsely represent that services were rendered by, or under the supervision of, a BCBA; and (2)

15  uses billing codes for direct care services that falsely represent that the services were rendered

16  under the supervision of a BCBA.

17     150.    For years, 360 Behavioral Health has knowingly employed an insufficient number

18  of BCBAs to meet the supervisory requirements of the patient population it serves. Despite this

19  insufficient staffing, 360 Behavioral Health has continued to treat patients without required

20

21  supervision and accept new patients.

22     151.    In February 2019, Relator instructed 360 Behavioral Health's clinical operating

23  team to provide a snapshot of the existing BCBA staffing levels for all of 360 Behavioral

24  Health's ABA patients. The snapshot revealed approximately **215 patients** who had no BCBA

25  assigned to them and had not seen a BCBA in months. That audit further revealed that

26  approximately **600 patients** had only a recently-hired BCBA assigned to them who had not yet

27                                                    -42-

28     COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
         CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

been approved by payors to provide services. In other words, 360 Behavioral Health could not bill for the ABA services provided to **approximately 815 patients, or nearly 1/3 of the 2,500 patients** receiving ABA services from the company.

152.    Nevertheless, 360 Behavioral Health has knowingly billed payors for behavioral therapy services neither directed nor supervised by BCBAs.

153.    360 Behavioral Health's leadership has been aware of its inadequate BCBA staffing levels and the resulting failure to provide appropriately-supervised ABA services for years. In November 2018, Dr. Jeremy Wilson, 360 Behavioral Health's Director of Process Improvement, completed an analysis of BCBA caseload that illustrated just how severe the problem had become. Exhibit 3. The analysis showed that well over half the company's BCBAs had a caseload that exceeded the Certification Board's ethical limit. Even worse, a plurality of BCBAs had caseloads at a level where the company was "**putting the BCBA at high risk for failure and our clients are high risk for injury, loss, or danger due to the lack of qualified supervision.**" *Id.* Wilson wrote, "[W]e need to increase the number of BCBA's . . . to make sure we are practicing ethically and responsibly." *Id.*

154.    This determination was not news to Defendants. For over a decade, 360 Behavioral Health maintained BCBA staffing levels that the company's management knew were insufficient to provide contractually and legally-mandated ABA direction and supervision. Defendants nonetheless falsely billed payors as though appropriate BCBA direction and supervision had been provided.

155.    To conceal the problem of insufficient BCBA staffing, 360 Behavioral Health billing staff have falsified patient records to indicate that specific BCBAs have (1) assessed or reassessed a patient to create or modify a treatment plan and/or (2) provided supervision of direct

-43-

1    care when, in fact, the BCBAs had not.  Often, the falsification has been done without the

2    BCBAs' knowledge.  Defendants even have falsified patient records to claim that BCBAs served

3    patients in geographic areas the BCBAs did not, or could not, serve, again without the BCBAs'

4    knowledge.  Because of this practice, patient records frequently identify one BCBA directing the

5    treatment of and supervising an impossibly high caseload of patients.  For example, an

6    impossibly large number of patient records show direction and supervision by BCBAs Jared

7    Freilich, Stephanie Richardson, and Edwin Tsai.

8

9        156.    The experience of CalOptima, one payor with which 360 Behavioral Health

10   contracts to serve approximately 140 patients, demonstrates the severity of the violations, as well

11   as their materiality to payors.  CalOptima is Orange County's exclusive Medi-Cal managed care

12   plan.  In late 2018, CalOptima audited the charts of a small portion of the CalOptima patients for

13   whom 360 Behavioral Health was contracted to provide ABA services.  The audit revealed that

14   BCBA direction and supervision of ABA either was not occurring or was not occurring at the

15   frequency represented by 360 Behavioral Health.

16

17       157.    Based on these findings, CalOptima decided not to grant 360 Behavioral Health a

18   new contract for 2019 and terminated the existing Letters of Authorization under which 360

19   Behavioral Health served CalOptima patients.  When Relator discussed these decisions with a

20   CalOptima representative on December 24, 2018, the representative accused the company of

21   "not providing appropriate treatment and no supervision for quite a while," and of committing

22   "fraud and abuse' going back 8 years."  Exhibit 4 (email sent by Relator to DW Healthcare

23   immediately following conversation).  On December 31, 2018, CalOptima informed 360

24   Behavioral Health that it had two open investigations into the company, one by its Fraud, Waste

25   and Abuse department and one by its Quality Improvement department.  Exhibit 5.

26

27                                                          -44-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
     CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

158.    On January 7, 2019, CalOptima sent 360 Behavioral Health a summary of its Quality Improvement audit findings and a series of questions.  In the letter, CalOptima explained that 360 Behavioral Health was failing to provide BCBA-supervised therapy, as required by law and contract:

- "A supervising BCBA must see the member in person regularly in order to do the initial FBA [functional behavior assessment], develop the treatment plan, oversee the implementation of the treatment plan and to determine the ongoing effectiveness of the treatment plan to determine if the plan needs to be adjusted.  This is consistent with the terms outlined in the Letter of Agreement(s), the CalOptima Transition Council Training, and the Behavior Analyst Certification Board's Practice Guidelines."

- "CalOptima supervision model follows [State Plan Amendment] 14-026 in which supervision of the paraprofessional occurs in the intervention setting."

- **"CalOptima does not consider the activities of the 'report reviewer' or an 'overseeing' BCBA who does not see the member face-to-face to be a supervising BCBA.  Therefore, neither of these two persons can provide indirect supervision."**

- "In addition to finding these same staffing shortages [identified in an earlier Department of Developmental Services Audit], our preliminary FWA [Fraud Waste and Abuse] and QI investigation has found a significant number of billing which are not supported by the medical records."

- "CalOptima has determined that CPC had inadequate BCBA supervision of CalOptima members which included, at a minimum:
  o Inadequate oversight of treatment plan
  o Inadequate oversight of ongoing therapy to determine effectiveness or need to adjust the treatment plan"

Exhibit 6 (emphasis in original).

159.    CalOptima specifically criticized 360 Behavioral Health's reliance on a "report reviewer" BCBA.  Rather than assign a local BCBA to observe and oversee therapy in person, 360 Behavioral Health had an off-site "report reviewer" monitor patient progress, even though this individual never met or interacted with the patient.  As the name suggests, the report

-45-

1 reviewer would purport to "supervise" treatment and "reevaluate" the patient's needs merely by

2 examining treatment notes from less qualified paraprofessionals.

3     160.   CalOptima rejected this second-hand supervision as plainly inadequate. As

4 CalOptima explained, "**A supervising BCBA must see the member in person regularly in**

5

6 **order to do the initial FBA, develop the treatment plan, oversee the implementation of the**

7 **treatment plan and to determine the ongoing effectiveness of the treatment plan to**

8 **determine if the plan needs to be adjusted.**" *Id.* (emphasis added).

9     161.   360 Behavioral Health responded on February 1, 2019, with a corrective action

10 plan that did not dispute CalOptima's core assertion: patients were not receiving the standard of

11 care required by law and contract. Exhibit 7 (2/1/19 corrective action plan). Rather, the

12 company agreed to eliminate the use of report reviewers for ABA supervision, implement new

13

14 training and controls to ensure BCBA supervision and correct billing, and increase staffing for

15 CalOptima patients, while it continued to investigate the breadth of the problem. *See Id.*

16     162.   In addition, when CalOptima asked 360 Behavioral Health whether it would

17 continue to use "report reviewers" for its "other lines of business," 360 Behavioral Health

18 equivocated. *Id.* at 3. ("[T]his CAP is focused on CalOptima, but our corrective action will be

19 addressed more broadly and *may include* improvements in other lines of business.") (emphasis

20 added).

21

22     163.   Notably, the CalOptima letter, as reflected in 360 Behavioral Health's corrective

23 action plan, referenced an audit of California Pyschcare conducted by the Department of

24 Developmental Services several years before, which similarly found that the company lacked

25 sufficient BCBAs and, as a result, failed to provide appropriately supervised services. *See infra*

26 for discussion of DDS audit conducted in 2011-2012. CalOptima pointedly asked whether

27 <div align="center">-46-</div>

28 <div align="center">COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE<br>CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT</div>

1 California Pyschcare "ever address[ed] the areas of non-compliance found in the Department of

2 Developmental Services audit?" *Id.* at 3.  360 Behavioral Health provided only a vague

3 response, because it had not remedied the problems raised by DDS.  *See id.*

4

164.    In response to the concerns raised by CalOptima, Stephanie Richardson (also

5 known as Stephanie London), the 360 Behavioral Health Regional Director with oversight over

6

7 Orange County, explained internally that, for years, Dr. Zarbakhsh and Dr. Sadeghi had been

8 aware of 360 Behavioral Health's failure to provide BCBA supervision and had instructed her to

9 falsify documentation of BCBA supervision in patient charts.  The company, in turn, billed

10 payors for this nonexistent BCBA supervision.  Richardson also reported that some patients in

11 her territory—which has also included San Bernardino and San Diego Counties—had not

12 received ABA services supervised by a BCBA **for at least two years**, but payors had

13

14 nonetheless been billed for these substandard, unsupervised services.

15 165.    In December 2018, Molina Healthcare, a Medi-Cal managed care plan for patients

16 in San Diego County, also confronted 360 Behavioral Health about its failure to provide BCBA

17 supervision of ABA therapy.  Molina Healthcare suspected 360 Behavioral Health of lying about

18 supervision after discovering that the company had listed the same supervising BCBA in

19 connection with 20 Molina patients receiving ABA services in San Diego County.  Molina has

20 since demanded repayment of nearly $700,000.

21

22 166.    Earlier this year, a 360 Behavioral Health billing employee conducted an internal

23 audit of claims the company submits to Cenpatico, a behavioral healthcare company that

24 contracts with Medi-Cal managed care plans to provide ABA services.  360 Behavioral Health

25 has a subcontract with Cenpatico to provide services to members of the Medi-Cal managed care

26 plan California Health & Wellness in Imperial County.  The internal audit revealed that for two

27                                                                                         -47-

28

years 360 Behavioral Health had billed Cenpatico for $1.9 million in ABA services allegedly supervised by a single BCBA—a physical impossibility. As of February 22, 360 Behavioral Health had not notified Cenpatico—or Medi-Cal, the ultimate payor—of this demonstrably false billing.

167.    360 Behavioral Health does not always falsify patient records to indicate that a BCBA supervised ABA services. In other cases, the patient records accurately reflect that no BCBA supervision has occurred. 360 Behavioral Health nonetheless bills payors for these ABA services as though they were properly supervised, using provider identifiers and/or billing codes indicating BCBA supervision had occurred. Knowing that payors would reject claims with no provider listed, billing staff were in some instances instructed to list non-BCBA paraprofessionals as the provider, in hopes that the payors would not notice the difference.

168.    For example, on August 30, 2018, the company received a letter from Inland Empire Health Plan ("IEHP"), a Medi-Cal managed care plan with which 360 Behavioral Health contracts to serve patients in at least San Bernardino and Riverside counties. *See* Exhibit 8 (Aug. 30, 2018 letter). The letter listed more than 400 claims submitted by 360 Behavioral Health for services allegedly rendered between April and June 2018. *Id.* IEHP stated that it was unable to process each claim because of "Missing/Invalid Rendering NPI (CMS 1500 Box 24J)."[27] *Id.* In an email dated October 26, 2018, which attaches the August 30, 2018, letter from IEHP, 360

---

[27] NPI stands for "National Provider Identifier," a standard unique identifier for healthcare providers including BCBAs; CMS Form 1500 is a standard health insurance claim form used not only by Medicare and Medicaid, but also private insurers and TRICARE. Notably, when a provider signs and submits CMS Form 1500 to a government payor, the provider "certif[ies] that . . . the information on this form is true, accurate, and complete" and has "provided or will provide sufficient information required to allow the government to make informed eligibility and payment decision." CMS, *Health Insurance Claim Form 1500,* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf

-48-

1    Behavioral Health employee Stephanie London explained her understanding that "the hold for

2    IEHP invoices is directly related to NO BCBA supervision which equals $663,197." Exhibit 9

3    (Oct. 26, 2018 email chain). In other words, IEHP refused to pay at least some of the 400 claims

4    submitted by 360 Behavioral Health because the company did not list the NPI of a credentialed

5
     BCBA in connection with the provision of ABA services that required a BCBA.
6

7          169.   The October 26, 2018, email also attaches a spreadsheet, "UserHold Project

8    8.29.18.xlsx," listing more than $2.2 million in claims payors were unwilling to pay at least in

9    part because 360 Behavioral Health did not provide an appropriate NPI. A significant portion of

10   the unpaid claims are associated with services "MH svc plan dev by non-md" (billing code

11   H0032) and "MH health assessment by non-md" (billing H0031)—services that require a BCBA.

12
     See supra, at paras. 142-49 (discussing Care 1st contract).
13

14         170.   As California law and provider contracts make clear, compliance with BCBA

15   supervision requirements is material to payors. Payors would not pay claims for ABA services

16   submitted by 360 Behavioral Health if they knew those services had not been provided or

17   supervised by a BCBA, or supervised at the required level. As the Board Certification

18   Guidelines and State Plan Amendment 14-026 explicitly state, direct BCBA supervision is

19   "critical" and "necessary" to the success of ABA therapy.

20
           171.   CalOptima also made this clear in December 2018 when it accused 360
21

22   Behavioral Health of fraud in connection with BCBA supervision and refused to enter a new

23   contract with the company. Similarly, as discussed above, both IEHP and Molina Healthcare

24   have either refused to pay or sought to recoup payment for claims indicating a lack of BCBA

25   supervision.

26

27                                              -49-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
          CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    172.    Private insurers—which must follow the same California laws governing the

2    delivery of ABA services as Medi-Cal managed care plans—would similarly refuse to pay

3    claims for ABA services submitted by 360 Behavioral Health if they knew the services lacked

4    appropriate and required BCBA supervision.  As discussed above, treatment and supervision by

5    qualified professionals is at the core of the widely-accepted care for persons with ASD.

6

7    173.    Compliance with supervision also drives the Department of Developmental

8    Services' decision whether to pay for care provided to individuals served through Regional

9    Centers.

10    174.    For example, DDS audited California Psychcare in connection with ABA services

11    provided by the company from June 30, 2008, through July 31, 2011, pursuant to contracts with

12    several Regional Centers.  DDS, *Department of Developmental Services Audit of California*

13    *Psychcare, Inc.*[28]

14

15    175.    The audit revealed that California Psychcare "staff who provided services under

16    Service Code 612 failed to meet the qualification required by CCR, Title 17 and were not

17    certified by the national Behavior Analyst Certification Board."  *Id.* at 12.  As discussed *supra*,

18    BCBAs fall under Service Code 612.  17 C.C.R. § 54342(a)(11).

19    176.    The audit explained that "if those providing service do not meet the required

20    qualification(s) for such service, they are not reimbursed at the same rate as those who possess

21    the required qualifications."  DDS, *supra*, at 12.

22

23

24

25

26    [28] https://www.dds.ca.gov/Transparency/docs/Vendors/californiaPsychare2011_12_2012_13.pdf

27

28    COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

177.    Because services were "provided by staff who did not meet the level of qualifications authorized for the service," DDS adjusted the reimbursement for services provided under Service Code 612 to a lower rate, recouping $645,804. *Id.*

178.    Compliance with supervision and other core ABA requirements also affects TRICARE's reimbursement decisions.  As recently as January 2019, the United States settled a lawsuit against East Coast Stepping Stones, Inc., a Florida-based provider of ABA services to military families under the TRICARE program.  The settlement resolved allegations that the company "misrepresented the [ABA] services provided and who had provided them" and also "failed to document services as required, and fabricated and altered medical records."  Press Release, Dep't of Justice, East Coast Stepping Stones, Inc., a Jacksonville-Based Provider for Children with Autism, Pays the United States $360,000 to Settle Allegations of Fraud (Jan. 28, 2019).[29]

### 2.    360 Behavioral Health Also Bills for ABA Services It Never Provided or Insufficiently Documented.

179.    In addition to billing payors for improperly supervised ABA services, 360 Behavioral Health bills payors for ABA services it simply never provided, with a qualified caregiver or otherwise.  Specifically, the company bills payors for treatment sessions that have been canceled by patients or that have been skipped by its employee.  To cover up this behavior, the company's employees often forge signatures of the patient's caregiver(s), which many payors require in order to verify the delivery of ABA services.  Plainly, payors would not pay 360 Behavioral Health for ABA services if they knew the company did not deliver them.

---

[29] https://www.justice.gov/usao-mdfl/pr/east-coast-stepping-stones-inc-jacksonville-based-provider-children-autism-pays-united

-51-

1    180.    The company also bills for ABA services that have been insufficiently

2 documented.  Because ABA requires constant reassessment to ensure that a patient's treatment

3 plan and goals adequately reflect a patient's needs, adequate documentation of rendered services

4 is essential.  Therapists constantly measure progress by collecting and recording data during each

5 therapy session.  Autism Speaks, *What is Applied Behavior Analysis?*[30]  All payors also require

6 thorough documentation of ABA services rendered.  It is generally understood in the healthcare

7 industry that if a service is not documented, it cannot be said to have occurred.  Because

8 documentation is central to the efficacy of ABA and industry-wide documentation requirements,

9

10 if payors knew ABA services were not properly documented, they would not pay 360 Behavioral

11 Health for delivering them.

12
### 3.    360 Behavioral Health Submits Claims That Are Tainted by Kickbacks
13

14    181.    During the relevant time period, 360 Behavioral Health also submitted false

15 claims tainted by at least two types of kickbacks.  First, 360 Behavioral Health maintains a de

16 facto policy not to collect co-payments from patients whose insurance requires their collection.

17
360 Behavioral Health's knowing refusal to collect co-payments violates the terms of its various
18
provider contracts, and each refusal to collect constitutes an illegal kickback.  Second, 360
19
20 Behavioral Health is currently providing services to some patients without billing their insurers

21 at all, in order to induce their insurer to continue referring the patients to the company.  Each

22 unbilled service is an illegal kickback.

23

24

25

26 [30] https://www.autismspeaks.org/applied-behavior-analysis-aba-0 (last visited Mar. 4, 2019)

27

28

1

a)    **360 Behavioral Health Routinely Waives Co-Payments**

2

182.    As to the co-payments, during a November 2018 meeting of 360 Behavioral

3

Health's executive leadership in Laguna Beach, discussion turned to building the company's

4

2019 budget.  To Relator's surprise, someone revealed that the company did not collect co-

5

payments.

6

7

183.    Shortly thereafter, Relator asked the compliance department to examine the

8

company's co-payment collection efforts.  Based on its review, the compliance department

9

informed Relator that the company has made no effort to collect co-payments since 2012.

10

184.    Also in early 2019, Relator hired Hardesty LLC, a management consulting firm,

11

to assess the company's internal financial and business processes.  On January 4, 2019, Hardesty

12

conveyed its discovery of a host of deficiencies, including "Not collecting client out of pocket

13

(copays, deductable [sic])," and "No current or historical client collections, lack of client

14

collection policies."  Exhibit 10 (Jan. 4, 2019 email from Hardesty's Domenic Giudice).

15

16

185.    The collection of co-payments is more than a contractual obligation for 360

17

Behavioral Health.  Co-payments also play an important role in deterring overutilization of

18

services.  If patients are aware that medical services will be completely free, with no co-

19

payments at all, many will use more medical services than they would if co-payments were

20

required, with resulting higher submission of claims to payors.  As discussed above, routine

21

22

waiver of co-payments without regard to ability to pay is a kickback within the meaning of the

23

federal Anti-Kickback Statute and the California analogues.  The federal government, which

24

funds the Medicaid program, would not have paid for claims submitted by 360 Behavioral

25

Health had it known that the company waived co-payments for services billed on those claims.

26

*See, e.g.*, Press Release, Dep't of Justice, United States Joins False Claims Act Lawsuit Against

27

-53-

28

Arriva Medical LLC and Alere Inc. (Feb. 19, 2019) (announcing government's intervention in a case against a mail-order diabetic testing supply company that "paid kickbacks to Medicare beneficiaries in the form of free glucometers and copayment waivers").[31]  Nor would California or the private insurers.

> **b)    360 Behavioral Health Provides Free Services to Induce Referrals.**

186.    Additionally, since at least February of this year, the company has been providing ABA services without billing certain patients' private or public insurers.  As explained in paragraph 151 above, 360 Behavioral Health's clinical team determined that approximately 600 patients were receiving care from BCBAs who were not approved by the patients' insurers.  Rather than return those patients to the insurer to be assigned to approved providers, 360 Behavioral Health has decided to continue to provide non-compliant services to these patients without billing their insurers.

187.    The company is providing free services because it fears the patients' insurers will discover its pervasive BCBA supervision failures and stop referring patients to 360 Behavioral Health.  The company's leadership intends to resume billing the insurers once it has sufficient BCBA staffing to appropriately supervise ABA therapy.  The decision to provide free services was made by 360 Behavioral Health's interim CEO Paul Fischer in consultation with DW Healthcare's Aly Champsi and Rod Boone.  In other words, 360 Behavioral Health is providing free ABA services with the intent to induce referrals.  These free services constitute remuneration and are therefore kickbacks under the federal FCA and California state analogues.

---

[31] https://www.justice.gov/opa/pr/united-states-joins-false-claims-act-lawsuit-against-arriva-medical-llc-and-alere-inc

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    **C.    Relator's Internal Reporting and Subsequent Termination**

2    188.    Relator first discovered 360 Behavioral Health's failure to properly supervise

3    ABA services in November 2018 when the company was confronted by CalOptima, discussed

4    *supra*.

5    189.    The reaction of 360 Behavioral Health's long-term employees to CalOptima's

6    concerns caused Relator to suspect that the issue was not confined to CalOptima.

7

8    190.    In the first week of December 2018, Relator informed DW Healthcare principals

9    Aly Champsi and Rod Boone that the CalOptima inquiry raised broader concerns about 360

10   Behavioral Health's failure to provide BCBA supervision and subsequent billing of payors.

11   From that point forward, Relator repeatedly raised these issues with Mr. Champsi, Mr. Boone,

12   and the rest of the company's Board of Directors.

13

14   191.    In the second week of December 2018, Relator presented at the quarterly meeting

15   of 360 Behavioral Health's Board of Directors. At this meeting, Relator again raised

16   CalOptima's concerns. He also explained that he had instructed Laura Padilla-Sauber, a non-

17   attorney who serves as 360 Behavioral Health's Chief Privacy and Compliance Officer, to

18   conduct a company-wide audit to determine the pervasiveness of the supervision failures. Ms.

19   Padilla-Sauber's intuition, with which Relator agreed, was that the supervision failures were not

20   confined to CalOptima. To ensure a rigorous and complete audit, Relator authorized the hiring

21   of approximately 10 additional compliance employees to support Ms. Padilla-Sauber's efforts.

22

23   192.    DW Healthcare responded to Relator's reporting and remedial efforts by

24   attempting to scapegoat and intimidate him. On December 18, Relator received a call from Mr.

25   Champsi. Mr. Champsi informed Relator that the 360 Board of Directors had received an email

26   from an anonymous account one day after the December Board meeting accusing Relator of

27                                              -55-

28

1  sexually harassing an unknown employee and creating a hostile work environment. These

2  allegations were completely false.

3      193.   Undeterred, Relator met with Mr. Champsi on December 19, where Relator again

4  raised the supervision and billing concerns. Rather than engage on these issues, Mr. Champsi

5  informed Relator that the Board was hiring a private firm to conduct an internal investigation

6

7  into the allegations against Relator. The investigation proceeded even though the person who

8  sent the anonymous email never identified him or herself or provided any further information.

9  The investigation found no evidence of sexual harassment and was closed. Mr. Boone and Mr.

10  Champsi spoke to Relator following the closure of the investigation and asked what he thought

11  about employee morale, and asked him to be thoughtful in certain employee interactions. They

12  were not critical of Relator's leadership or leadership style and agreed that Relator should

13

14  continue to be demanding with employees. Relator was not disciplined in any way.

15      194.   After December 19, Relator held weekly calls with Mr. Champsi to update him on

16  the billing issues and the audit's progress. As of February 22, 2019, no payors (other than those

17  who have complained to the company) had been informed of the pervasive problems.

18      195.   As discussed above, Relator also hired Hardesty LLC in January 2019 to assess

19  the soundness of 360 Behavioral Health's internal financial and business processes. The Board,

20  dominated by DW Healthcare, initially supported hiring Hardesty to fill the gap left by the

21  recently departed CFO, and Hardesty's original mandate was simply to address cash flow

22  problems.

23

24      196.   However, a mere week into Hardesty's 60-day contract, Hardesty's Domenic

25  Giudice provided Relator with a scathing preliminary assessment by email. Exhibit 10.

26  Giudice's "General Observations" included "Lack of enforceable policies," "Limited compliance

27                                              -56-

28  ────────────────────────────────────────────────
    COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
    CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1    to payer contracts/audit risk," and "Staffing levels." *Id.* Giudice also pointed out "Issues" that

2    included "Not collecting client out of pocket (copays, deductable [sic])," "No current or

3    historical client collections, lack of client collection policies," and "Ineffective credentialing,

4    inability to charge for services—contracting, certification." *Id.* Without the Board's support,

5    Relator directed Hardesty to continue its work.

6

7         197.    In early February, Mr. Champsi and Mr. Boone asked Relator to step down from

8    his position, citing cash flow issues, billing irregularities, and Relator's alleged creation of a

9    toxic work environment.

10        198.    As a result of Relator's efforts, 360 Behavioral Health has determined that it

11   needs to reduce the number of patients it serves. It has also determined not to bill certain payors

12   for services rendered without appropriate BCBA supervision, as discussed above.

13        199.    Yet as of February 22, 2019, the Defendants had not informed myriad payors that

14   it has been billing them for ABA services with limited or no BCBA supervision for years. Nor

15

16   have the Defendants met their legal obligations to refund these falsely-acquired payments.

17

18

19

20

21

22   **VII.    CAUSES OF ACTION**

23

24

25

26

27                                          -57-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
     CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

# Count I

## Federal False Claims Act

### 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), & (G)

200.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 199 above.

201.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

202.    By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Defendants, their agents, employees and co-conspirators knowingly have presented, or have caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

203.    By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Defendants, their agents, employees and co-conspirators knowingly have made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

204.    By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Defendants, their agents, employees and co-conspirators have made or used, or have caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

1    205.    By virtue of the acts described above, including on the basis of violations of the

2    federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Defendants, their agents, employees and

3    co-conspirators have conspired to commit violations of the three aforementioned provisions, in

4    violation of 31 U.S.C. § 3729(a)(1)(C).

5    206.    The United States Government, unaware of the falsity of the records, statements,

6    and claims that Defendants made, or caused to be made, paid, and continues to pay, the claims

7    that would not be paid but for Defendants' illegal conduct.

8

9    207.    Defendants have damaged, and continue to damage, the United States in a

10   substantial amount to be determined at trial.

11   208.    Additionally, the United States is entitled to the maximum penalty of up to

12   $21,562.80 for each and every violation alleged herein.

13

14                                    **Count II**

15                           **California False Claims Act**

16              **Cal. Gov't Code §§ 12651(a)(1), (2), (3), (7), & (8)**

17   209.    Relator realleges and incorporates by reference the allegations contained in

18   paragraphs 1 through 208 above.

19   210.    This is a claim for treble damages and penalties under the California False Claims

20   Act.

21

22   211.    By virtue of the acts described above, including on the basis of violations of the

23   federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Business & Professions Code § 650,

24   Defendants, their agents, employees and co-conspirators knowingly have presented, or have

25   caused to be presented, false or fraudulent claims to the State of California for payment or

26   approval, in violation of Cal. Gov't Code § 12651(a)(1).

27                                        -59-

28   COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
     CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

212. By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Business & Professions Code § 650, Defendants, their agents, employees and co-conspirators knowingly have made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the State of California to approve and pay such false and fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

213. By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Business & Professions Code § 650, Defendants, their agents, employees and co-conspirators knowingly have made, used, or caused to be made or used, false records or statements material to an obligation to transmit money to the State of California, and knowingly concealed or knowingly and improperly avoided an obligation to transmit money to the State of California, in violation of Cal. Gov't Code § 12651(a)(7).

214. By virtue of the acts described above, including on the basis of violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and Business & Professions Code § 650, Defendants were beneficiaries of the inadvertent submission of false claims, subsequently discovered the falsity of those claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claims, in violation of Cal. Gov't Code § 12651(a)(8).

215. Defendants, their agents, employees and co-conspirators have conspired to commit violations of the four aforementioned provisions, in violation of Cal. Gov't Code § 12651(a)(3).

-60-

216.    The State of California, unaware of the falsity of the records, statements, and claims that Defendants made, or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendants' illegal conduct.

217.    Defendants have damaged, and continue to damage, the State of California in a substantial amount to be determined at trial.

218.    Additionally, the State of California is entitled to the maximum penalty of $21,562.80 for each and every violation alleged herein.

## Count III

### California Insurance Frauds Prevention Act

### Cal. Ins. Code § 1871.7

219.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 218 above.

220.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended. The IFPA provides for civil recoveries against persons who violate the provisions of Penal Code section 550.

221.    By virtue of the acts described above, including on the basis of violations of California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators knowingly have presented, or caused to be presented, false or fraudulent claims for health-care benefits, in violation of Penal Code § 550(a)(1).

222.    By virtue of the acts described above, including on the basis of violations of California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators knowingly have prepared, made, or subscribed writings with the intent to present or use them, or

-61-

1  to allow them to be presented, in support false or fraudulent claims for health-care benefits, in

2  violation of Penal Code § 550(a)(5).

3    223.    By virtue of the acts described above, including on the basis of violations of

4  California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators

5  knowingly have made, or caused to be made, false or fraudulent claims for payment of health-

6

7  care benefits, in violation of Penal Code § 550(a)(6).

8    224.    By virtue of the acts described above, including on the basis of violations of

9  California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators

10  have presented, or caused to be presented, written or oral statements as part of, or in support of,

11  claims for payment or other benefits pursuant to insurance policies, knowing that the statements

12  contained false or misleading information concerning material facts, in violation of Penal Code

13  § 550(b)(1).

14

15    225.    By virtue of the acts described above, including on the basis of violations of

16  California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators

17  have prepared or made written or oral statements intended to be presented to insurers or

18  insurance claimants in connection with, or in support of or opposition to, claims or payments or

19  other benefits pursuant to insurance policies, knowing the statements contained false or

20  misleading information concerning material facts, in violation of Penal Code § 550(b)(2).

21

22    226.    By virtue of the acts described above, including on the basis of violations of

23  California Insurance Code § 1871.7(a), Defendants, their agents, employees and co-conspirators

24  have concealed, or knowingly failed to disclose the occurrence of, an event that affected a

25  person's initial or continued right or entitlement to an insurance benefit or payment, or the

26

27                                          -62-

28  COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
    CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1  amount of a benefit or payment to which the person was entitled, in violation of Penal Code

2  § 550(b)(3).

3     227.   Defendants have conspired to commit violations of the aforementioned

4  provisions, in violation of Penal Code §§ 550(a) & 550(b).

5

6     228.   Private insurers—unaware of the falsity of the records, statements, and claims that

7  Defendants made, or caused to be made—paid, and continue to pay, the claims that would not be

8  paid but for Defendants' unlawful conduct.

9     229.   The State of California is entitled to receive from Defendants three times the

10  amount of each claim for compensation Defendants submitted in violation of the IFPA.

11  Additionally, the State of California is entitled to a maximum penalty of $10,000 for each and

12  every violation alleged in this Complaint.

13

14  **VIII.  PRAYER**

15     WHEREFORE, Relator prays for judgement against Defendants as follows:

16     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*., California

17  Government Code section 12650 *et seq*., and California Insurance Code section 1871.7;

18     That this Court enter judgement against Defendants in an amount equal to three times the

19  amount of damages the United States has sustained because of Defendants' actions, plus the

20  maximum civil penalty permitted for each violation of the federal False Claims Act;

21

22     That this Court enter judgement against Defendants in an amount equal to three times the

23  amount of damages the State of California has sustained because of Defendants' actions, plus the

24  maximum civil penalty permitted for each violation of the California False Claims Act;

25     That this Court enter judgement against Defendants in an amount equal to three times the

26  amount of damages the State of California has sustained because of Defendants' actions, plus the

27                                      -63-

28     COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
       CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

1 | maximum civil penalty permitted for each violation of the California Insurance Frauds

2 | Prevention Act;

3 | That Relator be awarded the maximum amount pursuant to § 3730(d) of the federal FCA

4 | and the comparable provisions of the California FCA and the IFPA;

5 |

6 | That Relator be awarded all fees, costs, and expenses incurred in connection with this

7 | action, including attorney fees, costs, and expenses; and

8 | That Relator recover such other relief as the Court deems just and proper.

9 | **DEMAND FOR JURY TRIAL**

10 | Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by

11 | jury.

12 |

13 | Respectfully submitted,

14 | Dated:  March 6, 2019                    **CONSTANTINE CANNON LLP**

15 |

16 |

17 | By: _____

18 | ERIC R. HAVIAN
   | MICHAEL R. RONICKHER

19 | LEAH L. JUDGE

20 | CHRISTOPHER C. MCLAMB
   | Attorney for *Qui Tam* Plaintiff-Relator

21 |

22 | **KATZ, MARSHALL & BANKS, LLP**

23 |

24 |

25 | By: _____

26 | AVI KUMIN
   | MATTHEW LAGARDE

27 | -64-

28 | COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, THE CALIFORNIA FALSE
   | CLAIMS ACT, AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

# Exhibit 1

BY FAX



Promise
Health
Plan

## AUTISM SPECTRUM DISORDER SERVICES AGREEMENT

*BETWEEN*

# BLUE SHIELD OF CALIFORNIA PROMISE HEALTH PLAN

*AND*

# CALIFORNIA PSYCHCARE, INC.

**THIS AGREEMENT IS SUBJECT TO THE APPROVAL OF THE CALIFORNIA
DEPARTMENT OF MANAGED HEALTH CARE
AND THE DEPARTMENT OF HEALTH CARE SERVICES**

<div style="writing-mode: vertical">Blue Shield of California Promise Health Plan is an independent licensee of the Blue Shield Association</div>

blue | california ✚ | Promise Health Plan

## AUTISM SPECTRUM DISORDER SERVICES AGREEMENT

## TABLE OF CONTENTS

RECITALS ................................................................................................................................2

AGREEMENT .........................................................................................................................2

ARTICLE I DEFINITIONS .................................................................................................2

ARTICLE II PLAN RESPONSIBILITIES .........................................................................6

ARTICLE III PROVIDER RESPONSIBILITIES ..............................................................7

ARTICLE IV COMPENSATION ........................................................................................10

ARTICLE V UTILIZATION AND QUALITY IMPROVEMENT PROGRAMS ...........11

ARTICLE VI LEGAL AND REGULATORY COMPLIANCE .......................................11

ARTICLE VII ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS.....14

ARTICLE VIII ADVERTISING AND PUBLICITY .........................................................14

ARTICLE IX RELATIONSHIP OF THE PARTIES ........................................................14

ARTICLE X LIABILITY, INDEMNITY AND INSURANCE .........................................15

ARTICLE XI PLAN MEMBER COMPLAINTS AND DISPUTES ................................16

ARTICLE XII DISPUTE RESOLUTION ..........................................................................16

ARTICLE XIII UNFORESEEN CIRCUMSTANCES .......................................................17

ARTICLE XIV TERM AND TERMINATION OF AGREEMENT .................................17

ARTICLE XV GENERAL PROVISIONS ..........................................................................19

ATTACHMENT A COVERED PROVIDER SERVICES FOR PLAN MEDI-CAL MEMBERS ERROR! BOOKMARK NOT DEFINED.

ATTACHMENT A-1 SCOPE OF WORK ...................................ERROR! BOOKMARK NOT DEFINED.

ATTACHMENT B PROVIDER COMPENSATION FOR PLAN MEDI-CAL MEMBERS....................26

ATTACHMENT C PROFESSIONAL LIABILITY INSURANCE COVERAGE FORM ........................31

ATTACHMENT D DISCLOSURE FORM ................................................................................32

ATTACHMENT E DHCS REQUIREMENTS APPLICABLE TO SERVICES PROVIDED TO MEDI-CAL MEMBERS ................................................................................................................................35

REL000218

blue **(shield logo)** california | Promise Health Plan

## BLUE SHIELD OF CALIFORNIA PROMISE HEALTH PLAN

## AUTISM SPECTRUM DISORDER SERVICES AGREEMENT

This Autism Spectrum Disorder Services Agreement ("**Agreement**") is made and entered into this **March 1, 2019** by and between **BLUE SHIELD OF CALIFORNIA PROMISE HEALTH PLAN,** a California corporation ("**Plan**"), and **California Psychcare, Inc.** ("**Provider**").

## RECITALS

A. **WHEREAS,** Plan is licensed to operate a health care service plan under and subject to the requirements of the Knox-Keene Health Care Service Plan Act of 1975, as amended (the "Act"), and the rules promulgated thereunder ("DMHC Regulations");

B. **WHEREAS,** Plan desires to enter into contracts with licensed and experienced health care providers to provide or arrange for the provision of Covered Services to, Plan Medi-Cal, Medicare, and Dual Members ("Plan Members");

C. **WHEREAS,** Plan arranges for the provision of health care services to Medicare beneficiaries in Plan's Medicare Advantage Prescription Drug (MAPD) and Medicare Special Needs (SNP) Plans under a contract with the Center for Medicare and Medicaid Services ("CMS");

D. **WHEREAS,** Provider is licensed and in good standing under the laws of the State of California as an **Autism Spectrum Disorder** service provider; and

E. **WHEREAS,** Plan and Provider desire to enter into this Agreement for Provider to provide or arrange for the provision of certain Covered Services to Plan Members.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration the receipt of which is hereby acknowledged, the parties, having freely negotiated all provisions herein, agree as follows:

## APPLICABILITY

This Agreement covers applicable laws and responsibilities in providing specified health care services for Plan Members in Plan's all lines of business, namely: Medi-Cal, Medicare, and Duals Pilot Programs. However, Provider's rights and responsibilities, upon execution of this Agreement, will only be for the applicable laws, Plan policies, programs and procedures applicable to health care services to Plan Members in those lines of business Provider has elected to provide services for and set forth in Attachments A and B.

## ARTICLE I
## DEFINITIONS

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000219

blue california ❤ | Promise Health Plan

The following terms shall have the following meanings for purposes of this Agreement:

1.1 "Acts and Regulations" means the Federal and California codes and regulations that govern the services to be provided under this Agreement, and more fully described in Article VI of this Agreement.

1.2 "Attachment(s)" means the attachments, numbered A through E to this Agreement which are incorporated herein as if set forth in full.

1.3 "Authorization" means the approval by Plan for a Plan Member to be referred to a specialist physician, to be hospitalized in a hospital or skilled nursing facility, to be prescribed pharmaceuticals not included in the Plan's drug formulary, or for covered ancillary services including durable medical equipment, home health hospital services, ambulatory surgery facility, and medical transportation services.

1.4 "Benefits Agreement(s)" or "Plan Contract(s)" mean(s) the written agreement(s) between Plan and DHCS, and Plan and the Local Initiative which defines Covered ASD Services to be provided to Plan Members.

1.5 "Clean Claim" means a claim that has no defect, impropriety, lack of any substantiating documentation including the substantiating dpcumentation needed to meet the requirements for encounter data or particular circumstance requiring special treatment that prevents timely payments.

1.6 "Coinsurance" means an amount that may be required as a share of cost for services after deductibles are paid.

1.7 "Co-payment" means an amount that may be required as a share of cost for a medical service or supply, like a doctor's visit, hospital outpatient visit, or a prescription.

1.8 "Covered ASD Services" means those ASD services covered under a Benefits Agreement/Plan Contract for Plan Medi-Cal Members, Covered ASD Services includes Covered Provider Services.

1.9 "Covered Provider Services" means those  Medically Necessary and Authorized Covered ASD Services that are set forth in Attachment A and are to be provided to Plan Members by the Provider.

1.10 "Deductible" means the amount that must be paid for health care or prescriptions, before Plan begins to pay a provider.

1.11 "DHCS" means the California Department of Health Care Services.

1.12 "DMHC" means the California Department of Managed Health Care, the successor agency to the Department of Corporations, regulating health care service plans in California.

1.13 "Emergency Medical Condition" means a medical condition manifesting itself by the sudden onset of symptoms of acute severity, which may include severe pain, such that a reasonable person would expect that the absence of immediate medical attention could result in (1) placing the member's health in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part.

1.14 "Emergency Services and Care" means medical screening, examination, and evaluation by a physician, or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an Emergency Medical Condition or Active Labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the Emergency Medical Condition, within the capability of the facility. It also means, but only when such services are a covered benefit under

REL000220



a Benefits Agreement/Plan Contract, an additional screening, examination, and evaluation by a physician, or other personnel to the extent permitted by applicable law and within the scope of their licensure and clinical privileges, to determine if a psychiatric Emergency Medical Condition exists, and the care and treatment necessary to relieve or eliminate the psychiatric Emergency Medical Condition, within the capability of the facility.

1.15    "Health Professional" means any nurse/physician extender (e.g., nurse practitioner, physician assistant) and other allied health professional, including but not limited to a health educator, dietician, laboratory technologist, audiologist, speech pathologist, psychologist, podiatrist, dentist, chiropractor, physical therapist, occupational therapist, clinical social worker, marriage, family and child counselor, optometrist or dispensing optician, who is licensed by the State of California and who provides certain Covered Services to Plan Members through an agreement with Plan.

1.16    "Local Initiative" means L. A. Care Health Plan, the duly constituted government agency that is Los Angeles County's locally created health care service plan.

1.17    "Medi-Cal" means the federal and state funded health care program established by Title XIX of the Social Security Act, as amended and administered in California by DHCS.

1.18    "Medically Necessary" means those Covered Services provided by a Plan Provider that meet the following criteria:

    (i)    Provided for the diagnosis or the direct care and treatment of a medical condition, illness or injury;

    (ii)    Appropriate for the symptoms, consistent with diagnosis, and otherwise in accordance with generally accepted medical practice and professional recognized standards;

    (iii)    Not furnished primarily for the convenience of the Plan Member, the attending physician or other provider of services; and

    (iv)    Performed at the most appropriate level that is safe and effective to the Plan Member's medical condition.

1.19    "Out-of-Area" means that area which is considered to be outside the DMHC and DHCS/ approved Service Area for the Plan.

1.20    "Plan Hospital" means any institution licensed and certified for participation under Medicare and Medicaid (Medi-Cal) as an acute care hospital that provides certain covered services to Plan Members through an agreement with Plan.

1.21    "Plan Member" means a person certified as eligible for coverage under a Benefits Agreement/Plan Contract who has enrolled in Plan, and includes a Plan Medi-Cal Member.

1.22    "Plan Medi-Cal Member" means a person, certified as eligible for Medi-Cal coverage under a Benefits Agreement/Plan Contract for Medi-Cal Covered Services, who has enrolled in Plan.

1.23    "Plan Physician" means a physician duly licensed to practice medicine or osteopathy in accordance with applicable California law who has entered into an agreement with Plan, or a Plan Provider, to provide Primary Care Services to Plan Members.



1.24 "Plan Providers" means the physicians, hospitals, skilled nursing facilities, home health agencies, pharmacies, ambulance companies, laboratories, X-ray facilities, durable medical equipment suppliers and other licensed health care entities or professionals which or who provide Covered Services to Plan Members through an agreement with Plan, a Medical Group/IPA, a Primary Care Physician, a Plan Hospital, or another Plan Provider. Provider is, thus, a Plan Provider.

1.25 "Primary Care Physician" or "PCP" means a Plan Physician, chosen by or for a Plan Member, who is primarily responsible for providing initial and primary care to the Plan Member, for maintaining the continuity of the Plan Member's care, for providing Primary Care Services and for initiating referrals for other Covered Services for the Plan Member. PCPs include general and family practitioners, internists, pediatricians, and primary care obstetricians/gynecologists.

1.26 "Provider Services Manual" means documentation of the Plan's Quality Management and Utilization Management Programs, the Combined Evidence of Coverage and Disclosure Forms, Plan Member Grievance Policy and Procedures, Encounter Data Reporting Requirements, and Disenrollment Procedures, as amended by Plan from time to time.

1.27 "Qualified Autism Service Provider" means either of the following:

    (A) A person, entity, or group that is certified by a national entity, such as the Behavior Analyst Certification Board, that is accredited by the National Commission for Certifying Agencies, and who designs, supervises, or provides treatment for pervasive developmental disorder or autism, provided the services are within the experience and competence of the person, entity, or group that is nationally certified.

    (B) A person licensed as a physician and surgeon, physical therapist, occupational therapist, psychologist, marriage and family therapist, educational psychologist, clinical social worker, professional clinical counselor, speech-language pathologist, or audiologist pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, who designs, supervises, or provides treatment for pervasive developmental disorder or autism, provided the services are within the experience and competence of the licensee.

1.28 "Qualified Autism Service Professional" means an individual who meets all of the following criteria:

    (A) Provides behavioral health treatment.

    (B) Is employed and supervised by a Qualified Autism Service Provider.

    (C) Provides treatment pursuant to a treatment plan developed and approved by the Qualified Autism Service Provider. .

    (D) Is a behavioral service provider approved as a vendor by a California regional center to provide services as an Associate Behavior Analyst, Behavior Analyst, Behavior Management Assistant, Behavior Management Consultant, or Behavior Management Program as defined in Section 54342 of Title 17 of the California Code of Regulations.

    (E) Has training and experience in providing services for pervasive developmental disorder or autism pursuant to Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code or Title 14 (commencing with Section 95000) of the Government Code.

 

blue california | Promise Health Plan

1.29    "Qualified Autism Service Paraprofessional" means an unlicensed and uncertified individual who meets all of the following criteria:

    (A)    Is employed and supervised by a Qualified Autism Service Provider.

    (B)    Provides treatment and implements services pursuant to a treatment plan developed and approved by the Qualified Autism Service Provider.

    (C)    Meets the criteria set forth in the regulations adopted pursuant to Section 4686.3 of the Welfare and Institutions Code.

    (D)    Has adequate education, training, and experience, as certified by a Qualified Autism Service Provider.

1.30    "Quality Improvement Program" means Plan's program designed to review and manage the quality of care provided to Plan Members.

1.31    "Service Area" means the geographical area comprised of those areas designated by the U.S. Postal Service Zip Codes that have been approved by DHCS and DMHC.

1.32    "Utilization Management Program" means Plan's program designed to review and manage the utilization of Covered Services provided to Plan Members.

## ARTICLE II
## PLAN RESPONSIBILITIES

2.1    Administration. Plan shall perform the administrative, operations, enrollment, Plan Member services, marketing, Quality Management, Utilization Management, regulatory compliance and reporting functions appropriate and necessary for the administration of Plan and this Agreement.

2.2    Member Assignment To A PCP. Plan shall ensure that each Plan member selects or is assigned to a Primary Care Physician, either directly or through a medical Group or IPA, to provide and make available Covered Services to Plan Members.

2.3    Member Identification. Plan shall provide identification cards or other materials for Plan Members, to enable Provider to identify Plan Members who are eligible to receive Covered Services from or through Provider. Plan shall verify Plan Member eligibility and the scope of Covered Services the Plan Member is eligible to receive from Provider upon request from Provider.

2.4    Provider Compensation. Plan shall compensate Provider for Covered Provider Services provided to Plan Members under this Agreement as fully described in Article IV below.

2.5    Quality Management. Plan shall monitor the quality of health care provided to Plan Members in accordance with the policies and procedures set forth in the Provider Services Manual and all applicable legal requirements.

2.6    Monitor Access. Plan shall monitor and evaluate accessibility of care and address problems that develop, which shall include, but not be limited to, waiting time and appointments, and Plan's standards of accessibility and availability. Provider's compliance with these standards shall be reviewed by Plan at least annually.



2.7   Establish Public Policy Forum. Plan shall establish a Public Policy Advisory Committee through which Plan Members may participate in establishing the public policy of Plan to assure the comfort, dignity, and convenience of Plan Members.

## ARTICLE III
## PROVIDER RESPONSIBILITIES

3.1   Maintain Licenses. Provider shall maintain all applicable licenses and certifications required by law to operate as a provider of ASD services, its professional entity and facilities, and all certifications necessary for Provider to participate in the Medicaid (Medi-Cal). Provider agrees to notify Plan promptly in the event any action is taken against any such licenses or certifications.

3.2   Provision of Covered Provider Services. Provider shall provide or arrange for the provision of Covered Provider Services set forth in Attachment A to Plan Members.

3.3   Collection of Co-Payments. Provider shall collect all applicable co-payments from Plan Members.

3.4   Coordination with Linked and Carved Out Services. Provider shall cooperate and comply with the policies and procedures developed by Plan, the Local Initiative and with respect to required referral and linkage systems for mental health, dental, California Children Services, family planning, Indian health services, and Department of Public Health services and any other community health or excluded services in accordance with the requirements of DHCS. Provider shall take such action as necessary to ensure appropriate case management and continuity of care between Provider and the local health departments or other agencies to which Plan Members may be referred.

3.5   Agreed Compensation as Payment in Full; Plan Member Not Liable for Covered Services. Provider agrees to accept as payment in full for Covered Services the compensation set forth in Article IV of this Agreement. Provider agrees that, whether or not there is any unresolved dispute for payment, under no circumstances shall Provider, directly or indirectly, make any charge or claim against any Plan Member for Covered Services. Provider may bill Plan Members for services that are not Covered Services provided that prior to the rendering of such services Provider advises Plan Member of Plan Member's obligation therefor, and Plan Member agrees in writing to be financially responsible for such services.

3.6   Referral to Plan Providers. Except with respect to Emergency Services and Care, and family planning and obstetrical/gynecological services, Provider shall refer Plan Members for Covered ASD Services only to Plan Providers in accordance with Plan policies and procedures.

3.7   Selection of Providers. If Provider is delegated selection of other providers, contractors or subcontractors in the provision of Covered Services under this Agreement, Plan retains the right to approve, suspend or terminate any such arrangement.

3.8   Standards of Care. Provider shall provide Covered Provider Services to Plan Members with the standard of care, skill and diligence consistent with professionally recognized standards of care. Provider shall provide or arrange for the provision of Covered Provider Services to Plan Members in the same manner and in accordance with the same standards, and with the same time availability as it provides or arranges for the provision of Covered Provider Services and other services and supplies to all of its other recipients of Covered Provider Services. In no instances will the Provider penalize participating physicians for authorizing appropriate medical care and referrals.



3.9     Non-Discrimination. Provider shall not discriminate against any Plan Member on the basis of race, color, national origin, ancestry, religion, sex, marital status, sexual orientation, age or mental or physical handicap.

3.10    Employee and Contracted Professionals' Licenses. Provider shall ensure that the employees and Health Professionals employed by or under contract with Provider shall be appropriately licensed to provide health care services in the State of California and have met and continue to meet all applicable state laws, regulations and Plan standards of care. Provider shall submit evidence of such qualifications to Plan upon request.

3.11    Compliance with Plan Policies. Provider agrees to comply with Plan's policies and procedures governing services to be provided to Plan Members

3.12    24/7 Availability of Covered Provider Services; Prior Authorization Not Required for Medically Necessary Emergency Services. Provider shall make available Covered Services twenty-four (24) hours a day/seven (7) days a week. Provider shall obtain Emergency Services for Plan Members when Medically Necessary and shall not be required to obtain prior authorization for Emergency Services from Plan. Provider shall notify Plan no later than the following business day after a Plan Member receives Emergency Services.

3.13    Changes in Covered Provider Services. Provider agrees that Plan may change Covered Provider Services during the initial or any succeeding term of this Agreement to maintain compliance with federal or state laws or regulations. Plan may adjust compensation to Provider commensurate with the increase or decrease of modified services.

3.14    Establishment, Maintenance and Authorized Use/Sharing of Plan Members Medical Records. Provider shall ensure that a medical record is established and maintained for each Plan Member. Plan Member medical records shall contain information normally included in accordance with generally accepted medical practices. Provider shall facilitate the sharing of medical information with other Plan Providers in cases of authorized referrals, subject to federal and state laws regarding confidentiality of medical records. Provider shall make such records available to authorized Plan personnel to conduct Utilization Review and Quality Improvement Program functions.

3.15    Compliance with Drug Formularies. Provider shall comply with drug formularies and policies proposed by Plan. Provider acknowledges the authority of Plan contracting pharmacists to substitute generics for trade name drugs unless a Plan Physician writes "dispense as written" on the prescription form.

3.16    Refusal to Serve Plan Members. Provider shall not ask the Plan to terminate a Plan Member or transfer a Plan Member to another Plan Provider because of Plan Member's medical condition. Provider may request termination or transfer of a Plan Member for reasonable cause.

3.17    Not Advise Plan Members to Terminate Enrollment from Plan. During the term of this Agreement and for a period of one (1) year following the date of termination of this Agreement, Provider will not advise any Plan Member to disenroll from Plan and will not solicit any Plan Member to become enrolled with any other managed care organization. All Plan Member eligibility lists and any other documentation containing the names, addresses and telephone numbers of Plan Members that has been compiled by Plan is property of Plan and shall be kept confidential ("Confidential Information"). Provider shall not disclose or use the Confidential Information for its own benefit or gain either during the term of this Agreement; or after termination hereof provided, however, that Provider may use the Confidential Information to the extent necessary to perform its duties under this Agreement or upon express prior written permission of Plan.

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000225



3.18    Compliance with Reporting Requirements. Provider agrees to comply with all Plan, Local Initiative, DMHC and financial reporting requirements. Non-compliance with this section may be construed by Plan as a material breach of the Agreement.

3.19    Compliance with Standards of Regulatory Agencies. Provider acknowledges and agrees to comply with all performance standards, policies and procedures as may be adopted or amended from time to time by the Local Initiative, in accordance with the Benefits Agreement, or as may be required by DMHC, DHCS or . In the event Local Initiative finds Provider non-compliant with the Local Initiative, DHCS or DMHC performance standards, Local Initiative shall have the power and authority to impose sanctions upon Provider in accordance with, and subject to all appeal rights under, the Local Initiative Sanctions policies and procedures as implemented from time to time by Local Initiative. However, if changes are not provided to the Provider, Provider will not be held responsible for complying with amended performance standards, policies and procedures.

3.20    Compliance with Cultural and Linguistic Services Programs, Policies and Procedures. Provider shall participate in and comply with the performance standards, policies, procedures, and programs established from time to time by the Local Initiative,  and Plan with respect to cultural and linguistic services, including without limitation, attending training programs, and collecting and furnishing cultural and linguistic data to the Local Initiative,  and Plan.

3.21    Cooperation to Prevent Fraud and Abuse. Provider agrees to abide by the compliance policies and applicable standards of conduct in the Anti-Fraud    Plan established by Plan in compliance with Health & Safety Code, Section 1348, and other applicable federal and State laws to the extent that they directly or indirectly bear upon the subject matter of this Agreement.

3.21    Communications to Plan Members. . Nothing in this Agreement shall be construed to prohibit any of the following: (a) communications necessary or appropriate for the delivery of health care services; (b) communications to Plan Members regarding treatment alternatives regardless of the provisions or limitations of the Plan Member's coverage; (c) communications to Plan Members regarding applicable rights to appeal coverage determinations; or (d) communications to Plan Members identifying the type of reimbursement arrangement under which Provider is compensated for Covered Services under this Agreement (i.e., fee-for-service, capitation, etc.), excluding any communications with regard to the applicable rates of reimbursement. Plan affirms that its utilization management decision making is based only on appropriateness of care and service and existence of coverage; that it does not specifically reward health care providers or plan staff for issuing denials of coverage or service care; and while it has risk/cost savings sharing arrangements with certain health care provider groups, these incentives are to encourage appropriate utilization and discourage under-utilization but not to encourage barriers to care and service or under-utilizaton.

3.22    Manner and Location for Provision of Services. Provider shall provide Covered Services at locations approved by Plan.' Locations shall not be eliminated or moved without at least sixty (60) days prior written notice by Provider to Plan.

3.23    Provider Notice of Termination. Provider shall provide, and shall require any of its network Providers/facilities to provide Plan with at least ninety (90) days prior written notice of the withdrawal of any Provider/facility from Provider's network.

3.24    Timeliness of Services. Provider shall schedule Covered Services for Plan Members in a timely manner. Provider shall maintain weekly appointment hours which are sufficient and convenient to serve Plan Members.

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000226

blue california | Promise Health Plan

3.25    Use of Off-Shore Subcontractors: Provider agrees to provide to Plan information and attestations specified by Plan on any Down Stream Entities performing services related to this Agreement in any country other than the United States and its Territories ("Off-shore subcontractors") to enable Plan to comply with its own obligations on submitting information about such Off-shore subcontractors and attestations to CMS. Such information and attestations shall be submitted to Plan prior to commencing work under this Agreement and, in the case of new Off-shore subcontractors engaged during the term of the Agreement, within thirty (30) days of engaging such new Off-shore subcontractors.

## ARTICLE IV
## COMPENSATION

4.1    Compensation. As compensation for Covered Services to Plan Members, provided by the Provider and pre-approved by Plan, Plan shall pay Provider the rates set forth in Attachment B, according to DHCS and Local Initiative claims payment timeliness guidelines, upon receiving a clean claim from the Provider on forms agreed upon by Plan and Provider.

4.2    Compensation to Downstream Entities. Provider agrees, if applicable, to pay any Downstream Entities promptly in accordance with federal and state rules and regulations and to comply with any other laws and regulations related to payment, administration or oversight of the provision of Covered Services rendered to a Plan Member.

4.3    Prohibition on Billing Plan Members. Provider shall obtain necessary Authorization for Plan Member Covered Provider Services and shall not bill, or attempt to collect from a Plan Member for services rendered, including where Plan fails to pay for such services, and services that are determined not to be Medically Necessary or not to be Covered Services, unless Provider advised Plan Member prior to the rendering of those services that the services were not covered and of Plan Member's obligation to pay therefor, and Plan Member agreed in writing to be financially responsible for such services.

4.4    Compensation to be Payment in Full. No Action to Recover from Plan Member. Provider shall accept payments specified in Attachment B as payment in full except for any applicable Coinsurance, Co-payments and Deductibles, and shall not hold any Plan Medicare Member liable for payment of any fees that are the legal obligation of the Plan, other than for applicable Coinsurance, Deductibles, or Co-payments, due to the Provider. Provider shall not bill, charge, collect a deposit or other sum or seek compensation, remuneration or reimbursement from, or maintain any action at law or have any other recourse against, or make any surcharge upon, a Plan Medicare Member or other person acting on a Plan Medicare Member's behalf to collect sums owed by Plan. For Plan Medicare Members eligible for both Medicare and Medicaid, Provider shall not hold such Plan Medicare Members liable for Medicare Part A and B cost sharing when the State is responsible for paying such amounts. For such Plan Medicare Members Provider will (a) accept the MA plan payment as payment in full, or (b) bill the appropriate State source. This provision shall survuve the termination of this Agreement whether by recission or otherwise.

4.5    Hold Plan Members To Be Held Harmless. Provider agrees to hold harmless Plan Members and the State of California in the event Plan cannot or will not pay for Covered Services provided to Plan Members hereunder.

4.6    Survival of this Article upon Termination of Agreement. The obligations set forth in this Article IV shall survive termination of this Agreement regardless of the cause giving rise to such termination and shall be construed for the benefit of Plan Members, and the provisions of this Article IV shall supersede any oral or

REL000227



written agreement to the contrary now existing or hereafter entered into between Provider and any Plan Member or any persons acting on their behalf.

## ARTICLE V
## UTILIZATION AND QUALITY IMPROVEMENT PROGRAMS

5.1 <u>Utilization Management Program.</u> Plan shall establish a Utilization Management Program to review the medical necessity of Covered Services furnished by Provider to Plan Members on an inpatient and outpatient basis. This program may be amended from time to time by Plan. In addition, any Utilization Management program required by DHCS, or the Local Initiative shall also be deemed to be applicable under the terms and conditions of this Section. Provider shall comply with and, subject to Provider's rights of appeal, shall be bound by such Utilization Management programs, and if requested, shall make a best effort to serve on the Utilization Management Committees of such programs, without compensation, in accordance with the procedures established by Plan. Failure to comply with requirements of the Utilization Management programs may be deemed by Plan to be a material breach of this Agreement, and may, at Plan's option, be grounds for termination of this Agreement.

5.2 <u>Services Subject to Utilization Review.</u> Provider agrees that decisions of a Plan designated Utilization Management Committee may be used to deny Provider payment hereunder for those Covered Provider Services provided to a Plan Member which are determined to be medically unnecessary or for which Provider failed to receive a prior written Authorization in accordance with Plan's Referral/Authorization Procedures. In no instance will Plan penalize Plan Physicians for authorizing appropriate medical care and referrals. All documents and information received or obtained by Provider during its activities pursuant to this Section shall be held confidential by Provider during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.3 <u>Quality Improvement Program.</u> Plan shall establish a Quality Improvement Program to review the medical appropriateness and quality of Covered Provider Services furnished by Provider to Plan Members on an inpatient and outpatient basis. This program may be amended from time to time by Plan. In addition, any Quality Improvement program required by the conditions or provisions of DHCS, or the Local Initiative shall also be deemed to be applicable under the terms and conditions of this Section. Provider shall comply with and, subject to Provider's right of appeal, shall be bound by such Quality Improvement programs, and if requested, shall make a best effort to serve on the Quality Management Committees of such programs, without compensation, in accordance with the procedures established by Plan. Failure to comply with the requirements of the Quality Improvement Programs may be deemed by Plan to be a material breach of this Agreement, and may, at Plan's option, be grounds for termination of this Agreement. All documents and information received or obtained by Provider during its activities pursuant to this Section shall be held confidential by Provider during and after the term of this Agreement and shall not be disclosed to any person without the prior written consent of Plan.

5.4 Practitioner/Provider Performance Data: To ensure compliance with regulatory agencies (e.g. National Committee of Quality Assurance, (NCQA), Practitioners and Providers must comply with Plan policies and procedures that requires the health plan to use their performance data (i.e., HEDIS, clinical performance data). This requirement is also included in the Provider Manual in the quality improvement section.

## ARTICLE VI
## LEGAL AND REGULATORY COMPLIANCE

6.1 <u>Laws and Regulations.</u> Plan is subject to the requirements of Chapter 2.2 of Division 2 of the California Health and Safety Code, Chapters 7 and 8, Part 3, Division 9 of the Welfare and Institutions Code, Part 6.2



of Division 2 of the California Insurance Code, Subchapter 5.5 of Chapter 3 of Title 10 of the California Code of Regulations, Chapter 5.8 of Title 10 of the California Code of Regulations, Chapter 3 of Title 22 of the California Code of Regulations; and Subchapter 13, Chapter 4, Part 1, Title 17 of the California Code of Regulations, collectively called "Acts and Regulations", and any provisions required to be in this Agreement by any of the above Acts and Regulations, as amended, shall bind the parties whether or not provided in this Agreement.

6.2    Benefits Agreements. Plan is also subject to Benefits Agreements/Plan Contracts between the Plan and DHCS, and the Plan and Local Initiative, amended from time to time. Any provisions required to be in this Agreement by these Benefits Agreements/Plan Contracts, as amended, shall bind both parties whether or not provided in this Agreement. Nothing set forth in the Agreement shall be deemed to amend, interpret, construe or otherwise affect in any way the Benefits Agreements or Plan Contracts, as amended from time to time. To the extent there are any inconsistencies or contradictions between this Agreement and the Benefits Agreements/PlanContracts, the terms and provisions of the Benefits Agreements/Plan Contracts shall prevail and control.

6.3    Local Initiative Rules (LA County only). Provider acknowledges and agrees that in the event Local Initiative finds Provider non-compliant with the Local Initiative, DHCS or DMHC performance standards, Local Initiative shall have the power to impose sanctions upon Provider in accordance with, and subject to all appeals rights under, the Local Initiative Sanctions policies and procedures as implemented from time to time by the Local Initiative.

6.4    Compliance with Local Laws and Regulations. Plan and Provider agree that each shall comply with all applicable municipal and county ordinances and regulations, and all applicable state and federal statutes and regulations now or hereafter in force and effect to the extent that they directly or indirectly bear upon the subject matter of this Agreement.

6.5    Compliance with Local Initiative Requirements (LA County only). Provider agrees to comply with all Local Initiative requirements set forth in Attachment E

6.6    Inspectionof Records and Record Audits. Upon reasonable notice and during regular business hours, Plan, LA Care (if applicable), the Department of Health and Human Services (HHS), the Comptroller General, state regulatory agencies with proper authority or their designees shall have the right to audit, evaluate or inspect and make copies of, at Plan's expense, all records maintained by Provider pertaining to Covered Provider Services rendered under this Agreement. Plan or its designee shall have the right to conduct periodic audits of such records and may audit its own records to determine if amounts have been properly paid under this Agreement. Plan shall provide Provider with the results of any such audits and any amounts determined to be due and owing as a result of such audits shall be promptly paid or, at the option of the Party to whom such amounts are owed, offset against amounts due and owing by such Party hereunder. This provision shall survive the termination of this Agreement. Any right to refund or offset of amounts owed shall be subject to the applicable statute of limitations for recovery. Provider shall obtain the appropriate consent from a Plan Member in order to comply with this Section as consistent with federal privacy regulations. The right of the Department of Health and Human Services (HHS), the Comptroller General or their designees to inspect, evaluate and audit shall extend through ten years from the end of the final contract period or completion of audit, whichever is later, unless provisions in 42 CFR 422.504 ( i ) apply.

6.7    Maintenance of Records. Provider agrees to maintain, in a form in accordance with the general standards applicable to such book or record keeping at Provider's place of business or at such other mutually agreeable location in California, timely and accurate medical, financial and administrative records related to Covered Provider Services rendered by Provider under the Agreement. Provider shall maintain the


blue california | Promise Health Plan

contracts and administrative, financial, and medical records, patient care documentation, other records of Provider, sub-contractors, or related entities during the term of this Agreement and for Medicare services ten (10) years following: (a) the end of any term of this Agreement; or (b) the date of completion of any audit or two (2) years after any applicable malpractice statute of limitations, whichever is longer. These obligations of Provider shall not terminate upon termination of this Agreement, whether by recission or otherwise.

6.8     <u>Inspection of Premises.</u> Provider agrees to permit access to DHCS, DMHC, Plan, the Local Initiative or their authorized representatives, at all reasonable times upon demand, to inspect all facilities maintained or utilized by Provider in the provision of Covered Provider Services under this Agreement.

6.9     <u>Contracts with Downstream Entities.</u> If any services under this Agreement is to be provided by a entity contracted by Provider ("Downstream Entities"), Provider shall ensure that the Downstream Entity agrees to all conditions agreed to by the Provider under this Agreement. Such Downstream Entity contracts are subject to approval by Plan, CMS and applicable state agencies.

6.10    <u>Subcontracts with Downstream Entities</u> Provider agrees to maintain, provide to Plan, and, upon request, make available to CMS copies of all subcontracts for the provision of Covered Services and to ensure that all such subcontracts are in writing, comply with the Acts and the Regulations and require that the subcontractor:

      (i)  Make all applicable books and records available at all reasonable times for inspection, examination, or copying by DHCS or ; and
      (ii) Retain such books and records for a term of at least ten (10) years from the close of the DHCS/ fiscal year in which the subcontract is in effect.

Provider further agrees to notify Plan DHCS in the event any agreement with a subcontractor for the provision of Covered Services is amended or terminated. Notice is considered given when properly addressed and deposited in the United States Postal Service as first-class registered mail, postage attached.

6.11    <u>Compliance with Plan Member Protected Health Information Privacy, Security and Confidentiality Laws and Regulations:</u> Contractor agrees to abide by the legal and regulatory requirements Plan has to comply with including 45 CFR Parts 160 through 164 ("HIPAA Regulations") published pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and applicable state laws. Contractor agrees to execute and abide by the Business Associate Agreement to this Agreement which is incorporated into the Agreement by reference.

6.12    <u>"Exclusion from Participation"</u> means Provider represents and warrants to Plan that: (a) neither Provider nor any of its affiliates are excluded from participation in any federal health care program, as defined under 42 U.S.C Section 1320a-7b (f), for the provision of items or services for which payment may be made under such federal health care program; (b) Provider has not arranged or contracted (by employment or otherwise) with any employee, contractor or agent that Provider or its affiliates know or should know are excluded from participation in any federal health care program, to provide items or services hereunder; and (c) no final adverse action, as such term is defined under 42 U.S.C. Section☐ 1320a-7e (g), has occurred or is pending or threatened against Provider or its affiliates or to Provider's knowledge against any employee, contractor or agent engaged to provide items or services under this Agreement (collectively "Exclusions/Adverse Actions").  Provider, during the term of this Agreement, shall notify Plan of any·Exclusions/Adverse Actions or any basis therefore within two (2) business days of learning of any such Exclusions/Adverse Actions or any basis therefore.

blue ✚
california ®

Promise
Health
Plan

6.13 "Federal Non-Discrimination Requirements" means Provider agrees to comply with the provisions of the Equal Opportunity Clause contained in 41 CFR Section☐ 60-1.4(a) and the Affirmative Action Clauses contained in 41 CFR.

## ARTICLE VII
## ACCESS TO AND CONFIDENTIALITY OF MEDICAL RECORDS

7.1 Medical Records. Provider shall maintain for each Plan Member receiving Covered Services pursuant to this Agreement, a single standard medical record in such form and containing such information as may be required by the laws, rules and regulations of the State of California. The medical record shall contain, at a minimum, medical charts, prescription orders, diagnoses for which medications were administered or prescribed, documentation of orders for laboratory, radiological, EKG, hearing, vision, and other tests and the results of such tests and other documentation sufficient to disclose the quality, quantity, appropriateness, and timeliness of Covered Provider Services performed or ordered under this Agreement. Each Plan Member's medical record shall be legible and maintained in detail consistent with good medical and professional practice which permits effective internal and external peer review and/or medical audit and facilitates an adequate system of follow-up.

7.2 Confidentiality. Provider shall safeguard the confidentiality of Plan Member information according to applicable state and federal laws and regulations.

7.3 Access to Plan Members' Records. Authorized Plan representatives and duly authorized representatives of federal, state and local governments shall have access to Plan Members' records and shall be allowed to make notes and copies, subject to all applicable state and federal laws and regulations relating to the confidentiality of patient medical records.

7.4 Make Medical Records Available for Other Providers. Consistent with laws relating to the confidentiality of patient medical records, Provider shall make the medical records of Plan Members available to other Plan Providers to assure continuity of care for Plan Members.

7.5 Employed and Contracted Professionals and Staff Compliance. Provider shall ensure that all its employees and employed or contracted Health Professionals comply with the record maintenance, access and confidentiality provisions of this Agreement, as though each such professional were Provider for purposes of this Agreement.

## ARTICLE VIII
## ADVERTISING AND PUBLICITY

8.1 Right to Use Identity. Plan and Provider each reserves the right to use and control the use of its name and all symbols, trademarks and service marks presently existing or later established by it. Neither Plan nor Provider shall use the other party's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise (with the exception of the use of Provider's name in standard Provider listings developed by Plan) without the prior written consent of that party and shall cease any such usage immediately upon written notice of the party or on termination of this Agreement, whichever is sooner.

## ARTICLE IX
## RELATIONSHIP OF THE PARTIES

9.1 Independent Contractor Status. None of the provisions of this Agreement are intended to create nor shall any be deemed or construed to create, any relationship between Plan and Provider (or any Plan Physician or

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000231



Health Professional) other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement. Neither Plan nor Provider, nor any of their respective partners, contractors, employees, agents or representatives shall be construed to be the contractors, partners, employees, agents or representatives of the other. As independent contracting parties, Plan and Provider maintain separate and independent management, and each has full, unrestricted authority and responsibility regarding its organization and structure.

9.2 <u>No Third Party Beneficiaries.</u> This Agreement shall not create, nor be deemed or construed to create any rights in any third party, including any Plan Member or Plan Provider, or any partner, contractor, employee, agent or representative of the preceding. The above notwithstanding, Plan and Provider acknowledge and agree that, in so far as the Plan Member concerned is eligible for Covered Provider Services pursuant to a Benefit Agreement/Plan Contract between the Plan and Local Initiative, the Local Initiative is intended to be benefited by, and shall have the rights of a third party beneficiary under this Agreement.

## ARTICLE X
## LIABILITY, INDEMNITY AND INSURANCE

10.1 <u>Plan and Provider Liability to Third Parties.</u> Neither Plan nor Provider, nor any of their respective agents or employees, shall be liable to third parties for any act or omission of the other party.

10.2 <u>Limitation of Liability.</u> Neither Plan nor Hospital, nor any of their respective agents or employees, shall be liable to any third party for any act or omission of the other party.

10.3 <u>Insurance.</u> Provider, at its sole expense, agrees to maintain professional liability insurance of not less than One Million Dollars ($1,000,000) per claim and Three Million Dollars annual aggregate ($3,000,000), comprehensive general liability insurance, and such other available insurance as shall be necessary to insure Provider and its employees against any and all damages arising from its duties and obligations under this Agreement. Provider shall make Plan an additional named insured on such policies and Provider shall notify Plan at least thirty (30) days prior to the termination, cancellation or lapse of any such policy. Provider shall also provide Workers' Compensation benefits for its employees as required by California law.

10.4 <u>Provide Insurance Information to Plan.</u> Provider shall authorize its professional liability carrier, by executing the release form set forth in Attachment C, to provide Plan with evidence of the professional liability coverage required by this Agreement, and to notify Plan within thirty (30) days of any change in such coverage.

10.5 <u>Extended Coverage.</u> If the professional liability insurance procured by Provider pursuant to Section 10.3 is on a "claims made" rather than "occurrence" form, Provider upon termination of this Agreement, shall either obtain extended reporting malpractice insurance coverage ("tail" coverage) in a form acceptable to Plan with liability limits equal to those most recently in effect prior to the date of termination, or enter into such other arrangements as shall reasonably assure Plan of the maintenance of coverage applicable to the claims arising during the period in which this Agreement was in effect for a period of not less than seven (7) years after the date of termination.

blue california | Promise Health Plan

## ARTICLE XI
### PLAN MEMBER COMPLAINTS AND DISPUTES

11.1    <u>Notification of Plan.</u> If Provider receives any complaint from a Plan Members regarding Provider in connection with this Agreement, Provider agrees to notify Plan within two (2) working days of all details of such complaint. In the event that Plan receives any complaint from a Plan Member regarding Provider, Plan will notify Provider within two (2) working days of receipt thereof.

11.2    <u>Cooperation and Compliance with Plan Grievance Process.</u> Provider agrees to cooperate and comply with the Plan's grievance and appeals procedures for review of Plan Member clinical and non-clinical grievances and Provider grievances as established and amended from time to time by Local Initiative and Plan and as approved by DHCS and DMHC.

11.3    <u>Cooperation with Administrative Hearings and/or Arbitration Proceedings.</u> In the event any complaint or grievance of a Plan Member cannot be settled through the initial procedures described in the Provider Service Manual, the matter may be submitted to an administrative hearing before the California Department of Social Services, DMHC, or other administrative department or agency. Provider agrees to cooperate and, when necessary, participate in any such administrative hearings and/or arbitration proceedings, the final decision of which shall be binding on all parties.


## ARTICLE XII
### DISPUTE RESOLUTION

12.1    Controversies between Provider and Plan shall be resolved, to the extent possible, by informal meetings or discussions between appropriate representatives of the parties. Either party must submit a Notice of Dispute stating the nature of the dispute, the party's position, and requested remediation in writing to the other party before arbitration in 12.2 can be initiated. The party receiving the notice has thirty (30) days to respond to the other party. If no written response is forthcoming, the initiating party may file for arbitration under Section 12.2 below. If a written response is sent, the parties have thirty (30) days to meet and confer, or otherwise attempt to settle the dispute. If the matter remains unresolved after the thirty (30) days, either party can file for arbitration under Section 12.2 below.

12.2    Any dispute, controversy, or disagreement arising out of or relating to this Agreement shall be settled exclusively by binding arbitration which shall be conducted in Los Angeles, California in accordance with the American Health Lawyers Association ("AHLA") Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and which to the extent of the subject matter of the arbitration, shall be binding not only on the parties to the Agreement, but on any other entity controlled by, in control of, or under common control with the party to the extent that such affiliate joins in the arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. It is agreed that the arbitrator shall be bound by applicable state and federal laws and that the arbitrator shall issue written findings of fact and conclusions of law. The arbitrator shall have no authority to award damages or provide a remedy that would not be available to such prevailing party in a court of law. Nothing herein shall prohibit a party from seeking equitable or declaratory relief in a court of law to maintain the status quo while arbitration is pending hereunder. The prevailing party as determined by the arbitrator shall not be entitled to recover from the non-prevailing party any or all reasonable costs, fees and expenses of the arbitration, including its actual attorneys' fees. In no event shall either party initiate arbitration prior to the conclusion of the Provider dispute resolution procedures set forth in Section 12.1 or after the date when the institution of legal or equitable proceedings based on such dispute would be barred by the applicable statute of limitations."

blue california    Promise
Health
Plan

### ARTICLE XIII
### UNFORESEEN CIRCUMSTANCES

13.1    <u>Unforseen Circumstances.</u> For so long as any natural disaster, war, riot, civil insurrection, epidemic, other emergency or other event not within the control of Provider results in the facilities or personnel of Provider being unavailable to provide or arrange for the provision of Covered Provider Services, Provider shall only be required to make a good faith effort to provide such services, taking into account the impact of the event.

### ARTICLE XIV
### TERM AND TERMINATION OF AGREEMENT

14.1    <u>Term and Renewal.</u> This Agreement shall be effective for an initial term of two (2) years. Thereafter, this agreement shall be automatically renewed for one (1) year calendar periods without the necessity of notice or action by either party, provided, however, that this Agreement may be terminated as provided below and as otherwise expressly provided herein.

14.2    <u>Termination Without Cause and With Cause.</u> Notwithstanding any other provision of this Agreement, either party may terminate this Agreement without cause, by providing the other party with at least one hundred eighty (180) days written notice of termination. For cause termination may be effected for material breach of this Agreement or default in the performance of any material provision hereof. If such a breach or default is not cured to the reasonable satisfaction of the non-breaching party thirty days (30) of receipt of written notice from the non-breaching party specifying the breach or default, this Agreement shall terminate upon thirty (30) days written notice.

14.3    <u>Termination Upon Termination of Benefits Agreements.</u> This Agreement shall terminate upon the termination of all Benefits Agreements/Plan Contracts or the loss by either party of its license to conduct its business, effective as of the effective date of termination of the Benefits Agreement or loss of licensure. In the event of the termination of a specific Benefits Agreement/Plan Contract relating to the services to be provided under this Agreement, the provisions of this Agreement, in so far as they are applicable to the services provided under the remaining (non-terminated) Benefits Agreements/Plan Contracts shall continue to be in force.

14.4    <u>Plan's Right for Immediate Termination.</u> Nothing herein shall be construed as limiting the right of Plan to terminate this Agreement immediately upon delivery of written notice if Plan determines that the health, safety or welfare of Plan Members is jeopardized by continuation of this Agreement.

14.5    <u>Suspension of Enrollee Referral to Provider.</u> Provider further acknowledges and agrees that the Local Initiative has the right to require Plan to suspend referral of enrollees to Provider, to transfer Plan Members from Provider or to terminate Provider from the Local Initiative Medi-Cal Plan at any time, subject to such review or appeal rights as may be provided pursuant to the Benefits Agreement.

14.6    <u>Avavilability of Records upon Termination.</u> In the event of termination of this Agreement, upon request, Provider shall make available to Plan, Local Initiative and government agencies with authority, or their designated representative, at no charge, any or all records, whether medical or financial, related to the Provider's performance under this Agreement.

14.7    <u>Continuity of Care.</u> Upon termination of this Agreement, Provider shall continue to provide Covered Provider Services to Plan Members, who are receiving Covered Provider Services at the time of termination and who retain eligibility under the terms and conditions of the Benefits Agreement or by operation of law, until the Covered Provider Services being rendered to the Plan Members are completed, or until Plan makes reasonable and medically appropriate arrangements for the provision of such services by another Plan Provider, and notifies Provider that such arrangements have been made. Provider shall continue to provide Covered Provider Services under such circumstances at the compensation rates then in

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000234



effect for this Agreement. Additionally, Plan shall remain obligated to pay, and shall pay, Provider for Covered Provider Services rendered prior to the effective date of termination hereof, in accordance with the provisions of Article IV.

14.8 <u>Plan Members Under Care</u> Upon termination of this contract, or the termination of contract between Provider and any of its particpating specialist providers, Provider agrees to immediately notify Plan of Plan Members receiving treatment by, or under treatment and care of, the Provider or the particpating specialist provider. Any notifications to Plan Member shall be the responsibility of Plan.

14.9 <u>Termination of Physicians and, If Applicable, Health Professionals Employed or Contracted by Provider ("Provider Plan Physician or Health Professional").</u> Notwithstanding any other provision of this Agreement, Plan may immediately prohibit any Provider Plan Physician or Health Professional from treating Plan Members upon the occurrence of any of the following events:

(i)     A Provider Plan Physician's or Health Professional's conviction of a felony or misdemeanor of moral turpitude;

(ii)    A Provider Plan Physician or Health Professional is diagnosed as suffering from a severe mental or emotional disturbance;

(iii)   A Provider Plan Physician or Health Professional is ruled professionally incompetent, non-cooperation with Plan Policy, or non-performance of professional responsibility;

(iv)    A Provider Plan Physician's or Health Professional's addiction to alcohol, narcotics, or other drugs or physical disability which impairs the Plan Physician's or Health Professional's ability to practice his or her profession in a competent manner, or loss or suspension of the license(s) required to provide the services required under this Agreement.

(v)     A Provider Plan Physician's or Health Professional's failure to provide satisfactory personal or professional references and credentials, or to provide verifiable information regarding past employment, training, hospital affiliation or professional licensing;

(vi)    A Provider Plan Physician or Health Professional as being party to a malpractice or other litigation or arbitration which has resulted in substantial judgments, settlements, or awards against the Plan Physician or Health Professional or Provider.

If Provider continues to allow any Provider, Plan Physician or Health Professional to treat Plan Members despite a violation of this Section, Plan may in its sole discretion, terminate this Agreement at any time upon thirty (30) days' notice to Provider, notwithstanding any other provision of this Agreement.

blue california **Promise Health Plan**

**ARTICLE XV**
**GENERAL PROVISIONS**

15.1  Assignment

Neither party shall assign this Agreement without first obtaining the written consent of the other party. Assignment or delegation of this Agreement shall be void unless prior written approval of such assignment or delegation is obtained from DHCS or the Local Initiative.

15.2  Cooperation

Provider shall use its best efforts to maintain a cooperative working relationship to ensure smooth operation of the Local Initiative Medi-Cal Plan. The parties hereto shall, at any time before, at or after execution of this Contract, sign and deliver (or cause others so to do) all such documents and instruments, and do or cause to be done all such acts and things, and provide or cause to be provided all such information and approvals as may be reasonably necessary to carry out the provisions of this Agreement.

15.3  Notices

Any notice required to be given pursuant to this Agreement shall be made in writing and shall be personally delivered or sent by certified mail, return receipt requested, postage prepaid, to the other party as follows:

> *Plan:*
> **Blue Shield of California Promise Health Plan**
> 601 Potrero Grande Drive
> Monterey Park, CA 91755
> *Attn:* Director, Contracting
>
> *Provider:*
> California Psychcare, Inc.
> 16946 Sherman Way, #100
> Van Nuys, CA 91406
> *Attn:* Administrator

Notices shall be deemed effective upon receipt. Either party may at any time change its address for notification purposes by mailing or delivering a notice as required hereinabove stating the change and setting forth the new address. The new address shall be effective on the tenth (10th) day following the date such notice is received, unless a subsequent date of effectiveness is specified in said notice.

15.4  Severability

In the event that a provision of this Agreement is rendered invalid or unenforceable by the California legislature or by any regulation duly promulgated by the State of California acting in accordance with law, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement shall, subject to Section 15.5, remain in full force and effect.

15.5  Effect of Severable Provision

In the event that a provision of this Agreement is rendered invalid or unenforceable or declared null and void, as provided in Section 15.4 above, and its removal has the effect of materially altering the obligations of either party in such manner as, in the judgment of the party affected, (1) will cause serious financial hardship to such party; or (2) will cause such party to act in violation of its corporate articles or bylaws, the party so affected shall have the right to terminate this Agreement upon thirty (30) days' prior written notice to the other party. The provisions of Article XIV and Section 3.17 shall apply to such termination.

blue california | Promise Health Plan

15.6 Integration of Entire Agreement

Both parties agree and understand that this Agreement including the recitals and all Attachments referenced in this Agreement and attached hereto and incorporated herein supersede any and all prior agreements respecting the parties' rights and obligations.

15.7 Amendment

This Agreement may only be amended by the mutual written consent of the parties. Additionally, this Agreement may be amended by Plan to the extent required by DMHC , DHCS or as necessary to ensure that the terms of this Agreement comply with the provisions of the Acts and Regulations, as specified in Section 6.1. Amendments shall comply with the Act and the Regulations and shall be submitted by Plan to DMHC and DHCS/ for prior approval. Proposed changes that require DHCS/ approval shall become effective on receipt by Plan of notice of such approval. Proposed changes which do not require DHCS/ approval and which are not disapproved by DHCS/ shall become effective by operation of law thirty (30) days after DHCS/ has acknowledged receipt thereof, or upon the effective date specified in the amendment, whichever is later.

15.8 Headings

The headings of Articles and Sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

15.9 Conflict of Interest

Provider warrants that no part of the total compensation provided for herein shall be paid directly or indirectly to any officer or employee of the State of California as wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to Provider in connection with any services contemplated or performed relative to this Agreement. Provider certifies that no member of or delegate of Congress, the General Accounting Office, DHHS, HCFA or any other Federal agency has or will benefit financially or materially from this Agreement.

15.10 Waiver of Breach

The waiver of any breach of this Agreement by either party shall not constitute a continuing waiver of any subsequent breach of either the same or any other provision of this Agreement.

15.11 Governing Law

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without reference to its provisions on conflict of laws.

**SIGNATURE BLOCK NEXT PAGE**

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000237



**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the day and year first above written.

| **Blue Shield of California Promise Health Plan** ( *"Plan"*) | **California Psychcare, Inc.** (*"Provider"*) |
|---|---|

| By: _____ | By: _____ |
|---|---|
| Name: _____ | Name: _____ |
| Hugo Florez | Dennis Kogod |
| VP, Network Management Blue Shield of California Promise Health Plan & | |
| Title: _____ | Title: _____ |
| Specialty Networks | Executive Chairman/CEO |
| Date: _____ | Date: _____ |

blue california | Promise Health Plan

**ATTACHMENT A**
**COVERED PROVIDER SERVICES**
**FOR PLAN MEDI-CAL MEMBERS**

Provider is required to perform the covered Autism Related Services outlined below.

1. **Comprehensive Diagnostic Evaluation (CPT 90791):**
   1.1. A thorough review to include looking at the child's behavior and development and interviewing the parents. 1 hour/unit is provided for the interview.
   1.2. Services are to be requested in units – 1 hour is equal to 1 unit. Maximum unit to be approved is 1 unit unless medical records are provided to support medical necessity.
2. **Comprehensive Diagnostic Evaluation - Psychological Test (CPT 96101)**
   2.1. Standardized testing tools are to be used in conjunction with the evaluation to evaluate specifically for Autism Spectrum Disorder. Standard testing includes face-to-face time administering tests, interpreting the test and preparing the report. 2 hours/units for testing will be provided and 1 hour/unit to write the report and the Client may or may not be present the entire time.
   2.2. Services are to be requested in units – 1 hour is equal to 1 unit. Maximum units to be approved are 3 units unless medical records are provided to support medical necessity.
3. **Mental Health Assessment, by non-physician (Functional Behavior Assessment) (CPT H0031):**
   3.1. Skills Assessment: Assesses strengths and weaknesses of skill areas across skill domain areas; other assessments based on systematic evaluation of an individual's abilities and the development of a structured treatment program.
   3.2. Functional Behavior Assessment (FBA): Utilized when problem behaviors (e.g., aggression, self-injury, property destruction, and stereotypy) are present. Identifies the reason(s) behavior(s) occur and the skills and strategies necessary to decrease them. Functional Analysis (FA): Direct observation of behavior(s) combined with systematic manipulation of antecedent and/or consequent events Develop treatment goals, protocols, and data collection systems
   3.3. Re-Assessment: Every six (6) months a new assessment should be performed. The assessment must review previous treatment plan and adjust assessment based on data and patient's progression/regression. Data may be requested upon review of plan.
   3.4. Services are to be requested in units – 1 hour is equal to 1 unit.
4. **Mental Health Service Plan Development (Treatment Plan Development) (CPT H0032):**
   4.1. Client may or may not be present while the Treatment plan is developed. The Treatment plan will include goals, protocols, and data collection systems.
   4.2. The Behavioral Health Treatment plan will refer to data, the members developments and transition/discharge plan
   4.3. The updated Behavioral Health Treatment Plan will be provided to Plan for approval based on medical necessity.
   4.4. The treatment plan is to include all aspects of our template (see Attachments – Initial Assessment and Progress Report)
   4.5. Must be signed by the BCBA on the case, as well as, the parent/caregiver/guardian of the member
   4.6. Services are to be requested in units – 1 hour is equal to 1 unit.
5. **Supervision of BCaBA and/or ABA Paraprofessional (CPT H0046):**
   5.1. Clinical direction, supervision, and management across all phases including assessment, development, and implementation of the treatment, and discharge.
   5.2. Summarize and analyze data
   5.3. Directly observe therapy
   5.4. Meet and evaluate performance of direct line staff

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000239

blue california 🛡 | Promise Health Plan

- 5.5. Evaluate client progress towards treatment goals
- 5.6. Supervise implementation of treatment
- 5.7. Adjust treatment protocols based on data
- 5.8. Monitor treatment integrity
- 5.9. Ensure satisfactory implementation of treatment protocols
- 5.10. 75% of Supervision can be completed by a QAS Professional
- 5.11. At least 25% of Supervision must be completed by a BCBA
- 5.12. 80% of the monthly supervision hours billed must be with the client and/or parent/care-giver present.
- 5.13. Services are to be requested in units – 1 hour is equal to 1 unit

**6. Skills training and development (Social Skills Group) (CPT H2014):**
- 6.1. Based on the principles of ABA
- 6.2. Delivered in a small group format (up to 4 participants)
- 6.3. Typically developing peers or others with similar diagnoses, participate in the treatment session
- 6.4. Patient practices socially based on behavioral goals
- 6.5. Programming for generalization of skills
- 6.6. Services are to be requested in units – 15 min is equal to 1 unit

**7. Therapeutic behavioral services (Direct Care) (CPT H2019):**
- 7.1. Direct behavior analytic service provided to patient
- 7.2. Implementation of ABA based methodologies, treatment plan or protocol as designed by the supervising BCBA or BCBA-D
- 7.3. Records behavioral data through each session
- 7.4. Services are to be requested in units – 15 min is equal to 1 unit

**8. Home care training, family (*ongoing caregiver training*) (CPT S5111):**
- 8.1. Standard, but individualized, curriculum focused on the basics of ABA.
- 8.2. Emphasizes skill training, which enables caregivers to become competent in implementing treatment protocols across settings and/or environments.
- 8.3. Training usually occurs after an individualized behavioral assessment and treatment analysis or treatment recommendation formulation.
- 8.4. Training can include general and individualized didactic presentations, modeling and demonstrations of the skills in a training setting, and practice with performance feedback for each specific skill.
- 8.5. Ongoing parent training activities can involve supervision and coaching during implementation, refresher trainings, problem solving, and support in new environments.
- 8.6. Training should promote generalization and maintenance of treatment.
- 8.7. Services are to be requested in units – 15 min is equal to 1 unit
- 8.8. Must be included in every program. Recommendation for hours should be based on size, scope and progression of the member's program, but typically centered on 2 hours per every 10 hours recommended (similar to supervision).
- 8.9. Care1st expects an increase in parent education hours if our members are on a fade-out plan to ensure parents are equipped to maintain the program and trouble-shoot future issues.

REL000240

blue ✚ | Promise
california | Health
Plan

**ATTACHMENT A-1**
**SCOPE OF WORK**

The purpose of this Statement of Work is to specify the expectations and requirements of the diagnosis and/or treatment of individuals who have been diagnosed with Autism Spectrum Disorder (ASD) or who are potentially experiencing ASD where a diagnostic evaluation is appropriate. All services provided must be medically necessary and in accordance with the State of California's "All Plan Letter 15-025" issued by the California Department of Health Care Services issued September 15, 2014. This SOW is subject to modifications should there be changes in the All Plan Letter and/or other regulatory bodies' requirements and/or Plan determines changes to the SOW are necessary for oversight as appropriate.

1. **PROVIDER REQUIREMENTS:** Provider is eligible upon completion of the credentialing process established by Care1st Health Plan, and/or its affiliates. Providers are to have met the minimum qualifications to be considered for credentialing:
   1.1. General Provider Requirements:
      1.1.1. The "model" used will be the "3-tier model", utilizing Qualifying Autism Service Provider, Professional and Paraprofessional
      1.1.2. Required time frames for offering an appointment for services
      1.1.3. The Licensed Psychologist will offer an appointment for a Comprehensive Diagnostic Evaluation within 15 business days after the receipt of the referral and authorization. The full assessment and treatment plan should be completed within 60 days of the initial authorization.
      1.1.4. The Health Plan will review the Comprehensive Diagnostic Evaluation report, and treatment recommendations. If the provider verifies that the member has Autism Spectrum Disorder, and is recommending some form of Behavioral Health Treatment (BHT), the Health Plan will review for medical necessity for ABA services, and require that the referring provider contact the PCP for submission of all other BHT services. If there additional services to be coordinated, the Health Plan will coordinate as needed.
      1.1.5. The child will then be referred to a QAS Provider for a Functional Behavioral Assessment to be completed, in order to develop a treatment plan with the family/caregiver(s) and child. The initial appointment should be offered to occur within 15 business days of the authorization. The full assessment and treatment plan should be completed within 60 days of the initial authorization.
      1.1.6. Provider will complete their Behavioral Health Treatment plan and submit it to Care1st within those 60 days.
      The treatment plan and service authorization request will be reviewed by Plan for medical necessity. Upon Plan approval, two (2) authorizations will be provided. First appointment for services should occur within 15 business days of the approval notice of authorization.
         1.1.6.1. Authorization for no less than 6 months, approving Behavioral Health Treatment service(s);
         1.1.6.2. Authorization approving a re-assessment within six (6) months.
      1.1.7. Every five (5) months a re-assessment of the Member should occur, and a new treatment plan developed for the following 6 month of authorization. The re-assessment and new treatment plan will be submitted to Health Plan for review and approval for ongoing medical necessity. Submission of the new treatment plan automatically generates a TAR for Health Plan review and approval for covered services.
   1.2. Training requirements:
      1.2.1. Attestation of provider training meeting State of California requirements.

2. **CREDENTIALING REQUIREMENTS**
   2.1. QAS Providers and Professionals must complete the required credentialing application form, and provide all required information and documents/attestations.
   2.2. QAS Paraprofessionals will be required to show proof of certification through a national accredited body upon execution of an Agreement.

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

Page 24



    **2.3.** QAS Paraprofessionals with either rBT or ABAT will be required to provide appropriate documentation on the training and completion of the certification upon execution of an Agreement.

    **2.4.** All Providers must supply a copy of their provider's NCPI – Non-Violent Crisis Prevention Certificates upon execution of an Agreement.

**3.**   **SCOPE OF SERVICES:** Provider will utilize a client-centered approach that is inclusive of family members, and other providers in the member's care, which focuses on using evidenced-based practices in order to provide positive therapeutic outcomes for the members it serves. Refer to Attachment A – Covered Autism Related Services.

    **3.1. Care Coordination.** Provider will conduct care coordination activities to ensure that all respective service providers (i.e., primary health care, mental health care, speech pathologists, occupational therapists, and other healthcare professionals) are coordinating care and referrals for the benefit of the member.

    **3.2. Reporting Requirements.** Provider will be required to complete and submit all assessments and treatment plans to Plan in accordance with this Attachment A.

    **3.3. Acceptable Forms of Communication**

       3.3.1. Electronically

       3.3.2. Telephonically (323)889-2122

       3.3.3. Fax (844) 283-3298

       3.3.4. Secure email

       3.3.5. Acceptable written communications

    **3.4. Performance Requirements**

       3.4.1. Not meeting performance requirements as determined by Plan will result in Plan, at its discretion, requiring the provider to complete a Corrective Action Plan (CAP).

       3.4.2. Time frames (As referenced in 1.1 above) –

       3.4.3. Timeliness requirements for submitting the diagnostic evaluation upon completion of the testing

       3.4.4. Timeliness requirements for submitting the Functional Assessment upon completion of the data gathering

       3.4.5. Timeliness requirements for submitting the Treatment Plan upon completion of the Functional Assessment

  3.4.6. Reassessment process –

       3.4.7. Reassessment of member is to be conducted at least every 6 months if not sooner, as appropriate.

    **3.5. Treatment Plan revision**

       3.5.1. Treatment Plan to be revised at least every 6 months if not sooner, as appropriate.

**4.**   **QUALITY IMPROVEMENT & ULTIZATION MANAGEMENT PROGRAM COMPLIANCE**

    **4.1** Provider will be subject to and required to comply with Plan's Quality Improvement and Utilization Management Programs pursuant to Article VII of the Agreement.

**5.**   **BILLING**

    **5.1** Claims for provider covered services should be submitted to Health Plan.

    To avoid delay in processing your claim, please ensure that applicable fields are filled out according to CMS-1500 form requirements. Ensure that diagnosis codes are entered in the correct fields. They must be entered in the alphabetical order and appropriate diagnosis code pointers are populated. ICD indicator field must also be filled out. Forms that are not properly completed will be rejected. For more information on how to complete CMS-1500 form version 02/12, visit www.nucc.org or www.medi-cal.ca.gov.

    Additionally, Care1st encourages you to submit electronic claims to minimize delay on claims submission and mailing. You may contact and enroll with one of these clearinghouses:

       **Office Ally: Payer ID: C1SCA**

blue california | Promise Health Plan

**ATTACHMENT B**
**PROVIDER COMPENSATION**
**FOR PLAN MEDI-CAL MEMBERS**

Name of Provider: **California Psychcare, Inc.**
Specialty : **Autism Related Services**
Effective Date: **March 01, 2019**

Payment for Covered Provider Services provided by Provider to Plan Members for Autism Related Services, and pre-approved by Plan, will be made at the lesser of Provider's billed charges or the rates stipulated below, less any applicable co-payments, co-insurance or deductibles. The below payment includes, but is not limited to, the procedures set forth within the Health Plan policies and procedures and Provider Manual. All billings and payments shall be in accordance with established billing guidelines.

| Billing Code | Service Provided | Billing Increments | Client Status | Description/ Activities | QAS Provider | QAS Professional | QAS Paraprofessional |
|---|---|---|---|---|---|---|---|
| 90791 | Diagnostic Evaluation, by non-physician* | 1 Hour 1 unit Up to 1 unit | Client Present | • **Comprehensive Diagnostic Evaluation:** A thorough review to include looking at the child's behavior and development and interviewing the parents. Standardized testing tools are to be used in conjunction with the evaluation to evaluate specifically for Autism Spectrum Disorder. | **One hundred percent of Medi-Cal Fee For Service Rates (100%)** | **Not Applicable** | **Not Applicable** |
| 96101 | Psychological Testing | 1 Hour (1 unit) Up to 3 units | Client may or may not be Present | • Includes psychodiagnostic assessment of emotionality, intellectual abilities, personality and psychopathology. Both face to face time administering test to the patient and time interpreting these test results and preparing the report. | **$53.00 per hr** | **Not Applicable** | **Not Applicable** |

 

Promise Health Plan

REL000244

| Billing Code | Service Provided | Billing Increments | Client Status | Description/Activities | QAS Provider | QAS Professional | QAS Paraprofessional |
|---|---|---|---|---|---|---|---|
| H0031 | Mental Health Assessment, by non-physician* | 1 Hour (1 unit) | Client Present | **Skills Assessment:** Assesses strengths and weaknesses of skill areas across skill domain areas, other assessments based on systematic evaluation of an individual's abilities, and the development of a structured treatment program.<br>**Functional Behavior Assessment (FBA):** Utilized when problem behaviors (e.g. aggression, self-injury, property destruction, and stereotypy) are present. Identifies the reason(s) behavior(s) occur and the skills and strategies necessary to decrease them.<br>**Functional Analysis (FA):** Direct observation of behavior(s) combined with systematic manipulation of antecedent and/or consequent events. | $77.00 per hr | Not Applicable | Not Applicable |
| H0032 | Mental health service plan development by non-physician* | 1 Hour (1 unit) | Client may or may not be present | • Develop treatment goals, protocols, and data collection systems<br>• Adjust treatment protocols based on data<br>• Develop and oversee transition/discharge plan | $77.00 per hr | Not Applicable | Not Applicable |
| H0046 | BCBA Supervision of BCaBA/QASP and/or ABA Paraprofessional; BCaBA/QASP Supervision of ABA Paraprofessional | 1 Hour (1 unit) | Client may or may not be present | • Clinical direction, supervision, and management across all phases including assessment, development, and implementation of the treatment, and discharge.<br>• Summarize and analyze data<br>• Directly observe therapy<br>• Meet and evaluate performance of direct line staff<br>• Evaluate client progress towards treatment goals<br>• Supervise implementation of treatment<br>• Adjust treatment protocols based on data<br>• Monitor treatment integrity | $77.00 per hr | $77.00 per hr | Not Applicable |


blue california | Promise Health Plan

| Billing Code | Service Provided | Billing Increments | Client Status | Description/Activities | QAS Provider | QAS Professional | QAS Paraprofessional |
|---|---|---|---|---|---|---|---|
| H2014 | Skills training and development (**Social Skills Group**), per 15 minutes | 15 min. (1 unit) | Client Present | • Ensure satisfactory implementation of treatment protocols<br>• Based on the principles of ABA<br>• Delivered in a small group format (up to 4 participants)<br>• Typically developing peers or others with similar diagnoses, participate in the treatment session<br>• Patient practices socially based on behavioral goals<br>• Programming for generalization of skills | | $7.75 / 15 min increments | |
| H2019 | Therapeutic behavioral services (**Direct Care**), per 15 minutes | 15 min. (1 unit) | Client Present | • Direct behavior analytic service provided to patient<br>• Implementation of ABA based methodologies, treatment plan or protocol as designed by the supervising BCBA or BCBA-D<br>• Records behavioral data through each session | | $13.30 / 15 min increments | |
| S5111 | Home care training, family (**ongoing caregiver training**); per 15 min, per session or 1 hour | 15 min (1 unit) | Client may or may not be present | • Standard, but individualized, curriculum focused on the basics of ABA.<br>• Emphasizes skill training, which enables caregivers to become competent in implementing treatment protocols across settings and/or environments.<br>• Training usually occurs after an individualized behavioral assessment and treatment analysis or treatment recommendation formulation.<br>• Training can include general and individualized didactic presentations, modeling and demonstrations of the skills in a training setting, and practice with performance feedback for each specific skill.<br>• Ongoing parent training activities can involve supervision and coaching during | $18.00 15 min increments | $13.75 15 min increments | $13.75 15 min increments |

REL000245

blue california | Promise Health Plan

| Billing Code | Service Provided | Billing Increments | Client Status | Description/Activities | QAS Provider | QAS Professional | QAS Paraprofessional |
|---|---|---|---|---|---|---|---|
| | | | | implementation, refresher trainings, problem solving, and support in new environments.<br>• Training should promote generalization and maintenance of treatment. | | | |

| Definition (Provider) | License or Certification | Billing Modifier | Level |
|---|---|---|---|
| Licensed Clinical Psychologist (PhD/PsyD) | PhD/PsyD | AH | Provider |
| Doctoral Level | BCBA-D | HP | Provider |
| Masters Degree Level Provider (MFT/LCSW) | BCaBA, LMFT, LCSW, or equivalent | HO | Provider |
| Bachelors Degree Level Provider | BCaBA, QASP, or equivalent | HN | Professional[12] |
| Less than Bachelors Degree Provider | ABAT, rBT, BCAT, or equivalent | HM | Paraprofessional |

**Notes:**

1. Reimbursement is based on the treating provider's licensure, certification, and credentialing requirements for that discipline which is not based on provider's academic credentials alone [e.g., a treating provider with a Master degree who does not possess a BCBA or BCBA-D would not be reimbursed for conducting the FBA (H0031, H0032).
2. All providers must have proof of experience of training and work history with children with Autism Spectrum Disorder
3. Case Supervision of ABA follow-up services must be rendered by a Board Certified Behavior Analyst and in accordance with standards set by the California State Department of Health Care Services.
4. Rates include reimbursement for time and materials, including travel.
5. Rates for all services are subject to the provisions and limitations of the member's benefit plan including authorization requirements. Nothing in this schedule should be construed as altering member's benefits.
6. If Provider submits a claim for medically necessary Covered Services for an amount less than the applicable rate set forth in this Agreement, Provider will be paid the lesser of the billed amount or the rate set forth in this Agreement.
7. Billing Increments, stipulated above, are the maximum allowable billing units for Covered Service. If additional time is needed to perform such Covered Service, prior authorization is required from Plan. Provider must submit claim with billing modifiers as stipulated above.
8. Provider must provide Health Plan with supporting documentation in order to receive additional hours for codes with specified billing units.
9. * Physician refers to PCP or Surgeon
10. ABA Supervision (H0046) can be billed concurrently with Direct Intervention Services (H2014, H2019, S5111).
11. Supervision standards follow BACB guidelines (i.e., 2 hours of supervision for every 10 hours of direct intervention), with more supervision authorized if deemed medically necessary.
12. QAS Professional level provider is defined by Title 17 Section 54342. The BCaBA and QASP are current certificates available for this level of provider type.
13. Upon completion of the background check and fulfillment of the training requirement, qualified autism service paraprofessionals may provide treatment and implement services for up to 90 days while in the process of obtaining their credential/certification.

**SIGNATURE TO FOLLOW**

*California Psychcare, Inc.*
Autism Services Provider
V1: 011315 gg

REL00246

REL000247

blue california

Promise
Health
Plan

The above compensation, terms and conditions are agreed to by the Parties as signified by signature below.

**Blue Shield of California Promise Health Plan**

**California Psychcare, Inc.**

**"Plan"**

By: _____

Name: _____
          Hugo Florez

Title: _____
       VP, Network Management Blue Shield of
       California Promise Health Plan & Specialty
                      Networks

Date: _____

**"Provider"**

By: _____

Name: _____
          Dennis Kogod

Title: _____
       Executive Chairman /CEO

Date: _____

*California Psychcare, Inc.*
Autism Services Provider
V1. 011315 gg

Page 30



## ATTACHMENT C
## PROFESSIONAL LIABILITY INSURANCE COVERAGE FORM

*Date:*  2/5/19

*To:*  Llyod's Syndicate
_____
*(PRINT name of professional liability insurance carrier)*
HUB International Insurance Services 456 Montgomery St Ste 1200 San Francisco CA 94104
_____
*(PRINT address, city, state, zip code)*

*Re:* Continuous Authorization for Professional Liability Insurance Coverage Information Release

I hereby authorize you to send a Certificate of Insurance, identifying my policy, its effective and expiration dates, policy limits, endorsements and exclusions, if any, to:

**Blue Shield of California Promise Health Plan**
601 Potrero Grande Drive
Monterey Park, CA 91755
_Attention:_ Provider Contracting Department

Additionally, I authorize and direct you to submit notice of renewals, changes in coverage amounts, and/or cancellations to Blue Shield of California Promise Health Plan at least thirty (30) days prior to the renewal, change or cancellation date.

Signature: _____          Policy Number:W1CB1D190301
                                                                            _____

Print Name:  Dennis Kogod

Date:  02/05/19

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000248

blue **california** | Promise Health Plan

## ATTACHMENT D
## DISCLOSURE FORM
*(Welfare and Institutions Code Section 14452, 42 CFR § 455.104)*

### California, Psychcare, Inc.
**Name of the Provider**
*(The contracting party name under the Agreement)*

The undersigned hereby certifies that the following information regarding the Provider is true and correct as of the date set forth below:

I.    ***Form of Business:*** (Please state whether a: Corporation, LLC, Partnership, Sole Proprietorship, etc.)
        Corporation

II.    **If Provider is a *Corporation*:**

    A.  Please list the name, address, date of birth (DOB), social security number (SSN) and tax identification number (TIN) for **all shareholders** owning *more than five percent* (5%) of the company stock:

| Shareholder Name (Individual or Corporation) | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) | TIN (Corporation) |
|---|---|---|---|---|
| CA PC Midco, Inc. | 1413 Center Drive Park City UT 84098 | | | 82-4724611 |
| | | | | |
| | | | | |
| | | | | |

*(A separate sheet with all requested information may be included.)*

    B.  Please list the name, address, date of birth (DOB) and   social security number (SSN) for **all members of the Board of Directors (BOD)** of the provider company:

| BOD Member Name (Individual or Corporation) | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) |
|---|---|---|---|
| Aly Champsi | 1413 Center Drive Park City UT 84098 | 2/3/1980 | 509662078 |
| Andrew Carragher | 1413 Center Drive Park City UT 84098 | 2/8/1969 | 026802865 |
| Dennis Kogod | 1413 Center Drive Park City UT 84098 | 8/14/1959 | 217623700 |
| | | | |
| | | | |
| | | | |

*(A separate sheet with all requested information may be included.)*

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

REL000249

blue california® | Promise Health Plan

C. Please list the name, address, date of birth (DOB) and social security number (SSN) for the designated corporate officers:

| Company Officer | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) |
|---|---|---|---|
| President: Dennis Kogod | 35 Beach View Av Dana Point CA 92629 | 8/14/1959 | 217623700 |
| Secretary: | | | |
| Treasurer: | | | |
| Other with Title: | | | |

*(A separate sheet with all requested information may be included.)*

III.    **If Provider is an *LLC, Partnership, Sole Proprietorship, or Other Entity*:**

a. Please list the name, address, date of birth (DOB) and social security number (SSN) for the designated company officers:

| Company Officer | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) |
|---|---|---|---|
| President: | | | |
| Secretary: | | | |
| Treasurer: | | | |
| Other with Title: | | | |

*(A separate sheet with all requested information may be included.)*

b. Please list the name, address, date of birth (DOB), social security number (SSN) and tax identification number (TIN) for **the Owners (those who directly or indirectly own five percent (5%) or more of the Provider), Members (if Provider is an LLC) and Partners (if Provider is a partnership).**

| Name (Individual or Corporation) | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) | TIN (Corporation) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*(A separate sheet with all requested information may be included.*

IV.    Is any person (individual or corporation) with an ownership or controlling interest in the Provider **related to another person with ownership or controlling interest in the Provider** as a spouse, parent,

*California Psychcare, Inc.*
Autism Services Provider
V 1. 011315 gg

Page 33

REL000250



child, or sibling; **or** is any person (individual or corporation) with an ownership or controlling interest **in any subcontractor** in which the Provider has a *five percent (5%) or more interest,* related to another person with ownership or controlling interest in the Provider as a spouse, parent, child, or sibling? *If so, please provide the following:*

| Name (Individual or Corporation) | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) | Please briefly explain the relationship |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*(A separate sheet with all requested information may be included.)*

V. Is the Provider, or a co-owner, partner, stockholder, director or officer of the Provider, *either directly or indirectly related to, or affiliated with,* Blue Shield of California Promise Health Plan? If so, please explain:

_____

_____

VI. *Major creditors* holding *more than five percent* (5%) of the Provider debt:

| Creditor (Individual or Corporation) | Address (Individual or Corporation) | DOB (Individual) | SSN (Individual) | TIN (Corporation) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*(A separate sheet with all requested information may be included.)*

Date: _____     Signature: _____

Name: _____
      *(Please type or print)*     Dennis Kogod

Title: _____
      *(Please type or print)*     Executive Chairman/CEO



### ATTACHMENT E
### DHCS REQUIREMENTS
### APPLICABLE TO SERVICES PROVIDED
### TO MEDI-CAL MEMBERS

Provider agrees to comply with the following requirements of the California Department of Health Care Services ("**DHCS**") with respect to Blue Shield of California Promise Health Plan Medi-Cal Members and to include such provisions in all agreements between Provider and any health care providers from which Provider obtains usual or frequently used health care services on behalf of Medi-Cal Members.

1.  **Provision of Covered Services.** Provider shall furnish to Medi-Cal Members those services which Provider is authorized to provide under this Agreement, consistent with the scope of Provider's license, certification or accreditation, and in accordance with professionally recognized standards.

2.  **Quality Assurance/Improvement Programs.** Provider shall cooperate and comply with and participate in any applicable quality assurance/improvement programs established (or amended from time to time) by Blue Shield of California Promise Health Plan, and approved by DHCS and DMHC.

3.  **Utilization Management Program.** Provider shall cooperate and comply with and participate in any applicable utilization management programs established (or amended from time to time) by Blue Shield of California Promise Health Plan and approved by DHCS and DMHC.

4.  **Utilization Data.** To the extent that Provider is responsible for the coordination of care for Medi-Cal Members, Blue Shield of California Promise Health Plan agrees to share with Provider any utilization data that DHCS has provided to Blue Shield of California Promise Health Plan, and Provider agrees to receive the utilization data provided and use, as able, for the purpose of Medi-Cal Member care coordination.

5.  **Excluded Services Linkages: Case Management.** Provider shall cooperate and comply with any applicable policies and procedures developed by Blue Shield of California Promise Health Plan, and provided or made available to Provider, with respect to required referral and linkage systems for mental health, dental, California Children's Services, family planning, Indian health services, and Department of Public Health Services and any other community health or excluded services in accordance with the requirements of DHCS.

6.  **Cultural/Linguistic Training Programs.** Provider shall participate in and comply with any applicable performance standards, policies, procedures and programs established from time to time by Blue Shield of California Promise Health Plan and federal and state agencies and are provided or made available to Provider with respect to cultural and linguistic services (CLAS) including, without limitation, attending training programs, and collecting and furnishing cultural and linguistic data to Blue Shield of California Promise Health Plan and federal and state agencies. Provider agrees to provide interpreter services for Medi-Cal Members during all visits.

7.  **Performance Standards.** Provider shall comply with all applicable performance standards, as set forth in the Care Coordination Agreement (the "**Agreement**"), including but not limited to all Schedules, and applicable policies and procedures as may be required by DMHC or DHCS, and are provided or made available to Provider, with respect to Medi-Cal Members enrolled in Blue Shield of California Promise Health Plan.

8.  **Information.** Provider shall promptly provide Blue Shield of California Promise Health Plan with financial, capacity and encounter data or other applicable information, reports, documents or forms as may be required to enable Blue Shield of California Promise Health Plan to fulfill its reporting and other obligations for purposes of compliance with the Medi-Cal Acts and Regulations.

REL000252



9. **Prospective Requirements.** Blue Shield of California Promise Health Plan agrees to inform Provider of current requirements and prospective requirements added by DHCS before the requirement would be effective, and Provider agrees to comply with the new requirements within thirty (30) days of the effective date, unless otherwise instructed by DHCS and to the extent possible.

10. **Records.** Provider agrees to maintain and make available to DHCS, upon request, copies of all sub-subcontracts and to ensure that all sub-subcontracts are in writing and require that:

    a) All premises, facilities, equipment, applicable books, records, contracts, computer, or other electronic systems related to this Agreement will be made available at all reasonable times for audit, inspection, examination, or copying by DHCS, CMS, or the DHHS Inspector General, the Comptroller General, DOJ, and DMHC, or their designees.

    b) All records and documents will be retained for a minimum of ten (10) years from the final date of the Agreement period or from the date of completion of any audit, whichever is later.

11. **Grievances.** Provider has the right to submit a grievance through Blue Shield of California Promise Health Plan's formal process to resolve provider grievances.

12. **Hold Harmless.** Provider agrees to hold harmless both the State of California and Medi-Cal Members in the event DHCS cannot or will not pay for Covered Services provided to Medi-Cal Members hereunder.

13. **Officers and Directors.** Attachment D contains the names of all of the officers and directors of Provider, all of the stockholders owning more than ten (10) percent of the issued and outstanding stock of Provider and all major creditors holding more than five (5) percent of the debt of Provider. Provider shall promptly notify Blue Shield of California Promise Health Plan of any and all changes in the information contained in Attachment D.

14. **Conflict of Interest.** Provider warrants that no part of the total compensation provided for herein shall be paid directly or indirectly to any officer or employee of the State of California as wages, compensation, or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to Provider in connection with any services contemplated or performed relative to this Agreement. Provider certifies that no member of or delegate of Congress, the General Accounting Office, DHHS, CMS or any other Federal agency has or will benefit financially or materially from this Agreement.

15. **Revocation of Delegation.** Provider agrees to revoke the delegation of activities or obligations, or specify other remedies, in instances where DHCS or Blue Shield of California Promise Health Plan determine that Provider has not performed satisfactorily.

16. **Assignment.** To the extent required by DHCS, any assignment or delegation of this Agreement shall be void unless prior written approval is obtained from DHCS.

17. **DHCS Subcontract Approval.** To the extent required by DHCS, any amendment(s) to this Agreement shall be submitted to DHCS for prior approval.

# Exhibit 2

**TRICARE Operations Manual 6010.59-M, April 1, 2015**
Demonstrations And Pilot Projects (Except Value-Based Initiatives)

Chapter 18                                                    Addendum A

## Participation Agreement For Comprehensive Autism Care Demonstration Corporate Services Provider (ACSP)

Revision:    C-21, March 1, 2018

**Name Of ACSP:**    _____

**Address:**    _____

**Telephone:**    _____

**Tax Identification
Number (TIN) Or Social
Security Number (SSN):**    _____

REL000002

**TRICARE Operations Manual 6010.59-M, April 1, 2015**
Chapter 18,  Addendum A
Participation Agreement For Comprehensive Autism Care Demonstration Corporate Services Provider
(ACSP)

## ARTICLE 1

### RECITALS

1.1    IDENTIFICATION OF PARTIES

This Comprehensive Autism Care Demonstration Corporate Services Provider (ACSP) Participation Agreement ("Participation Agreement") is between the United States of America (USA) through the Defense Health Agency (DHA), an agency of the Office of the Assistant Secretary of Defense (Health Affairs) (OASD(HA)) and _____, doing business as _____ (hereinafter ACSP).

1.2    AUTHORITY FOR ACSPS AS TRICARE-AUTHORIZED PROVIDERS

The authority to designate ACSPs as authorized TRICARE providers resides with the Department of Defense (DoD) Demonstration authority under 10 USC 1092. This authority ceases upon termination of the Comprehensive Autism Care Demonstration Project ("Demonstration") as determined by the Director, DHA, or designee.

1.3    PURPOSE OF PARTICIPATION AGREEMENT

The purpose of this Participation Agreement is to:

(a)  Establish the undersigned ACSP as an authorized provider of Applied Behavior Analysis (ABA) services;

(b)  Establish the terms and conditions that the undersigned ACSP must meet to be an authorized provider under the Demonstration.

## ARTICLE 2

### REFERENCES

2.1    REQUIREMENTS

By reference, the requirements set forth in the TRICARE Operations Manual (TOM), Chapter 18, Section 4, are incorporated into this Participation Agreement and shall have the same force and effect as if fully set out herein.

2.2    GENERAL AGREEMENT

The undersigned ACSP agrees to render appropriate ABA services to eligible beneficiaries as specified in the TOM, Chapter 18, Section 4.

REL000003

TRICARE Operations Manual 6010.59-M, April 1, 2015
Chapter 18, Addendum A
Participation Agreement For Comprehensive Autism Care Demonstration Corporate Services Provider
(ACSP)

## ARTICLE 3

### REIMBURSEMENT

3.1    Claims for Demonstration services will be submitted on a Centers for Medicare and Medicaid Services (CMS) 1500 Claim Form by the ACSP in accordance with the TOM, Chapter 18, Section 4, paragraph 11.0.

3.2    The ACSP shall:

    (a)  Submit claims to the appropriate TRICARE Managed Care Support Contractor (MCSC) in accordance with the TOM, Chapter 18, Section 4, paragraph 11.0; and

    (b)  Collect the monthly sponsor cost-share in accordance with TOM, Chapter 18, Section 4, paragraph 14.0; and

    (c)  Not bill the sponsor/beneficiary for:

        (1)  Services for which the provider is entitled to TRICARE reimbursement; and

        (2)  Services that are denied due to provider non-compliance with all applicable requirements in the TOM, Chapter 18, Section 4.

## ARTICLE 4

### TERM, TERMINATION, AND AMENDMENT

4.1    TERM

The term of this agreement shall begin on the date this agreement is signed and shall continue in effect until terminated or superseded as specified herein.

4.2    TERMINATION OF AGREEMENT BY DHA

    (a)  The Director, DHA, or designee, may terminate this agreement upon written notice, for cause, if the ACSP is found not to be in compliance with the provisions set forth in 32 CFR 199.6, or is determined to be subject to the administrative remedies involving fraud, abuse, or conflict of interest as set forth in 32 CFR 199.9. Such written notice of termination shall be an initial determination for purposes of the appeal procedures set forth in 32 CFR 199.10.

    (b)  In addition, the Director, DHA, or designee, may terminate this agreement without cause by giving the ACSP written notice not less than 45 days prior to the effective date of such termination.

3

**TRICARE Operations Manual 6010.59-M, April 1, 2015**
Chapter 18,   Addendum A
Participation Agreement For Comprehensive Autism Care Demonstration Corporate Services Provider
(ACSP)

4.3    TERMINATION OF AGREEMENT BY THE ACSP

The ACSP may terminate this agreement by giving the Director, DHA, or designee, written notice not less than 45 days prior to the effective date of such termination. Effective the date of termination, the ACSP will cease being a TRICARE-authorized provider of Demonstration services. Subsequent to termination, an ACSP may be reinstated as a TRICARE-authorized provider of Demonstration services only by entering into a new Participation Agreement.

4.4    AMENDMENT BY DHA

(a) The Director, DHA, or designee, may amend the terms of this Participation Agreement by giving 120 days notice in writing of the proposed amendment(s) except when necessary to amend this agreement from time to time to incorporate changes to the 32 CFR 199. When changes or modifications to this agreement result from changes to the 32 CFR 199 through rulemaking procedures, the Director, DHA, or designee, is not required to give 120 days written notice. Any such changes to 32 CFR 199 shall automatically be incorporated herein on the date the regulation amendment is effective.

(b) An ACSP who does not accept the proposed amendment(s), including any amendment resulting from changes to 32 CFR 199 accomplished through rulemaking procedures, may terminate its participation as provided for in this Article. However, if the ACSP notice of intent to terminate its participation is not given at least 30 days prior to the effective date of the proposed amendment(s), the proposed amendment(s) shall be incorporated into this agreement for services furnished by the ACSP between the effective date of the amendment(s) and the effective date of termination of this agreement.

**ARTICLE 5**

**EFFECTIVE DATE**

5.1    DATE SIGNED

This Participation Agreement is effective on the date signed by the Director, DHA, or designee.

DHA                                                      ACSP

_____        _____
By: Typed Name and Title                          By: Typed Name and Title

Executed on _____, _____

- END -

4

REL000005

# Exhibit 3

| From: | Jeremy Wilson <jwilson@pal-services.org> |
| --- | --- |
| Sent: | Thursday, November 15, 2018 9:16 PM |
| To: | Dr. Lydia Luna <Drluna@calpsychcare.com>; Dennis Kogod <dkogod@360bhmail.com>; Robert Fitt <Rfitt@360bhmail.com> |
| Cc: | Laura Sauber <Laura.Sauber@360bhmail.com>; Jesse Garcia <Jesse.Garcia@360bhmail.com> |
| Subject: | BCBA Caseload Data |
| Attach: | BCBA Caseload Data.xlsx |

Hi All,

I hope you are well!

I wanted to share some preliminary baseline data for the BCBA caseloads. Below is a color coded graph representing this data. The **_green_** represents the ethical limit and BACB board recommendations for the number of clients on BCBA's caseload with middle tier supervisors. Our goal (as we all know) should be to have each BCBA in the green because this number allows the BCBA to practice ethically and responsibly and our clients are at the lowest risk for injury, loss, or danger. The yellow is a warning area, which signifies that the caseload numbers are posing more risk for failure and our clients may be at risk for injury, loss, or danger. The **_red_** signifies that we are putting the BCBA at high risk for failure and our clients are high risk for injury, loss, or danger due to the lack of qualified supervision. Attached is the raw data.



We have yet to collect data for SLO and Templeton. During the budget meeting we discussed roughly 7 locations (*Monterey Park, Temecula, SLO, Santa Clarita, Camarillo, and Ridgecrest*) that were showing poor outcomes. These are the BCBA caseload numbers for the clinicians in some of these areas:

| Data Point # | Name | Caseload # |
| --- | --- | --- |
| 4 | Diana Echeverria - Monterey Park | 51 |
| 5 | Melina Barragan - Monterey Park | 99 |
| | | 74 |

REL000123

| | | |
|---|---|---|
| 22 | Jennie Long - Santa Clarita | 18 |
| 23 | Anneli Weingard - Santa Clarita | 7 |
| 24 | Peter Schmidt - Santa Clarita | 24 |
| | | |
| 46 | Jennifer Hoster -Temecula | 21 |
| 49 | Laura Garcia – Camarillo (Assist Director) | 47 |
| | | |
| 51 | Lauren Franco - Camarillo - on medical leave | 11 |
| | | |

There is variability in caseload numbers between directors in these locations. My next step is to identify the BCBA's average billables rendered for August – October and number of middle tiers managing cases for each BCBA. I also plan to see if there is correlation between overloaded clinical duties and decreased attention to administrative tasks (I'm already observing an informal trend).

I hypothesize (...and I believe we covered this in the meeting) that in some cases we will see a high performing clinician (numbers hours rendered) and a low performing office location. If anything (which is a known variable) we need to increase the number of BCBA's in locations where numbers are in the high yellow and red areas to make sure we are practicing ethically and responsibly.

I also hypothesize that we will see better management of these locations and improved quality of clinical support and services if our Directors and Regional Clinical Directors solely focus on clinical duties and responsibilities and we hire Regional Office Managers who solely focus on the administrative duties and responsibilities.

If we plan to close any location, we may want to consider offering supervision staff (BCBA's and Mid Tiers) relocation opportunities to areas where BCBA/Mid-Tier staffing numbers are low, but show higher client numbers and a higher rate of referral.

Let me know if you have any questions regarding the data. Aysa was kind enough to assist me with gathering the data for this project. Still more to come!!

Take care!!!

Dr. Jeremy Wilson, PhD, BCBA-D
Director of Process Improvement



www.360behavioralhealth.com

Confidentiality Note: In compliance with the Health Portability and Accountability Act "HIPAA"(rule 104-91), this message is intended only for use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this electronic message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error or it was forwarded to you without permission from Jeremy Wilson, please FORWARD this message back to the sender at the email address above, DELETE this message from all mailboxes and any other electronic storage medium and DESTROY all copies. Thank you.

REL000124

REL000125

# Exhibit 4

| | |
|---|---|
| **From:** | Aly Champsi <aly@dwhp.com> |
| **Sent:** | Tuesday, December 25, 2018 5:17 AM |
| **To:** | Dennis Kogod <dkogod@360bhmail.com>; Rod Boone <rboone@dwhp.com> |
| **Subject:** | RE: Cal optima call went poorly today |

Yes, let's talk and then we can go back to them or move to the rep and warranty insurance.

Aly Champsi
Managing Director
DW Healthcare Partners
416-583-2422

**From:** Dennis Kogod <dkogod@360bhmail.com>
**Sent:** December-24-18 2:35 PM
**To:** Aly Champsi <aly@dwhp.com>; Rod Boone <rboone@dwhp.com>
**Subject:** Re: Cal optima call went poorly today

You may want to go back to the billing company you hired in DD. And see if they have any liability based on the work they did

Get Outlook for iOS

**From:** Aly Champsi <aly@dwhp.com>
**Sent:** Monday, December 24, 2018 11:34 AM
**To:** Dennis Kogod; Rod Boone
**Subject:** Re: Cal optima call went poorly today

That's obviously disappointing news. Certainly seems like they are not being as helpful or sympathetic as the clinical team was hoping. Let's add this to our discussion on Wednesday and we are happy to help brain storm any best next steps.

Aly Champsi
Managing Director
DW Healthcare Partners
**Sent via voice dictation, please excuse any typos**

**From:** Dennis Kogod <dkogod@360bhmail.com>
**Sent:** Monday, December 24, 2018 12:21 PM
**To:** Rod Boone; Aly Champsi
**Subject:** Cal optima call went poorly today

They accused us of not providing appropriate treatment and no supervision for quite a while

We were hoping for a second chance but they are not going to give us one

REL000179

The concerns are a few to me and are quite serious

1) loss of 5% of our aba census over the next few months
2) what they will say about us in the community.  And to other managed Medicaid providers
3) possibility they come back to us for recoupment on services provided because no bcba supervision
4) kept alluding to claims data suggesting that we provided supervision and had no documentation to support the claims.

Will keep you posted on next steps but trying to go above them may be fruitless as they have so many counter claims

They ended call saying this is a pattern of behavior of CPC going back to a DDS 2012 audit

They were not sympathetic or sensitive. Used the words "fraud and abuse " going back 8 years, several times.

We should expect follow up on their part regarding a comprehensive audit they will initiate going all the way back. I'm told statute of limitations is 4-5 years but checking   They did tell us to expect a bunch of follow up requests for records and referenced DDS.  Suggested they have not seen this behavior with other aba agencies

Also accused us of not reporting past issues from 2017 on this recent audit on the 10 charts

Leili did her best, but the data was what they hung their hat on and are sticking by that

Dennis Kogod
Executive Chairman and CEO
360 Behavioral Health
360Behavioralhealth.com

1-949-285-8969 ( cell)

---

**Total Control Panel**                                                                    Login

To: aly@dwhp.com                     Message Score: 50                    High (60): Pass
From: dkogod@360bhmail.com           My Spam Blocking Level: Custom       Medium (75): Pass
                                                                          Low (90): Pass
                                     Block this sender                    Custom (100): Pass
                                     Block 360bhmail.com

*This message was delivered because the content filter score did not exceed your filter level.*

---

**Total Control Panel**                                                                    Login

To: aly@dwhp.com                     Message Score: 50                    High (60): Pass
From: dkogod@360bhmail.com           My Spam Blocking Level: Custom       Medium (75): Pass
                                                                          Low (90): Pass
                                     Block this sender                    Custom (100): Pass
                                     Block 360bhmail.com

*This message was delivered because the content filter score did not exceed your filter level.*

REL000180

# Exhibit 5

**From:**      Laura Sauber <Laura.Sauber@360bhmail.com>
**Sent:**      Friday, January 4, 2019 2:00 AM
**To:**        Masatsugu, Miles <mmasatsugu@caloptima.org>; Dennis Kogod <dkogod@360bhmail.com>
**Cc:**        Sharps, Donald <dsharps@caloptima.org>; Dr. Leili Zarbakhsh <Drlzarbakhsh@calpsychcare.com>;
               Tammy Pedersen <Tammy.Pedersen@360bhmail.com>; Dr. Lydia Luna <drluna@360bhmail.com>;
               Dunphy, Jessica <jdunphy@caloptima.org>
**Subject:**   RE: CPC contact for all billing related issues

Hello Dr. Masatsugu,

Thank you for your response. It looks like we had a glitch in our email system. I am available to speak tomorrow at noon, if you are still free. If not, I can also be available on Monday. I look forward to our discussion.

Thank you.

**From:** Masatsugu, Miles <mmasatsugu@caloptima.org>
**Sent:** Monday, December 31, 2018 12:52 PM
**To:** Laura Sauber <Laura.Sauber@360bhmail.com>; Dennis Kogod <dkogod@360bhmail.com>
**Cc:** Sharps, Donald <dsharps@caloptima.org>; Dr. Leili Zarbakhsh <Drlzarbakhsh@calpsychcare.com>; Tammy Pedersen <Tammy.Pedersen@360bhmail.com>; Dr. Lydia Luna <drluna@360bhmail.com>; Dunphy, Jessica <jdunphy@caloptima.org>
**Subject:** RE: CPC contact for all billing related issues

Hello Laura, a few comments and a clarification.

    1. CalOptima currently has two investigations open. One in our Fraud, Waste and Abuse (FWA) department and one in our Quality Improvement (QI) department. You will be receiving a follow-up letter from our QI department detailing our follow-up questions. That being said, I am open to speaking with you directly to review what additional information we will be requesting.
    2. The FWA investigation is awaiting the QI investigation's findings. After that, they may or may not have additional questions.
    3. Finally, when you stated that you wanted to discuss "the upcoming audit", were you referencing one of the investigations above or were you referencing an upcoming internal CPC audit which your company was in the process of starting?

If you wanted to speak about the follow-up questions to the QI investigation, I would be free to speak with you on either Friday the 4th at noon or Monday the 7th at noon. If neither of those times work, let me know and I will try to find additional times.

Thank you.

Dr. Masatsugu

**Miles Masatsugu, M.D.**
Medical Director
Medical Management



CalOptima, A Public Agency
505 City Parkway West, Orange, CA 92868
Direct: 657-235-6912| Cell: 949-375-9308 | Fax: 714-954-2303
www.caloptima.org | Facebook | Twitter

**California's Top-Rated Medi-Cal Plan**
*-NCQA's Medicaid Health Insurance Plan Ratings 2018–2019*

**From:** Laura Sauber <Laura.Sauber@360bhmail.com>

**Sent:** Wednesday, December 26, 2018 9:59 AM
**To:** Dennis Kogod <dkogod@360bhmail.com>; Masatsugu, Miles <mmasatsugu@caloptima.org>
**Cc:** Sharps, Donald <dsharps@caloptima.org>; Dr. Leili Zarbakhsh <Drlzarbakhsh@calpsychcare.com>; Tammy Pedersen <Tammy.Pedersen@360bhmail.com>; Dr. Lydia Luna <drluna@360bhmail.com>
**Subject:** RE: CPC contact for all billing related issues

Dr. Masatsugu,

I look forward to speaking with you. Please let me know when you have availability to discuss the upcoming audit.

Thank you.

Laura Sauber
Chief Compliance and Privacy Officer
Chief Audit Executive
360 Behavioral Health
818-918-6491

**From:** Dennis Kogod
**Sent:** Wednesday, December 26, 2018 9:54 AM
**To:** mmasatsugu@caloptima.org
**Cc:** Dr Sharps <dsharps@caloptima.org>; Laura Sauber <Laura.Sauber@360bhmail.com>; Dr. Leili Zarbakhsh <Drlzarbakhsh@calpsychcare.com>; Tammy Pedersen <Tammy.Pedersen@360bhmail.com>; Dr. Lydia Luna <drluna@360bhmail.com>
**Subject:** CPC contact for all billing related issues

Good AM

Pursuant to our conversation on Monday, I wanted to introduce you to Laura Sauber, our chief compliance officer for 360 Behavioral Health and CPC

Laura is on point to provide you the billing data you talked about on our call Monday

Thank you

Dennis Kogod
Executive Chairman and CEO
360 Behavioral Health
360Behavioralhealth.com

1-949-285-8969 ( cell)

CONFIDENTIALITY WARNING:  This email is intended for the use of
the person to whom it is addressed and may contain information that
is privileged and confidential, the disclosure of which is governed
by applicable law. If the reader of this email is not the intended
recipient, or the employee or agent responsible to deliver it to the
intended recipient, you are hereby notified that any dissemination,
distribution, or copying of this information is STRICTLY PROHIBITED.
If you have received this message in error, please notify us
immediately and delete the related email.

# Exhibit 6



**CalOptima**
Better. Together.

505 City Parkway West | Orange, CA 92868

**RETURN SERVICE REQUESTED**

CERTIFIED MAIL

7018 0680 0002 1457 8059

RECEIVED

JAN 1 0 2019

ACCOUNTS PAYABLE

9140688613 COt9

PR-038-202 (0117.E)

REL000186



**CalOptima**
Better. Together.

Quality Improvement Department – Clinical Grievance

**CERTIFIED MAIL WITH RETURN RECEIPT**

January 7th, 2019

California PsychCare
c/o Tammy Pederson
16946 Sherman Way
Van Nuys, CA 91406

Dear Ms. Pedersen,

Thank you for your responses you sent to CalOptima in the letter dated 12/18/18.

The responses as well as the information we received during our informal telephone conference on 12/14/18 has not alleviated the concerns we have about the quality of care being delivered to CalOptima members by California PsychCare (CPC). We want to point out the following:

- A supervising BCBA must see the member in person regularly in order to do to the initial FBA, develop the treatment plan, oversee the implementation of the treatment plan and to determine the ongoing effectiveness of the treatment plan to determine if the plan needs to be adjusted. This is consistent with the terms outlined in the Letter of Agreement(s), the CalOptima Transition Council Training, and the Behavior Analyst Certification Board's Practice Guidelines.
- In CalOptima's 12/11/17 Transition Council Training, the following was outlined:
  - CalOptima supervision model follows SPA 14-026 in which supervision of the paraprofessional occurs in the intervention setting.
  - CalOptima typically authorizes supervision hours at a rate that falls between 10-20% of weekly paraprofessional service hours.
  - Most supervision hours are expected to take place directly supervising the paraprofessional.
  - Less than 20% of the total supervision hours may be used for "indirect supervision".
- At CalOptima's 3/12/18 Transition Council Training, the following was outlined:
  - CalOptima supervision model follows SPA 14-026 in which a BCBA or BMC provides supervision of the paraprofessional in the intervention setting.
  - CalOptima will typically authorize supervision hours at a rate that falls between 10–20 percent of weekly paraprofessional service hours.
  - Currently, as much as 90 percent of supervision of paraprofessional by a BMA will be acceptable if oversight is well documented.
  - Of supervision hours authorized, most supervision hours are expected to take place directly supervising the paraprofessional.



- o ≤ 20 percent of total supervision hours per six months (minimum of three and maximum of eight hours) may be used for the following indirect supervision tasks:
  - • Development of goals/objectives and behavior intervention plans/reports
  - • Reviewing direct staff summary notes
  - • Clinic meetings with paraprofessionals and parent
- **CalOptima does not consider the activities of a "report reviewer" or an "overseeing" BCBA who does not see the member face-to-face to be a supervising BCBA. Therefore, neither of these two persons can provide indirect supervision.**
- CPC had a Department of Developmental Services audit performed for dates of service July 1st, 2008 to June 30th, 2011 which found a significant number of issues of non-compliance that led to a settlement on April 20th, 2015 in which CPC had to pay back $1,819,261. These issues of non-compliance included billings that were not supported by session notes and billings for services provided by staff who did not have the minimum qualifications required to perform and bill for those services. With respect to the services that were supposed to be performed by a BCBA, you stated at the time that "this was done due to an inadequate number of board-certified behavior analysts available to perform the services". In addition to finding these same staffing shortages, our preliminary FWA and QI investigation has found a significant number of billing which are not supported by the medical records.
- CalOptima has determined that CPC had inadequate BCBA supervision of CalOptima members which included, at a minimum:
  - o Inadequate oversight of the implementation of the treatment plan.
  - o Inadequate oversight of ongoing therapy to determine effectiveness or need to adjustment to the treatment plan.

CalOptima is concerned that the BCBA staffing deficiencies have been a prevalent issue at CPC for a longer period of time that what CPC is suggesting and is not confident that CPC understands the full scope of the problem. In your response, you stated that "the occurrence of limited face-to-face BCBA supervision was episodic due to unusual and unplanned BCBA turnover in Orange County between November 2017 and October 2018". However, our investigation has found that CPC also had a limited number of BCBAs providing face-to-face supervision in Orange County prior to this timeline as well which suggests that there were additional gaps that were not addressed in your internal investigation. Furthermore, CPC has intimated that it provided this supervision as evidence by the claims submitted to CalOptima during this same period. Because we are finding similar issues to those found by the Department of Developmental Services audit, CalOptima does not believe that the root cause of the staffing deficiencies were due to transitional staffing issues. Some of these findings, including the unsupported billings and the staffing issues continue to persist three years after the Department of Developmental Services audit findings were finalized and ten years after they first occurred.

The information you have provided in your response was limited and incomplete. You provided a report which showed that only two of the thirteen members identified had one face-to-face visit with a BCBA. Both of these encounters occurred in 8/18 by Emi Fukoka who left the company less than a month later. The response does not disclose the breath of the supervision before or after these visits. Additionally, in your response you state that thirty-five members received at least one face-to-face BCBA supervision



CalOptima
Better. Together.

session. This means that the vast majority of our members did not have direct face-to-face supervision the vast majority of the year. If there was a CalOptima member who did not have a BCBA directly supervising their treatment for any period of time, CalOptima will need to determine whether any of the paraprofessional visits were appropriate as there was not a BCBA to determine if the treatment plan was being implemented correctly by the paraprofessional and whether the treatment plan was effective or needed to be adjusted. Finally, as stated earlier, your internal investigation only appears to have addressed the timeframe which CalOptima had called out. However, our investigation has found that you had significant BCBA staffing deficiencies prior to these dates as well. We were disappointed that your internal investigation did not uncover and address these additional time frames. As a result, CalOptima is requesting a report of the following for all CalOptima members from January 1st, 2017 to December 31, 2018.

- The member's name
- The name of the supervising BCBA.
- The period of time the BCBA was supervising.
- The dates of the face-to-face BCBA visits.
- Medical records to support the report.

CalOptima would like to know the full scope and root causes of the deficiencies. Did CPC ever address the areas of non-compliance found in the Department of Developmental Services audit? If so, why are we continuing to find the same issues? How long have you had BCBA staffing deficiencies? Was the "report reviewer" a way to get around the supervision requirements or to address the staffing deficiencies? When did you first start using "report reviewers" for CalOptima members? Have "report reviewers" or overseeing BCBAs who did not see members face-to-face provide indirect supervision for CalOptima members prior to November 1st, 2017? Have you billed for indirect BCBA supervision completed by BCBAs who did not see CalOptima members face-to-face prior to November 1st, 2017? Although you will no longer be using "report reviewers" for CalOptima members, will they continue to be used for your other lines of business?

CalOptima needs to understand the full scope of the problem in order to determine if the corrective actions you have put into place this time fully addresses the root causes.

Sincerely,

Miles Masatsugu, M.D.
Medical Director
CalOptima

505 City Parkway West | Orange, CA 92868 | Fax: 657-900-1615 | email: qualityofcare@caloptima.org

# Exhibit 7



**California Psychcare**

February 1, 2019

Via Federal Express (7743 7005 2816)

CalOptima
Attention: Miles Masatsugu, M.D., Medical Director
505 City Parkway west
Orange, CA 92868

Subject: CalOptima Quality Improvement Department, Clinical Grievance Response

Dear Dr. Masatsugu,

This letter is in response to your letter dated January 7, 2019 and the points set forth therein. First and most importantly, California PyschCare, Inc. (CPC) is dedicated to delivering high quality care to CalOptima members that meets evidenc e-based best practices as well as the guidelines set forth by CalOptima. We acknowledge receipt of your concerns and we are committed to addressing and alleviating each of these concerns. Therefore, please find attached, Exhibit A, in which we set forth a detailed CalOptima Corrective Action Plan (CAP) that addresses each point of concern raised in your letter. Further, CPC is dedicated to completing a root cause analysis, which as of today, is ongoing. Therefore, any new or unaddressed concern that may be identified by our root cause analysis investigation and is relevant for CalOptima will be added to the CAP and addressed as soon as possible.

On April 1, 2018, CPC came under new ownership and management. Compliance due diligence was performed by a rationally recognized independent third party in connection with the purchase of CPC. The due diligence review did not uncover and the report submitted to the purchaser by the independent third party did not identify any of the issues identified in the concerns raised by CalOptima. Nonetheless, in accordance with the purchaser's customary post-acquisition procedures, a new senior management team has been put in place for CPC. Part of the responsibilities of the new team is to ensure CPC is committed to ongoing compliance. As part of the new team, a more experienced and well qualified Chief Privacy and Compliance Officer (CPCO), Laura Sauber, was hired by CPC's affiliate, 360 Behavioral Health, as of October 8, 2018, to provide compliance and privacy guida nce to CPC and its other affiliates. Laura has worked in healthcare for 23 years. Prior to joining 360 Behavioral Health, Laura worked for Kaiser Permanente for 16 years. Thirteen of those years were in progressive leadership roles in compliance, including serving for 3 years as the national VP of Health Plan Compliance. This strategic hire demonstrates senior management's affirmative actions to set the correct "Tone at the Top" for compliance, including quality of care to your members that complies with CalOptima requirements.

Due to the transition in ownership, staff turnover, and the passing of the prior owner, Dr. Sadeghi, the new management team may not have all of the facts relevant to the Department of Developmental Services (DDS) audit and subse quent settlement. However, through our investigation, the following information has been shared with us: (i) the DDS audit was settled by CPC and DDS without any admission of wrongdoing by CPC; (ii) the DDS and Regional Centers were aware of the shortage of Board Certified Behavior Analysts (BCBAs) and were committed to working with all providers to address this shortage; (iii) the historical context of the provision of ABA services; and (iv) the philosophy of the prior owners, which included working with D DS and the Regional Centers to provide care while seeking solutions to the BCBA shortage.

As you know, there has historically been a significant shortage of BCBAs to support the population of children with autism. In 2016, there were 97,000 children in Ca lifornia public schools with autism. Even using the current number of 15,552 BCBAs in California this represents approximately only a 16% ratio of BCBAs to the population of individuals with autism. In addition, the ratio of individuals with autism has been cited as high as 1:40 and as low as 1:59. Dr. Sadeghi and his partner and wife, Dr. Zarbakhsh, understood the lack of certified BCBAs, the growth of the population of children with autism, and the resulting denial of services. They recognized the need for treatment for the growing population of children with autism as an emergent situation, which still exists today. Dr. Sadeghi and Dr. Zarbakhsh had a philosophy that no child should be without services. As a result, CPC continued to work diligently to ensure needed services were provided to CalOptima members with the resources available while, at the same time, working diligently to eliminate any shortage of BCBAs.

As noted in the attached CAP, we are addressing the questions posed and concerns raised by CalOptima regarding appropriate staffing levels, formalized policies, training, and auditing and monitoring. As an example of CPC's ongoing efforts, our senior clinical team received fraud, waste, and abuse training from an outside law firm, in person and by audio conference, on January 16, 2019.

We acknowledge CalOptima's expression of concern regarding billing for "report reviewer" or overseeing BCBA activities, when the BCBA did not see the member face -to-face. CPC is continuing its root cause analysis which includes a billing audit and will take appropriate action upon completion of the analysis.

While the attached CAP sets forth our initial plan of action, we will continue to perform root cause analysis and will address any compliance issues that may be identified. Further, we will implement a communication plan and ongoing roundtable clinical and compliance meetings as a preventive measure company-wide.

Please find below responses to each of your specific questions/actions:

1. ***Report for all CalOptima members from January 1, 2017 through December 31, 2018 that contains the following.*** This response is set forth in the CAP and as stated in the CAP will be provided to CalOptima by March 1, 2019.
   a. *Members name*
   b. *Name of supervising BCBA*

2

REL000206

       c. *Period of time the BCBA was supervising*

       d. *Dates of the face-to-face BCBA visits*

       e. *Medical records to support the report*

2. ***Did CPC ever address the areas of non-compliance found in the Department of Development Services audit?*** Based on interviews, it is the understanding of the current management team that the issues raised were addressed and the matter resolved with no admission of wrongdoing by CPC. Also, the timeframe of the DDS audit and subsequent evolving credentials and shortage of BCBAs was known by DDS and the Regional Centers. These issues spanned all providers and were not unique to CPC. It is our understanding that to the best present belief and knowledge of staff members who were with CPC at the time, that CPC complied with the DDS requirements; noting, that both DDS and the Regional Centers were aware of BCBA shortages. Further, it is our understanding that both DDS and the Regional Centers were committed to working with CPC and other providers through, and in spite of, the BCBA shortage. It is noted, the ABA field was evolving during the years of the DDS audit and subsequent settlement. However, our investigation is ongoing and to the extent that any problems associated with prior issues are discovered, we will implement effective correction actions.

3. ***If so, why are we continuing to find the same issues?*** Please see response above.

4. ***How long have you had BCBA staffing deficiencies?*** As noted above, BCBA shortages have been an ongoing concern for providers and Behavioral Health in general. However, as noted in the attached CAP, CPC has addressed the BCBA staffing issues for CalOptima members.

5. ***Was the "report reviewer" a way to get around the supervision requirements or to address staffing deficiencies?*** It was never CPC's intention to use report reviewers in an effort to get around meeting supervision or other requirements. Rather, the understanding of the current management team is that the "report reviewer" performed functions that included services such as data analysis, review of clinical recommendations and case oversight.

6. ***When did you first start using "report reviewers" for CalOptima members ?*** While we don't have an exact date, CPC sets forth the historical precedent for the data analysis, review of the treatment plan in the context of the analyzed da ta, review of and discussion with direct providers regarding treatment plans across clients and review of clinical recommendations, etc. that are highly beneficial to clients and are represented by these indirect services.

7. ***Have "report reviewers" or overseeing BCBAs who did not see members face -to-face provided indirect supervision for CalOptima members prior to November 1, 2017?*** Yes, as per above noted historical precedent.

8. ***Although you will no longer be using "report reviewers" for CalOptima members, will they continue to be used for your other lines of business?*** CPC is eliminating the use of report reviewers in the capacity of indirect supervision. Further, as stated throughout this letter, we are committed to compliance and addressing any neded improvements noted on a company-wide basis. For a timely response, this CAP is focused on CalOptima, but our corrective action will be addressed more broadly and may include improvements in other lines of business.

3

In closing, we present this letter and the attached CAP (Exhibit A) in commitment to addressing the full scope and root cause analysis of the concerns raised by CalOptima.  As noted, we are also committed to continue our ongoing efforts to identify and implement improvements to our compliance program throughout our organization. As part of these efforts, we look forward to working with CalOptima to address each objective addressed herein and answer any questions regarding our CAP and this response.

Cordially,

Dennis L. Kogod
Executive Chairman and CEO
360 Behavioral Health
818-474-1562

45902492.v1

16946 Sherman Way Van Nuys, CA 91406

4

CONFIDENTIAL

**California Psychcare, Inc.**
**Exhibit A - CalOptima Corrective Action Plan Submission**
**February 1, 2019**

**Date of Submission:** January 30, 2019

This Corrective Action Plan (CAP) constitutes California PsychCare's (CPC) written allegation of compliance for the issues raised in the CalOptima letter dated January 7, 2019. Submission of this CAP; however, does not waive any appeal rights or other administrative or judicial processes to which it is otherwise entitled nor is this an admission of any wrongdoing. CPC reserves the right to pursue all remedies to which it may be entitled. This CAP is submitted to meet requirements set forth by CalOptima.

| Summary Statement of Findings | Provider's CAP | Completion Date |
|---|---|---|
| * A supervising BCBA must see the member in person regularly in order to do the initial FBA, develop the treatment plan, oversee the implementation of the treatment plan and to determine the ongoing effectiveness of the treatment plan to determine if the plan needs to be adjusted. <br><br> * CalOptima does not consider the activities of the "report reviewer" or an "overseeing" BCBA who does not see the member face-to-face to be a supervising BCBA. Therefore, neither of these two persons can provide indirect supervision. <br><br> * In addition to finding these same staffing shortages[1], our preliminary | In response to CalOptima's finding, CPC is addressing the following within the completion timeline stated. As part of our root cause analysis, we are addressing these concerns across our organization; however, those timelines and any resulting corrective action are not part of this CAP. <br><br> **Documentation** <br> Requested documentation by CalOptima for the dates of January 1, 2017 through December 31, 2018. The documentation requested includes: <br>    * The member's name. <br>    * The name of supervising BCBA. <br>    * The period of time the BCBA was supervising. <br>    * The dates of the face-to-face BCBA visits. <br>    * Medical records to support the report. <br><br> **Staffing** <br>    * Chief Operating Officer and the clinical team have personally reviewed CPC's BCBA staffing levels and have ensured each member is assigned a supervising BCBA that will provide direct face to face supervision as authorized by the health plan. <br>    * The Chief Operating Officer has eliminated the use of report reviewers for indirect supervision. | March 1, 2019 |

[1] The CalOptima letter references the DDS audit.

1

REL000209

CONFIDENTIAL

California Psychcare, Inc.

Exhibit A - CalOptima Corrective Action Plan Submission

February 1, 2019

| | |
|---|---|
| FWA and QI investigation has found a significant number of billing which are not supported by the medical records.<br><br>* CalOptima has determined that CPC had inadequate BCBA supervision of CalOptima members which included, at a minimum:<br>  o Inadequate oversight of treatment plan<br>  o Inadequate oversight of ongoing therapy to determine effectiveness or need to adjust the treatment plan | **Polices**<br>* Ongoing commitment to adherence to federal and state laws and regulations including SPA 14-026, BACB guidance for managers and funders, and payor policies, including:<br>  o Commitment to maintaining staffing levels to ensure the provision of direct supervision according to authorization and notification to payors when capacity is reached.<br>  o Commitment to compliant billing practices, including acceptable indirect supervision services for billing.<br>* Clinical record documentation standards.<br><br>**Training**<br>All billing team members, BCBAs, middle tier and direct staff, senior management and regional management team members serving CalOptima members receive:<br>* Fraud, Waste, and Abuse training by the Chief Compliance and Privacy Officer.<br>* Prohibition on billing for quality assurance activities such as a BCBA "report reviewer" that is not providing member face-to-face supervision.<br>* Timely documentation for all services rendered pursuant to the clinical record documentation standard.<br>* Training on State Plan Amendment 14-026 and CalOptima supervision policies, including:<br>  o Supervision of the paraprofessional occurs in the intervention setting.<br>  o CalOptima typically authorizes supervision hours at a rate that falls between 10-20% of the weekly paraprofessional service hours .<br>  o Most supervision hours are expected to take place directly supervising the paraprofessional.<br>  o Less than 20% of total supervision hours may be used for "indirect supervision".<br>  o As much as 90 percent of supervision of a paraprofessional by a BMA will be acceptable if oversight is well documented.<br>  o $\leq$ 20 percent of total supervision hours per six months (minimum of three and    maximum of eight hours) may be used for the following indirect supervision tasks:<br>    o Development of goals/objectives and behavior intervention plans/reports .<br>    o Reviewing direct staff summary notes.<br>    o Clinic meetings with paraprofessional and parent. |

2

REL000210

CONFIDENTIAL

California Psychcare, Inc.
Exhibit A - CalOptima Corrective Action Plan Submission
February 1, 2019

* Training on clinical records documentation standards policy.

**Monitoring**
Weekly review of adequacy of direct supervision comparing scheduled and rendered hours versus authorized hours, for the next 60 days and monthly thereafter. Review includes evaluation of supporting clinical documentation. Monitoring outcomes are reviewed by the Chief Operating Officer. Based upon outcomes staffing additions are addressed. If adequate BCBA supervision is not in place, CPC ceases to accept new members until appropriate staffing ratios are in place. Further, if staffing ratios are such that existing members cannot be seen, CPC will notify Cal Optima within ten (10) days of such an event.

**Auditing**
* Weekly auditing of supervision for the next 60 days by the Compliance Department of ten percent (10%) of the monitoring outcomes noted above.
* Audit of services billed for the period of 1/1/17 to 12/31/18.

**Policies**
* Ongoing commitment to maintain quality standards including:
  o Appropriate supervision for two and three tiermodels with description of standards for each model of care.
  o Initial functional behavioral assessment
  o Oversight of ongoing therapy and treatment plan.

**Monitoring**
Monitor for adequacy of supervision and clinical documentation, as stated above.

**Auditing**
* Audit by the Compliance Department, as stated above.

April 1, 2019

**Training**
BCBAs, middle tier and direct staff, senior management and regional management team members serving CalOptima members receive training on quality standards policy.

May 1, 2019

3

REL000211

CONFIDENTIAL

California Psychcare, Inc.
Exhibit A - CalOptima Corrective Action Plan Submission
February 1, 2019

* Ongoing annual code of conduct training, including FWA.

**Monitoring**
Ongoing monthly monitoring by Senior Leadership for adequacy of supervision, clinical documentation, and quality standards.

**Auditing**
* Submit billing audit results.
* Include supervision and billing practices in risk assessment and annual audit planning.

4

REL000212

# Exhibit 8



Inland Empire Health Plan

August 30, 2018

California Psychcare Inc
16946 Sherman Way
Van Nuys, CA 91406

Dear Provider:

Inland Empire Health Plan (IEHP) received claim(s) referenced in the list below. We are unable to process your claim(s) due to the reason stated. Please submit your claim(s) with the corrected information.

| Patient Acct No | Member ID Name DOB | Date(s) of Service | Total Billed Amount | IEHP Claim No | Date Received | Explanation |
|---|---|---|---|---|---|---|
| 213716824 | 20100800762100 Anthony Tellez Hernandez 05/13/2010 | 5/4/2018 to 5/31/2018 | $1,362.50 | 0003247148 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213881711 | 200610006442 Robert Peterson 04/27/2006 | 5/8/2018 to 5/30/2018 | $837.50 | 0003247149 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213776850 | 20010100295400 Rebecca Miller 02/08/2000 | 5/2/2018 to 5/31/2018 | $1,793.75 | 0003247150 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213786867 | 20100500482200 Brandon Mottl 02/13/2010 | 5/1/2018 to 5/31/2018 | $3,200.00 | 0003247151 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206364047 | 20161000321500 Elijah Aragon 05/18/2007 | 4/18/2018 to 4/30/2018 | $875.00 | 0003247152 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000040

| 213647317 | 20090500676800<br>Netenel Singleton<br>04/25/2007 | 5/2/2018 to<br>5/3/2018 | | $300.00 | 0003247153 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 213639400 | 20100700276100<br>Dylan Hasbach<br>04/22/2010 | 5/1/2018 to<br>5/31/2018 | | $2,725.00 | 0003247154 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207452559 | 20111100534600<br>Mario Leon<br>08/28/2005 | 4/2/2018 to<br>4/20/2018 | | $1,775.00 | 0003247155 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206465194 | 20150301207700<br>Iker Cabrera<br>03/04/2014 | 4/3/2018 to<br>4/27/2018 | | $3,537.50 | 0003247156 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213576255 | 20141100850500<br>Fernando Ruiz<br>08/17/2011 | 5/1/2018 to<br>5/30/2018 | | $2,287.50 | 0003247157 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213649651 | 20141001664600<br>Katelin Snedegar<br>04/01/2005 | 5/3/2018 to<br>5/31/2018 | | $2,475.00 | 0003247158 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206359038 | 20140200032300<br>Miguel Alonso<br>09/28/2008 | 4/5/2018 to<br>4/30/2018 | | $1,300.00 | 0003247159 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207455755 | 20020600283600<br>Ismael Lopez<br>01/28/2002 | 4/3/2018 to<br>4/30/2018 | | $550.00 | 0003247160 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207627384 | 20100900483900<br>Joseph Olmos<br>03/05/2010 | 4/4/2018 to<br>4/30/2018 | | $1,362.50 | 0003247161 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207551120 | 20080800395000<br>Andy Melgar<br>09/19/2005 | 4/3/2018 to<br>4/30/2018 | | $1,575.00 | 0003247162 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213647621 | 20170100932100<br>Gabriel De La Cruz<br>10/01/2013 | 5/1/2018 to<br>5/4/2018 | | $700.00 | 0003247163 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 213618911 | 20141101907700 Alexander Bohse 06/28/2012 | 5/2/2018 to 5/31/2018 | | $3,225.00 | 0003247164 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213507538 | 20101100637000 Rafael Roman 08/12/2010 | 5/3/2018 to 5/12/2018 | | $160.00 | 0003247165 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206689983 | 20141003496100 Kaidyn Darby 11/12/2013 | 4/2/2018 to 4/30/2018 | | $2,550.00 | 0003247166 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213645549 | 20010300151600 George Hernandez 12/07/2000 | 5/1/2018 to 5/3/2018 | | $225.00 | 0003247167 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213636175 | 20150301207700 Iker Cabrera 03/04/2014 | 5/2/2018 to 5/24/2018 | | $300.00 | 0003247168 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207392516 | 20121000341900 Gavin Himler 12/15/2010 | 4/3/2018 to 4/26/2018 | | $1,162.50 | 0003247169 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213726173 | 20130700804900 Mia Torres 01/08/2013 | 5/3/2018 to 5/30/2018 | | $1,275.00 | 0003247170 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213722700 | 20101000646800 Edward Torres 07/15/2010 | 5/2/2018 to 5/31/2018 | | $1,400.00 | 0003247171 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207629059 | 20110900692300 Aaron Orozco 05/21/2011 | 4/2/2018 to 4/30/2018 | | $2,850.00 | 0003247172 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207560771 | 20010100295400 Rebecca Miller 02/08/2000 | 4/2/2018 to 4/27/2018 | | $1,325.00 | 0003247173 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213504606 | 20141100400900 Carmen Reyes-Ramirez 08/05/2014 | 5/1/2018 to 5/29/2018 | | $3,575.00 | 0003247174 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

REL000042



Inland Empire Health Plan

| 213647317 | 20090500676800 Netenel Singleton 04/25/2007 | 5/2/2018 to 5/3/2018 | | $300.00 | 0003247153 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|---|
| 213639400 | 20100700276100 Dylan Hasbach 04/22/2010 | 5/1/2018 to 5/31/2018 | | $2,725.00 | 0003247154 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207452559 | 20111100534600 Mario Leon 08/28/2005 | 4/2/2018 to 4/20/2018 | | $1,775.00 | 0003247155 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206465194 | 20150301207700 Iker Cabrera 03/04/2014 | 4/3/2018 to 4/27/2018 | | $3,537.50 | 0003247156 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213576255 | 20141100850500 Fernando Ruiz 08/17/2011 | 5/1/2018 to 5/30/2018 | | $2,287.50 | 0003247157 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213649651 | 20141001664600 Katelin Snedegar 04/01/2005 | 5/3/2018 to 5/31/2018 | | $2,475.00 | 0003247158 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206359038 | 20140200032300 Miguel Alonso 09/28/2008 | 4/5/2018 to 4/30/2018 | | $1,300.00 | 0003247159 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207455755 | 20020600283600 Ismael Lopez 01/28/2002 | 4/3/2018 to 4/30/2018 | | $550.00 | 0003247160 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207627384 | 20100900483900 Joseph Olmos 03/05/2010 | 4/4/2018 to 4/30/2018 | | $1,362.50 | 0003247161 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207551120 | 20080800395000 Andy Melgar 09/19/2005 | 4/3/2018 to 4/30/2018 | | $1,575.00 | 0003247162 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213647621 | 20170100932100 Gabriel De La Cruz 10/01/2013 | 5/1/2018 to 5/4/2018 | | $700.00 | 0003247163 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000043

| 206472700 | 20080600106700 Robert Cantu 03/07/2008 | 4/3/2018 to 4/26/2018 | $706.25 | 0003247186 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 216089126 | 20131000817600 Josue Aguirre 02/15/2006 | 6/1/2018 to 6/28/2018 | $2,712.50 | 0003247187 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216370046 | 201207002066 June Davis 05/04/2012 | 6/1/2018 to 6/19/2018 | $1,112.50 | 0003247188 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216217983 | 20130100150500 Martin Caudillo 07/27/2012 | 6/1/2018 to 6/29/2018 | $1,687.50 | 0003247189 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207751378 | 20100100605900 Blas Rodriguez-Gamez 08/26/2009 | 4/2/2018 to 4/28/2018 | $1,237.50 | 0003247190 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213715292 | 201305005350 Axel Martin 11/15/2011 | 5/2/2018 to 5/4/2018 | $506.25 | 0003247191 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216730194 | 20160801435400 Kate Johnson 11/14/1997 | 06/04/2018 | $1,375.00 | 0003247192 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207444750 | 20101100937200 Andrew Labuen 10/09/2010 | 4/2/2018 to 4/30/2018 | $1,387.50 | 0003247193 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206450485 | 20160200774000 Joshua Burnham 04/24/2009 | 4/2/2018 to 4/26/2018 | $1,650.00 | 0003247194 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216745681 | 20100400409600 Natalie Lopez 03/21/2007 | 6/4/2018 to 6/14/2018 | $975.00 | 0003247195 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213641283 | 20150300384900 Levi Sedivy 10/24/2011 | 5/1/2018 to 5/31/2018 | $3,150.00 | 0003247196 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

REL000044



**Inland Empire Health Plan**

| 207749546 | 20161200251100<br>Alexander Robinson<br>09/01/2012 | 4/10/2018 to<br>4/27/2018 | $712.50 | 0003247175 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 207626168 | 20060900358600<br>Nicholas Norman<br>06/29/2006 | 4/2/2018 to<br>4/30/2018 | $3,025.00 | 0003247176 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213841212 | 20090400552200<br>Kenneth Muro<br>07/15/2005 | 5/1/2018 to<br>5/30/2018 | $2,287.50 | 0003247177 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213879919 | 20080500510300<br>James Perzabal<br>03/11/2008 | 5/2/2018 to<br>5/31/2018 | $2,612.50 | 0003247178 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207624001 | 20060400354500<br>Rosario Navarro<br>02/18/2006 | 4/3/2018 to<br>4/28/2018 | $1,650.00 | 0003247179 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207752191 | 20120500828200<br>Esequiel Rojas<br>02/10/2012 | 4/3/2018 to<br>4/24/2018 | $581.25 | 0003247180 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213610773 | 20030400046700<br>Neil Barron<br>11/26/2002 | 5/1/2018 to<br>5/25/2018 | $412.50 | 0003247181 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213631634 | 20061100491000<br>Eduardo Grimaldo<br>08/12/2006 | 5/29/2018 to<br>5/31/2018 | $275.00 | 0003247182 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213636323 | 201704005577<br>Gabriel Calixte<br>06/20/2014 | 5/10/2018 to<br>5/24/2018 | $56.25 | 0003247183 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207868143 | 20100500632800<br>Dylan Salgado Avila<br>02/18/2010 | 4/3/2018 to<br>4/28/2018 | $1,937.50 | 0003247184 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216097652 | 20140200032300<br>Miguel Alonso<br>09/28/2008 | 6/5/2018 to<br>6/26/2018 | $1,100.00 | 0003247185 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000045

| 213646266 | 20120500898700<br>Ronald Silva<br>06/02/2004 | 5/2/2018 to<br>5/31/2018 | | $2,175.00 | 0003247208 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 216748359 | 20151200338300<br>Jason Martinez<br>04/16/2010 | 6/3/2018 to<br>6/26/2018 | | $1,650.00 | 0003247209 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207749093 | 20141100400900<br>Carmen Reyes-<br>Ramirez<br>08/05/2014 | 4/10/2018 to<br>4/30/2018 | | $2,862.50 | 0003247210 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206420103 | 20110600054400<br>Andre Arguelles<br>04/12/2011 | 4/2/2018 to<br>4/30/2018 | | $1,512.50 | 0003247211 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216825239 | 20030100320500<br>Kemish Muro<br>07/08/2002 | 6/1/2018 to<br>6/29/2018 | | $2,737.50 | 0003247212 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216817768 | 20161200251100<br>Alexander Robinson<br>09/01/2012 | 6/5/2018 to<br>6/28/2018 | | $1,787.50 | 0003247213 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206695690 | 20100300167100<br>Kyng Davis<br>12/18/2009 | 4/3/2018 to<br>4/26/2018 | | $1,425.00 | 0003247214 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 208013280 | 20130600967600<br>Nathan Vu<br>05/15/2006 | 4/4/2018 to<br>4/26/2018 | | $1,325.00 | 0003247215 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213648390 | 20111000416500<br>Arianna Hernandez<br>Montes<br>05/28/2011 | 5/1/2018 to<br>5/31/2018 | | $1,425.00 | 0003247216 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207626766 | 20100500504500<br>Dillyn Nottle<br>03/06/2010 | 4/2/2018 to<br>4/26/2018 | | $2,750.00 | 0003247217 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216837949 | 20100500504500<br>Dillyn Nottle<br>03/06/2010 | 6/4/2018 to<br>6/27/2018 | | $2,250.00 | 0003247218 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |



Inland Empire Health Plan

| 207455479 | 20061100297600<br>Alexander Lopez<br>09/20/2006 | 4/3/2018 to<br>4/26/2018 | $1,593.75 | 0003247197 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216840625 | 20100900483900<br>Joseph Olmos<br>03/05/2010 | 6/4/2018 to<br>6/25/2018 | $1,387.50 | 0003247198 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216252510 | 20150300805600<br>Cristian Chacon<br>Tiznado<br>08/20/2007 | 6/1/2018 to<br>6/27/2018 | $1,425.00 | 0003247199 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216195865 | 20150500019200<br>Chris Barrientos-<br>Orozco<br>10/14/2013 | 6/2/2018 to<br>6/27/2018 | $3,425.00 | 0003247200 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216253237 | 20091100136700<br>Jezerael Chatlos<br>07/07/2009 | 6/7/2018 to<br>6/25/2018 | $593.75 | 0003247201 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207440818 | 20170701356800<br>Shiloh West<br>01/07/2011 | 4/6/2018 to<br>4/24/2018 | $750.00 | 0003247202 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207866536 | 20130600823700<br>Degan Ryder<br>02/10/2007 | 4/2/2018 to<br>4/30/2018 | $2,100.00 | 0003247203 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206362833 | 201109000294<br>Diego Alvarado<br>10/16/2002 | 4/4/2018 to<br>4/30/2018 | $1,825.00 | 0003247204 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207949152 | 20150801327300<br>Aliyah Torres<br>06/13/2011 | 4/2/2018 to<br>4/30/2018 | $1,950.00 | 0003247205 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207413511 | 20090200329100<br>Nathan Johnson<br>09/07/2002 | 4/12/2018 to<br>4/30/2018 | $1,081.25 | 0003247206 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216093129 | 20060600025100<br>Julia Aispuro<br>01/24/2006 | 6/8/2018 to<br>6/30/2018 | $675.00 | 0003247207 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800<br>Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003<br>Office Hours: 8am - 5pm<br>www.iehp.org

MC-15-01676

REL000047

| 213857677 | 20100900483900 Joseph Olmos 03/05/2010 | 5/4/2018 to 5/28/2018 | $918.75 | 0003247230 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 213842040 | 20100500738900 Andrew Vo 03/10/2010 | 5/3/2018 to 5/31/2018 | $1,512.50 | 0003247231 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216844320 | 20101200843700 Karely Padilla 08/24/2008 | 6/2/2018 to 6/27/2018 | $1,487.50 | 0003247233 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216748439 | 20100400439900 Antonio Martinez 04/18/2004 | 6/18/2018 to 6/28/2018 | $900.00 | 0003247234 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213503791 | 20141100400900 Carmen Reyes-Ramirez 08/05/2014 | 5/1/2018 to 5/16/2018 | $506.25 | 0003247235 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207439367 | 20090602053300 Rami Khatib 01/22/2001 | 4/3/2018 to 4/30/2018 | $1,150.00 | 0003247236 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213582634 | 20160801301000 Humberto Aguilar 05/14/1999 | 5/2/2018 to 5/30/2018 | $2,187.50 | 0003247237 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213646698 | 201207002066 June Davis 05/04/2012 | 5/1/2018 to 5/31/2018 | $1,868.75 | 0003247238 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207728968 | 20110200499500 Ashlynn Reim 11/29/2010 | 4/2/2018 to 4/13/2018 | $225.00 | 0003247239 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207746508 | 20140200622600 Robert Rendon 10/01/2013 | 4/9/2018 to 4/27/2018 | $1,875.00 | 0003247240 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207707695 | 20120600587300 Erick Padilla Torres 03/11/2012 | 4/2/2018 to 4/30/2018 | $2,475.00 | 0003247241 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |



Inland Empire Health Plan

| 213779424 | 20110300449800 Josue Miramontes 01/17/2011 | 5/9/2018 to 5/30/2018 | $850.00 | 0003247219 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 216813977 | 20141100400900 Carmen Reyes-Ramirez 08/05/2014 | 6/2/2018 to 6/28/2018 | $3,250.00 | 0003247220 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216994454 | 20100400758500 Josue Vicente 01/12/2010 | 6/2/2018 to 6/23/2018 | $1,756.25 | 0003247221 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213641028 | 20150502085100 David Clay 05/17/1998 | 5/1/2018 to 5/29/2018 | $837.50 | 0003247222 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216997763 | 20130100928200 Natalyn Vu 08/22/1999 | 6/1/2018 to 6/28/2018 | $1,762.50 | 0003247223 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206422847 | 20110500914800 Matthew Austrian 11/03/2006 | 4/4/2018 to 4/30/2018 | $1,675.00 | 0003247224 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207949430 | 20080300541900 Oscar Torres 01/08/2008 | 4/3/2018 to 4/27/2018 | $1,312.50 | 0003247225 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206498668 | 20120500173600 Luis Ceja 03/06/2012 | 4/2/2018 to 4/30/2018 | $2,100.00 | 0003247226 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207625481 | 20100700449800 Isaac Nease 01/11/2010 | 4/2/2018 to 4/30/2018 | $1,850.00 | 0003247227 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207454153 | 20080900329000 Jacksen Lesher 04/22/2008 | 04/18/2018 | $150.00 | 0003247228 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216748688 | 20130600594700 Alex Mcdonald 01/09/2001 | 06/01/2018 | $200.00 | 0003247229 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000049

| 216367699 | 20100300167100 Kyng Davis 12/18/2009 | 6/1/2018 to 6/30/2018 | $1,731.25 | 0003247253 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 213648446 | 20110400716000 Evan Smith 10/02/2009 | 5/1/2018 to 5/24/2018 | $2,300.00 | 0003247254 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207408454 | 20110200327900 Jose Jimenez 03/23/2005 | 4/3/2018 to 4/26/2018 | $2,000.00 | 0003247255 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213855564 | 20060900358600 Nicholas Norman 06/29/2006 | 5/16/2018 to 5/31/2018 | $750.00 | 0003247256 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206752838 | 20161100486500 Liam Finnegan 10/22/2012 | 4/2/2018 to 4/9/2018 | $393.75 | 0003247257 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207694544 | 20110100600700 Axel Padilla 10/12/2010 | 4/6/2018 to 4/27/2018 | $1,037.50 | 0003247258 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206860650 | 20120900301900 Brian Gener 01/08/2012 | 4/3/2018 to 4/28/2018 | $2,375.00 | 0003247259 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206973437 | 20100200318700 Luke Hendrix 11/25/2009 | 4/3/2018 to 4/26/2018 | $1,200.00 | 0003247260 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213870727 | 20110100600700 Axel Padilla 10/12/2010 | 5/3/2018 to 5/31/2018 | $1,462.50 | 0003247261 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216095037 | 20090200021400 Gisell Aispuro 11/13/2008 | 6/4/2018 to 6/26/2018 | $1,575.00 | 0003247262 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207748730 | 20141100400900 Carmen Reyes-Ramirez 08/05/2014 | 4/3/2018 to 4/9/2018 | $1,112.50 | 0003247263 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

REL000050



Inland Empire Health Plan

| 206897367 | 20100900274200 Angel Gutierrez Miranda 06/26/2010 | 4/4/2018 to 4/30/2018 | $2,587.50 | 0003247242 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 207953972 | 20140502077000 Christian Villafana 08/01/2013 | 4/3/2018 to 4/30/2018 | $2,025.00 | 0003247243 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207954501 | 20111101023700 Milinda Villalobos 12/14/2005 | 4/3/2018 to 4/16/2018 | $750.00 | 0003247244 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216746775 | 20130700435500 Joe Lara 12/24/2012 | 6/1/2018 to 6/28/2018 | $1,893.75 | 0003247245 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213862727 | 20141100190600 Emmett Padgette 08/06/2014 | 5/2/2018 to 5/31/2018 | $3,800.00 | 0003247246 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213650053 | 20110900239600 Dan Diaz 06/20/2011 | 5/1/2018 to 5/10/2018 | $425.00 | 0003247247 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206505697 | 20150502085100 David Clay 05/17/1998 | 4/3/2018 to 4/24/2018 | $700.00 | 0003247248 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207373709 | 20140701135100 Isaiah Hernandez 11/21/2012 | 4/2/2018 to 4/27/2018 | $2,650.00 | 0003247249 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207584320 | 20090400552200 Kenneth Muro 07/15/2005 | 4/11/2018 to 4/30/2018 | $1,900.00 | 0003247250 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213653045 | 20160801435400 Kate Johnson 11/14/1997 | 5/1/2018 to 5/30/2018 | $1,725.00 | 0003247251 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207913745 | 20141001664600 Katelin Snedegar 04/01/2005 | 4/3/2018 to 4/27/2018 | $1,975.00 | 0003247252 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000051

| | | | | | | |
|---|---|---|---|---|---|---|
| 207579674 | 20090400552200 Kenneth Muro 07/15/2005 | 4/2/2018 to 4/6/2018 | $975.00 | 0003247275 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213601275 | 20110600054400 Andre Arguelles 04/12/2011 | 5/1/2018 to 5/31/2018 | $1,175.00 | 0003247276 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 208015306 | 20090602277100 Alex Vu 04/17/2007 | 4/4/2018 to 4/27/2018 | $1,325.00 | 0003247277 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207953185 | 20100400758500 Josue Vicente 01/12/2010 | 4/3/2018 to 4/30/2018 | $981.25 | 0003247278 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213587938 | 20060600025100 Julia Aispuro 01/24/2006 | 05/01/2018 | $212.50 | 0003247279 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213717964 | 201305005350 Axel Martin 11/15/2011 | 5/7/2018 to 5/30/2018 | $1,468.75 | 0003247280 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216256422 | 20161100264300 Richard Cloutman 12/14/2010 | 6/1/2018 to 6/30/2018 | $2,962.50 | 0003247281 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 208020830 | 20120600859000 Grayson Yuvienco 07/05/2011 | 4/2/2018 to 4/30/2018 | $1,875.00 | 0003247282 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213648611 | 20110400716000 Evan Smith 10/02/2009 | 05/31/2018 | $462.50 | 0003247283 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206507294 | 20101200144500 Alexander Corral 07/29/2010 | 4/4/2018 to 4/24/2018 | $1,125.00 | 0003247284 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207862494 | 20080900539200 Antonio Rubio-Martinez 06/25/2008 | 4/4/2018 to 4/25/2018 | $1,000.00 | 0003247285 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

REL000052



**IE♥HP.**
A Public Entity
Inland Empire Health Plan

| 207728663 | 20130801085300 Camila Regalado 02/19/2008 | 4/9/2018 to 4/27/2018 | $1,437.50 | 0003247264 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 206748953 | 20140300335600 Samuel Espinoza 09/26/2010 | 4/4/2018 to 4/23/2018 | $750.00 | 0003247265 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206507804 | 20080300120900 Yair Cortes 10/10/2007 | 4/3/2018 to 4/30/2018 | $2,481.25 | 0003247266 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207906251 | 20110400716000 Evan Smith 10/02/2009 | 4/3/2018 to 4/28/2018 | $2,212.50 | 0003247267 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206967207 | 20100700276100 Dylan Hasbach 04/22/2010 | 4/3/2018 to 4/28/2018 | $2,575.00 | 0003247268 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207566763 | 20100500460200 Lauren Minger 03/28/2009 | 4/4/2018 to 4/30/2018 | $1,750.00 | 0003247269 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213590954 | 20090200021400 Gisell Aispuro 11/13/2008 | 5/2/2018 to 5/10/2018 | $825.00 | 0003247270 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207567987 | 20150401668600 Grayson Minton 06/12/2014 | 4/15/2018 to 4/27/2018 | $875.00 | 0003247271 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207945835 | 20130300708300 Moja Stevenston 03/08/2003 | 4/4/2018 to 4/30/2018 | $1,400.00 | 0003247272 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207559953 | 201502016931 Dakota Merryman 06/13/2004 | 4/18/2018 to 4/26/2018 | $337.50 | 0003247273 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207621516 | 20030100320500 Kemish Muro 07/08/2002 | 4/2/2018 to 4/6/2018 | $825.00 | 0003247274 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000053

| 216821848 | 20110600653100<br>Michael Munoz<br>07/24/2007 | 6/1/2018 to<br>6/29/2018 | | $768.75 | 0003247297 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|---|
| 213733874 | 20130700435500<br>Joe Lara<br>12/24/2012 | 5/1/2018 to<br>5/31/2018 | | $2,175.00 | 0003247298 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213641695 | 20161100264300<br>Richard Cloutman<br>12/14/2010 | 5/1/2018 to<br>5/30/2018 | | $3,262.50 | 0003247299 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216366122 | 20141003496100<br>Kaidyn Darby<br>11/12/2013 | 6/20/2018 to<br>6/29/2018 | | $1,275.00 | 0003247300 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213742585 | 20100900890000<br>Santiago Mercado<br>07/20/2004 | 5/2/2018 to<br>5/30/2018 | | $650.00 | 0003247301 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207624886 | 20140300810600<br>Hasan Nawaz<br>02/15/2012 | 4/2/2018 to<br>4/30/2018 | | $2,187.50 | 0003247302 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207386396 | 20111000416500<br>Arianna Hernandez Montes<br>05/28/2011 | 4/3/2018 to<br>4/27/2018 | | $950.00 | 0003247303 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207954439 | 20111101023700<br>Milinda Villalobos<br>12/14/2005 | 4/2/2018 to<br>4/30/2018 | | $2,825.00 | 0003247304 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216748720 | 20130600594700<br>Alex Mcdonald<br>01/09/2001 | 06/26/2018 | | $75.00 | 0003247305 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216659145 | 20100200318700<br>Luke Hendrix<br>11/25/2009 | 6/27/2018 to<br>6/28/2018 | | $275.00 | 0003247306 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216386077 | 20140703222300<br>Javier Del Toro<br>07/29/2001 | 6/1/2018 to<br>6/29/2018 | | $1,825.00 | 0003247307 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

Case 2:19-cv-00405-DJC-AC    Document 1    Filed 03/06/19    Page 149 of 182



Inland Empire Health Plan

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 213771668 | 20030700297400 Benito Mercado 03/08/2003 | 5/7/2018 to 5/31/2018 | | $1,850.00 | 0003247286 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206435553 | 20160100765900 Logan Bradley 12/30/2009 | 4/2/2018 to 4/27/2018 | | $1,550.00 | 0003247287 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207751064 | 20090200559200 Ivan Rodriguez Constantin 06/23/2007 | 4/13/2018 to 4/26/2018 | | $287.50 | 0003247288 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213645588 | 20061000710100 Eduardo Cuevas 06/05/2003 | 5/1/2018 to 5/31/2018 | | $1,575.00 | 0003247289 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216700499 | 20091000323900 Anthony Jaquez 08/03/2009 | 6/4/2018 to 6/27/2018 | | $1,018.75 | 0003247290 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213891025 | 20151003967700 Noah Mcknight 12/29/2008 | 5/7/2018 to 5/21/2018 | | $750.00 | 0003247291 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213505733 | 20120600678800 Valeria Rodriguez 01/13/2012 | 5/1/2018 to 5/26/2018 | | $1,725.00 | 0003247292 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207874375 | 20130700744000 Logan Sarner 03/25/2006 | 4/2/2018 to 4/30/2018 | | $1,900.00 | 0003247293 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206720428 | 20060400141600 Ramses Duran 01/16/2006 | 4/2/2018 to 4/25/2018 | | $618.75 | 0003247294 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207455011 | 20100400409600 Natalie Lopez 03/21/2007 | 4/2/2018 to 4/30/2018 | | $2,925.00 | 0003247295 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206431456 | 20161100484700 Aidan Boynton 06/25/2007 | 4/3/2018 to 4/5/2018 | | $475.00 | 0003247296 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000055

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 213647380 | 20110900226000 George Dayoub 04/05/2011 | 5/1/2018 to 5/31/2018 | $2,668.75 | 0003247319 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213636039 | 20071200580000 Darikson Sanchez 09/08/2007 | 5/4/2018 to 5/25/2018 | $512.50 | 0003247320 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213874324 | 20131200576000 Aaron Pardo 08/29/2011 | 5/26/2018 to 5/31/2018 | $562.50 | 0003247321 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213702401 | 20090200329100 Nathan Johnson 09/07/2002 | 5/2/2018 to 5/30/2018 | $1,575.00 | 0003247322 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213701149 | 20160700740100 Joshua Duran 07/03/2006 | 5/1/2018 to 5/31/2018 | $2,437.50 | 0003247323 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216676482 | 20111000416500 Arianna Hernandez Montes 05/28/2011 | 6/1/2018 to 6/15/2018 | $737.50 | 0003247324 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207389209 | 20090500315800 Brandon Hernandez Rodriguez 10/24/2007 | 4/2/2018 to 4/30/2018 | $2,087.50 | 0003247325 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213848352 | 20130100928200 Natalyn Vu 08/22/1999 | 5/1/2018 to 5/31/2018 | $1,768.75 | 0003247326 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207629635 | 20110900692300 Aaron Orozco 05/21/2011 | 4/11/2018 to 4/30/2018 | $750.00 | 0003247327 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206969207 | 20161201492200 Michael Hendrickson 06/01/2012 | 4/4/2018 to 4/27/2018 | $1,800.00 | 0003247328 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213651937 | 20060400141600 Ramses Duran 01/16/2006 | 5/1/2018 to 5/21/2018 | $243.75 | 0003247329 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

REL000056



Inland Empire Health Plan

| 213651965 | 20091000323900<br>Anthony Jaquez<br>08/03/2009 | 5/1/2018 to<br>5/30/2018 | | $1,768.75 | 0003247308 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 213737132 | 20130700435500<br>Joe Lara<br>12/24/2012 | 5/15/2018 to<br>5/29/2018 | | $281.25 | 0003247309 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207892853 | 20150300384900<br>Levi Sedivy<br>10/24/2011 | 4/2/2018 to<br>4/30/2018 | | $2,950.00 | 0003247310 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206974193 | 20160702150100<br>Mason Henning<br>04/26/2004 | 4/4/2018 to<br>4/30/2018 | | $1,087.50 | 0003247311 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206748677 | 20140300335600<br>Samuel Espinoza<br>09/26/2010 | 4/2/2018 to<br>4/30/2018 | | $2,650.00 | 0003247312 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213635999 | 20150301207700<br>Iker Cabrera<br>03/04/2014 | 5/2/2018 to<br>5/31/2018 | | $3,787.50 | 0003247313 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206424143 | 20150500019200<br>Chris Barrientos-<br>Orozco<br>10/14/2013 | 4/2/2018 to<br>4/28/2018 | | $2,300.00 | 0003247314 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207868544 | 20160900437300<br>Jeremiah Salomon<br>05/04/2004 | 4/5/2018 to<br>4/23/2018 | | $337.50 | 0003247315 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216832187 | 20140300810600<br>Hasan Nawaz<br>02/15/2012 | 6/4/2018 to<br>6/14/2018 | | $1,150.00 | 0003247316 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206432413 | 20161100484700<br>Aidan Boynton<br>06/25/2007 | 4/12/2018 to<br>4/30/2018 | | $1,275.00 | 0003247317 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216008635 | 20150301327700<br>Logan Abbott<br>07/31/2011 | 6/10/2018 to<br>6/29/2018 | | $768.75 | 0003247318 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000057

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 207544597 | 20080400395600<br>Fernanda Martinez-<br>Ramos<br>02/06/2008 | 4/6/2018 to<br>4/27/2018 | | $1,100.00 | 0003247341 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213711666 | 20131000443300<br>Phu Mai<br>11/28/2010 | 5/1/2018 to<br>5/31/2018 | | $2,775.00 | 0003247342 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206750013 | 20080400730900<br>Joana Esqueda<br>02/12/2007 | 4/2/2018 to<br>4/27/2018 | | $1,037.50 | 0003247343 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213649419 | 20140703222300<br>Javier Del Toro<br>07/29/2001 | 5/4/2018 to<br>5/29/2018 | | $1,725.00 | 0003247344 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213590422 | 20060600025100<br>Julia Aispuro<br>01/24/2006 | 5/2/2018 to<br>5/31/2018 | | $750.00 | 0003247345 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213644807 | 20150600539300<br>Joeseph Shannon<br>02/17/2006 | 5/4/2018 to<br>5/14/2018 | | $900.00 | 0003247346 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213640622 | 20161201492200<br>Michael<br>Hendrickson<br>06/01/2012 | 5/2/2018 to<br>5/30/2018 | | $1,900.00 | 0003247347 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213640680 | 20090500131100<br>Cristian Chavez<br>03/10/2009 | 5/1/2018 to<br>5/31/2018 | | $1,662.50 | 0003247348 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207573736 | 20120700564700<br>Damian Monroy<br>05/06/2012 | 4/2/2018 to<br>4/30/2018 | | $3,187.50 | 0003247349 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216957644 | 20130700804900<br>Mia Torres<br>01/08/2013 | 6/1/2018 to<br>6/29/2018 | | $1,900.00 | 0003247350 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216963966 | 20101000646800<br>Edward Torres<br>07/15/2010 | 6/1/2018 to<br>6/29/2018 | | $2,012.50 | 0003247351 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000058



Inland Empire Health Plan

| | | | | | | |
|---|---|---|---|---|---|---|
| 213745914 | 20120700869400<br>Matthew Valle<br>03/02/2012 | 5/4/2018 to<br>5/31/2018 | $2,418.75 | 0003247330 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207953633 | 20130900006400<br>Liam Vieth<br>06/07/2013 | 4/2/2018 to<br>4/30/2018 | $1,525.00 | 0003247331 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207445016 | 20101100937200<br>Andrew Labuen<br>10/09/2010 | 4/3/2018 to<br>4/27/2018 | $675.00 | 0003247332 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206893259 | 20041100203100<br>Luis Grimaldo<br>Salvador<br>09/11/2004 | 4/9/2018 to<br>4/28/2018 | $2,137.50 | 0003247333 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207952866 | 20120700869400<br>Matthew Valle<br>03/02/2012 | 4/2/2018 to<br>4/28/2018 | $2,512.50 | 0003247334 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216887467 | 20140902518200<br>Braydon Snedegar<br>06/14/2007 | 6/1/2018 to<br>6/29/2018 | $2,768.75 | 0003247335 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213853912 | 20101100772700<br>Lester White<br>08/08/2010 | 5/2/2018 to<br>5/30/2018 | $1,600.00 | 0003247336 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206749728 | 20060200125500<br>Elijah Espinoza<br>10/17/2005 | 4/3/2018 to<br>4/30/2018 | $1,100.00 | 0003247337 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216979087 | 20070600768300<br>Matthew Vernon<br>09/17/2003 | 06/29/2018 | $157.50 | 0003247338 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213841462 | 20090400552200<br>Kenneth Muro<br>07/15/2005 | 5/11/2018 to<br>5/25/2018 | $637.50 | 0003247339 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206507236 | 20101200144500<br>Alexander Corral<br>07/29/2010 | 4/2/2018 to<br>4/30/2018 | $3,575.00 | 0003247340 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800<br>Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003<br>Office Hours: 8am - 5pm<br>www.iehp.org

MC-15-01676

| 216994704 | 20130900006400<br>Liam Vieth<br>06/07/2013 | 6/13/2018 to<br>6/28/2018 | $600.00 | 0003247363 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|
| 213638132 | 20071100263300<br>Akira Hannah-Diaz<br>12/26/2006 | 5/2/2018 to<br>5/9/2018 | $850.00 | 0003247364 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207870465 | 20071200580000<br>Darikson Sanchez<br>09/08/2007 | 4/2/2018 to<br>4/30/2018 | $525.00 | 0003247365 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216961045 | 201712010201<br>Skyler Torres<br>05/31/2013 | 6/1/2018 to<br>6/29/2018 | $2,250.00 | 0003247366 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213761265 | 20111101023700<br>Milinda Villalobos<br>12/14/2005 | 5/15/2018 to<br>5/18/2018 | $450.00 | 0003247367 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213789188 | 20030100320500<br>Kemish Muro<br>07/08/2002 | 05/30/2018 | $150.00 | 0003247368 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206470072 | 20070800077300<br>Rebecca Cano<br>02/21/2007 | 4/2/2018 to<br>4/30/2018 | $1,287.50 | 0003247369 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207699046 | 20110100601500<br>Isabella Padilla<br>10/12/2010 | 04/21/2018 | $75.00 | 0003247370 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206712173 | 20120501132500<br>Izabell Deleon<br>07/13/2010 | 4/3/2018 to<br>4/26/2018 | $1,412.50 | 0003247371 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216998422 | 20090602277100<br>Alex Vu<br>04/17/2007 | 6/6/2018 to<br>6/29/2018 | $950.00 | 0003247372 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207441405 | 20110801013300<br>Blake Kneuer<br>01/03/2010 | 4/13/2018 to<br>4/27/2018 | $431.25 | 0003247373 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |



Inland Empire Health Plan

| 216973301 | 20120700869400<br>Matthew Valle<br>03/02/2012 | 6/2/2018 to<br>6/8/2018 | $437.50 | 0003247352 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 206714618 | 20110900238600<br>Andres Diaz<br>08/02/2010 | 4/3/2018 to<br>4/26/2018 | $931.25 | 0003247353 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207452697 | 20111100534600<br>Mario Leon<br>08/28/2005 | 4/24/2018 to<br>4/27/2018 | $250.00 | 0003247354 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213581669 | 20130500017300<br>Alexis Aguilar<br>01/10/2013 | 5/2/2018 to<br>5/31/2018 | $2,400.00 | 0003247355 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216955842 | 20150801327300<br>Aliyah Torres<br>06/13/2011 | 6/1/2018 to<br>6/19/2018 | $931.25 | 0003247356 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213885292 | 200905005848<br>Joshua Rangel<br>02/28/2009 | 05/10/2018 | $135.00 | 0003247357 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213632807 | 20160200774000<br>Joshua Burnham<br>04/24/2009 | 5/1/2018 to<br>5/24/2018 | $1,800.00 | 0003247358 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213646970 | 20100300167100<br>Kyng Davis<br>12/18/2009 | 5/1/2018 to<br>5/31/2018 | $1,581.25 | 0003247359 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207864547 | 20141100850500<br>Fernando Ruiz<br>08/17/2011 | 4/2/2018 to<br>4/30/2018 | $2,187.50 | 0003247360 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206702589 | 20110900226000<br>George Dayoub<br>04/05/2011 | 4/3/2018 to<br>4/30/2018 | $1,018.75 | 0003247361 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 217000777 | 20110100878000<br>Malik York<br>11/02/2010 | 06/06/2018 | $75.00 | 0003247362 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800<br>Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003<br>Office Hours: 8am - 5pm<br>www.iehp.org

MC-15-01676

REL000061

| 213880336 | 20130900670800<br>Frank Peterson<br>01/25/2010 | 5/2/2018 to<br>5/10/2018 | $525.00 | 0003247386 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|
| 206754420 | 20100900210400<br>Ezequiel Flores<br>07/15/2010 | 4/3/2018 to<br>4/30/2018 | $1,218.75 | 0003247387 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213705244 | 20140902518200<br>Braydon Snedegar<br>06/14/2007 | 5/7/2018 to<br>5/25/2018 | $2,125.00 | 0003247388 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206752546 | 20080800181600<br>Cristian Figueroa<br>11/04/2007 | 4/3/2018 to<br>4/27/2018 | $2,825.00 | 0003247389 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207750888 | 20120600678800<br>Valeria Rodriguez<br>01/13/2012 | 4/2/2018 to<br>4/30/2018 | $2,712.50 | 0003247390 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213780286 | 20110700673900<br>Miguel Moncada<br>07/29/1999 | 5/2/2018 to<br>5/30/2018 | $2,756.25 | 0003247391 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213760875 | 20111101023700<br>Milinda Villalobos<br>12/14/2005 | 5/1/2018 to<br>5/31/2018 | $3,000.00 | 0003247392 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213720832 | 20150801327300<br>Aliyah Torres<br>06/13/2011 | 5/1/2018 to<br>5/31/2018 | $1,431.25 | 0003247393 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206506675 | 201411019780<br>Katherine Coreas<br>06/13/2014 | 4/7/2018 to<br>4/24/2018 | $512.50 | 0003247394 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216939766 | 20110800788000<br>Nathan Soto<br>11/26/2008 | 6/6/2018 to<br>6/29/2018 | $1,412.50 | 0003247395 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216954771 | 20080300541900<br>Oscar Torres<br>01/08/2008 | 6/1/2018 to<br>6/28/2018 | $1,450.00 | 0003247396 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |



Inland Empire Health Plan

| | | | | | | |
|---|---|---|---|---|---|---|
| 213885398 | 200905005848 Joshua Rangel 02/28/2009 | 05/25/2018 | $585.00 | 0003247374 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207902151 | 20120500898700 Ronald Silva 06/02/2004 | 4/2/2018 to 4/30/2018 | $1,987.50 | 0003247375 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213745243 | 20151100313900 Eduardo Leal 12/13/2011 | 5/3/2018 to 5/31/2018 | $2,675.00 | 0003247376 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213507110 | 20120500828200 Esequiel Rojas 02/10/2012 | 5/11/2018 to 5/31/2018 | $562.50 | 0003247377 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213789119 | 20030100320500 Kemish Muro 07/08/2002 | 5/1/2018 to 5/29/2018 | $3,075.00 | 0003247378 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206721942 | 20060400141600 Ramses Duran 01/16/2006 | 4/2/2018 to 4/30/2018 | $2,287.50 | 0003247380 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206894235 | 20121000306100 Jorge Gutierrez 06/12/2012 | 4/2/2018 to 4/30/2018 | $2,525.00 | 0003247381 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213650411 | 20140902518200 Braydon Snedegar 06/14/2007 | 05/04/2018 | $250.00 | 0003247382 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216997327 | 20100500738900 Andrew Vo 03/10/2010 | 6/1/2018 to 6/29/2018 | $1,256.25 | 0003247383 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207576388 | 20100500482200 Brandon Mottl 02/13/2010 | 4/3/2018 to 4/24/2018 | $2,375.00 | 0003247384 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216998218 | 20130600967600 Nathan Vu 05/15/2006 | 6/26/2018 to 6/28/2018 | $400.00 | 0003247385 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000063



Inland Empire Health Plan

| 216967483 | 20070400662800<br>Jasmine Tran<br>02/14/2007 | 6/1/2018 to<br>6/27/2018 | $1,500.00 | 0003247397 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 213751171 | 20130900006400<br>Liam Vieth<br>06/07/2013 | 5/1/2018 to<br>5/30/2018 | $775.00 | 0003247398 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216961333 | 201712010201<br>Skyler Torres<br>05/31/2013 | 6/5/2018 to<br>6/22/2018 | $431.25 | 0003247399 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213731022 | 20160700596700<br>William Ukpong<br>01/28/2003 | 5/21/2018 to<br>5/31/2018 | $1,081.25 | 0003247400 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207723935 | 20100100564900<br>Manuel Ramirez<br>10/23/2009 | 4/2/2018 to<br>4/27/2018 | $1,981.25 | 0003247401 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213874069 | 20131200576000<br>Aaron Pardo<br>08/29/2011 | 5/1/2018 to<br>5/29/2018 | $2,962.50 | 0003247402 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207940242 | 20110800788000<br>Nathan Soto<br>11/26/2008 | 4/3/2018 to<br>4/27/2018 | $2,350.00 | 0003247403 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213650470 | 20130900978700<br>Jackson Howell<br>07/26/2011 | 5/7/2018 to<br>5/25/2018 | $750.00 | 0003247404 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213706577 | 20140401348600<br>Denis Solonovich<br>06/25/2001 | 5/4/2018 to<br>5/25/2018 | $1,200.00 | 0003247405 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207451944 | 20151100313900<br>Eduardo Leal<br>12/13/2011 | 4/4/2018 to<br>4/30/2018 | $1,125.00 | 0003247406 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213720003 | 20100400439900<br>Antonio Martinez<br>04/18/2004 | 5/3/2018 to<br>5/17/2018 | $900.00 | 0003247407 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000064

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 213707878 | 20090602053300<br>Rami Khatib<br>01/22/2001 | 5/1/2018 to<br>5/29/2018 | | $1,150.00 | 0003247408 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213778431 | 20150401668600<br>Grayson Minton<br>06/12/2014 | 5/6/2018 to<br>5/30/2018 | | $1,500.00 | 0003247409 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207534661 | 20131000443300<br>Phu Mai<br>11/28/2010 | 4/2/2018 to<br>4/30/2018 | | $3,275.00 | 0003247410 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216841753 | 20080900539200<br>Antonio Rubio-<br>Martinez<br>06/25/2008 | 6/4/2018 to<br>6/20/2018 | | $631.25 | 0003247411 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216370775 | 201207002066<br>June Davis<br>05/04/2012 | 6/25/2018 to<br>6/28/2018 | | $487.50 | 0003247412 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213650262 | 20110900239600<br>Dan Diaz<br>06/20/2011 | 5/11/2018 to<br>5/31/2018 | | $1,481.25 | 0003247413 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216008133 | 20150301327700<br>Logan Abbott<br>07/31/2011 | 6/3/2018 to<br>6/27/2018 | | $3,400.00 | 0003247414 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216809408 | 20120700564700<br>Damian Monroy<br>05/06/2012 | 6/4/2018 to<br>6/28/2018 | | $2,812.50 | 0003247415 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206507998 | 20170401453400<br>Braiden Creamer<br>08/18/2002 | 4/3/2018 to<br>4/27/2018 | | $1,175.00 | 0003247416 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216997052 | 20111101023700<br>Milinda Villalobos<br>12/14/2005 | 6/1/2018 to<br>6/29/2018 | | $3,050.00 | 0003247417 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206346938 | 20150301327700<br>Logan Abbott<br>07/31/2011 | 4/2/2018 to<br>4/30/2018 | | $3,025.00 | 0003247418 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000065



Inland Empire Health Plan

| 216841606 | 20151201336600 Josiah O Neal 02/04/2009 | 6/1/2018 to 6/29/2018 | $2,750.00 | 0003247419 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 217000309 | 20130402542000 Kevin Williams 03/09/2013 | 6/1/2018 to 6/21/2018 | $1,400.00 | 0003247420 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213781381 | 20120700564700 Damian Monroy 05/06/2012 | 5/1/2018 to 5/31/2018 | $3,262.50 | 0003247421 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213869580 | 20101200843700 Karely Padilla 08/24/2008 | 5/14/2018 to 5/29/2018 | $1,175.00 | 0003247422 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213855338 | 20060900358600 Nicholas Norman 06/29/2006 | 5/1/2018 to 5/31/2018 | $3,075.00 | 0003247423 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216184994 | 201305000392 Leonardo Alvarez 01/12/2009 | 6/12/2018 to 6/28/2018 | $1,925.00 | 0003247424 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216836492 | 20020500393300 Adam Rossi 01/23/2002 | 6/4/2018 to 6/28/2018 | $2,100.00 | 0003247425 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216255681 | 20150502085100 David Clay 05/17/1998 | 6/5/2018 to 6/19/2018 | $637.50 | 0003247426 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216656269 | 20161201492200 Michael Hendrickson 06/01/2012 | 6/1/2018 to 6/29/2018 | $1,350.00 | 0003247427 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216749176 | 20100400459400 Ester Medina Mercado 01/06/2005 | 6/8/2018 to 6/28/2018 | $750.00 | 0003247428 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 208018191 | 20130402542000 Kevin Williams 03/09/2013 | 4/2/2018 to 4/30/2018 | $800.00 | 0003247429 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000066

| 216703552 | 20110200327900<br>Jose Jimenez<br>03/23/2005 | 6/1/2018 to<br>6/28/2018 | $2,225.00 | 0003247430 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|
| 216092796 | 20060600025100<br>Julia Aispuro<br>01/24/2006 | 6/1/2018 to<br>6/29/2018 | $2,837.50 | 0003247431 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216826496 | 20090400552200<br>Kenneth Muro<br>07/15/2005 | 6/4/2018 to<br>6/29/2018 | $2,312.50 | 0003247432 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207871520 | 20080800569800<br>Lehi Sandoval<br>01/05/2007 | 4/12/2018 to<br>4/24/2018 | $500.00 | 0003247433 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216360297 | 20061000710100<br>Eduardo Cuevas<br>06/05/2003 | 6/1/2018 to<br>6/13/2018 | $662.50 | 0003247434 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216834562 | 20060900358600<br>Nicholas Norman<br>06/29/2006 | 06/01/2018 | $150.00 | 0003247435 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207752075 | 20120500828200<br>Esequiel Rojas<br>02/10/2012 | 4/3/2018 to<br>4/30/2018 | $1,750.00 | 0003247436 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216807883 | 20110700673900<br>Miguel Moncada<br>07/29/1999 | 6/25/2018 to<br>6/30/2018 | $575.00 | 0003247437 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216194790 | 20120500087900<br>Hunter Barrera<br>01/13/2005 | 06/28/2018 | $37.50 | 0003247438 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206428704 | 20141101907700<br>Alexander Bohse<br>06/28/2012 | 4/4/2018 to<br>4/29/2018 | $3,237.50 | 0003247439 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213849472 | 20090602277100<br>Alex Vu<br>04/17/2007 | 5/2/2018 to<br>5/30/2018 | $1,300.00 | 0003247440 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |



**Inland Empire Health Plan**

| | | | | | | |
|---|---|---|---|---|---|---|
| 213719299 | 20080300541900<br>Oscar Torres<br>01/08/2008 | 5/1/2018 to<br>5/31/2018 | $1,768.75 | 0003247441 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216843308 | 20141100190600<br>Emmett Padgette<br>08/06/2014 | 6/1/2018 to<br>6/29/2018 | $3,825.00 | 0003247442 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207914708 | 20140401348600<br>Denis Solonovich<br>06/25/2001 | 4/6/2018 to<br>4/27/2018 | $1,200.00 | 0003247443 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207451475 | 20130700435500<br>Joe Lara<br>12/24/2012 | 4/3/2018 to<br>4/30/2018 | $2,131.25 | 0003247444 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216210412 | 20160200774000<br>Joshua Burnham<br>04/24/2009 | 6/5/2018 to<br>6/29/2018 | $1,575.00 | 0003247445 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216869906 | 20071200580000<br>Darikson Sanchez<br>09/08/2007 | 6/15/2018 to<br>6/29/2018 | $631.25 | 0003247446 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216682664 | 20130700386100<br>Carlie Howell<br>11/12/2007 | 6/1/2018 to<br>6/29/2018 | $875.00 | 0003247447 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216731682 | 20090200329100<br>Nathan Johnson<br>09/07/2002 | 6/4/2018 to<br>6/28/2018 | $1,462.50 | 0003247448 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216799689 | 20030700297400<br>Benito Mercado<br>03/08/2003 | 6/4/2018 to<br>6/28/2018 | $2,175.00 | 0003247449 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216711609 | 20111200415400<br>Joyce Jin<br>10/07/2011 | 06/27/2018 | $150.00 | 0003247450 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 208019048 | 20140502115100<br>Amar Williams<br>04/17/2011 | 4/5/2018 to<br>4/30/2018 | $1,362.50 | 0003247451 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000068

| 216832417 | 20140300810600<br>Hasan Nawaz<br>02/15/2012 | 6/18/2018 to<br>6/21/2018 | | $400.00 | 0003247452 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 207412817 | 20090200329100<br>Nathan Johnson<br>09/07/2002 | 4/2/2018 to<br>4/9/2018 | | $356.25 | 0003247453 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207555474 | 20120700547500<br>Jesus Mendoza<br>03/29/2012 | 4/2/2018 to<br>4/30/2018 | | $2,550.00 | 0003247454 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207559147 | 20030700297400<br>Benito Mercado<br>03/08/2003 | 4/2/2018 to<br>4/30/2018 | | $2,200.00 | 0003247455 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216376650 | 20111200209200<br>Roby De Los Santos<br>11/05/2010 | 6/4/2018 to<br>6/29/2018 | | $1,587.50 | 0003247456 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206355756 | 20131000817600<br>Josue Aguirre<br>02/15/2006 | 4/2/2018 to<br>4/30/2018 | | $2,237.50 | 0003247457 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216847138 | 20141100850500<br>Fernando Ruiz<br>08/17/2011 | 6/4/2018 to<br>6/27/2018 | | $1,850.00 | 0003247458 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207577138 | 20110600653100<br>Michael Munoz<br>07/24/2007 | 4/9/2018 to<br>4/30/2018 | | $625.00 | 0003247459 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207722364 | 200610006442<br>Robert Peterson<br>04/27/2006 | 4/13/2018 to<br>4/17/2018 | | $375.00 | 0003247460 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207946438 | 20070400129900<br>Urija Colon Stuckey<br>02/06/2007 | 4/24/2018 to<br>4/27/2018 | | $56.25 | 0003247461 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206363953 | 20161000321500<br>Elijah Aragon<br>05/18/2007 | 4/4/2018 to<br>4/14/2018 | | $800.00 | 0003247462 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000069



**Inland Empire Health Plan**

| 216251814 | 20120500173600<br>Luis Ceja<br>03/06/2012 | 6/4/2018 to<br>6/27/2018 | $1,800.00 | 0003247463 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|
| 216803246 | 20100500460200<br>Lauren Minger<br>03/28/2009 | 6/1/2018 to<br>6/29/2018 | $1,600.00 | 0003247464 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207554060 | 20130300412900<br>Michael Mendez<br>11/08/2010 | 4/3/2018 to<br>4/30/2018 | $1,706.25 | 0003247465 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216833149 | 20100700449800<br>Isaac Nease<br>01/11/2010 | 6/1/2018 to<br>6/27/2018 | $1,450.00 | 0003247466 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216375361 | 20170100932100<br>Gabriel De La Cruz<br>10/01/2013 | 6/6/2018 to<br>6/29/2018 | $3,375.00 | 0003247467 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216256836 | 201411019780<br>Katherine Coreas<br>06/13/2014 | 6/4/2018 to<br>6/30/2018 | $1,887.50 | 0003247468 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216388219 | 20110900239600<br>Dan Diaz<br>06/20/2011 | 6/1/2018 to<br>6/29/2018 | $1,443.75 | 0003247469 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206692493 | 201207002066<br>June Davis<br>05/04/2012 | 4/3/2018 to<br>4/26/2018 | $1,525.00 | 0003247470 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213507016 | 20120500828200<br>Esequiel Rojas<br>02/10/2012 | 5/2/2018 to<br>5/31/2018 | $1,750.00 | 0003247471 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213644900 | 20071100275800<br>Emiliano Hernandez<br>08/05/2007 | 5/1/2018 to<br>5/31/2018 | $1,893.75 | 0003247472 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206715874 | 20101100187200<br>Caleb Diaz<br>08/18/2010 | 4/6/2018 to<br>4/30/2018 | $850.00 | 0003247473 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

MC-15-01676

REL000070

| | | | | | | |
|---|---|---|---|---|---|---|
| 207575697 | 20110400501000 Maya Montoya 02/07/2011 | 4/3/2018 to 4/30/2018 | $2,168.75 | 0003247474 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213631124 | 20061100491000 Eduardo Grimaldo 08/12/2006 | 5/1/2018 to 5/26/2018 | $2,087.50 | 0003247475 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206727093 | 201306002713 Carlos Escalante 08/02/2006 | 04/11/2018 | $18.75 | 0003247476 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213578636 | 20110600315100 Christopher Frederick 02/11/2011 | 5/1/2018 to 5/31/2018 | $2,325.00 | 0003247477 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213644708 | 20150600539300 Joeseph Shannon 02/17/2006 | 5/1/2018 to 5/31/2018 | $4,200.00 | 0003247478 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213647495 | 20090500676800 Netenel Singleton 04/25/2007 | 5/16/2018 to 5/31/2018 | $1,650.00 | 0003247479 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213641422 | 20100200318700 Luke Hendrix 11/25/2009 | 5/1/2018 to 5/31/2018 | $1,300.00 | 0003247480 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213647907 | 20170100932100 Gabriel De La Cruz 10/01/2013 | 5/9/2018 to 5/30/2018 | $3,050.00 | 0003247481 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213505405 | 20161200251100 Alexander Robinson 09/01/2012 | 5/8/2018 to 5/31/2018 | $1,856.25 | 0003247482 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213571807 | 20080900539200 Antonio Rubio-Martinez 06/25/2008 | 5/7/2018 to 5/30/2018 | $793.75 | 0003247483 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213592811 | 20090200021400 Gisell Aispuro 11/13/2008 | 5/16/2018 to 5/31/2018 | $1,200.00 | 0003247484 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |



Inland Empire Health Plan

| 213582029 | 20100500632800 Dylan Salgado Avila 02/18/2010 | 5/1/2018 to 5/31/2018 | | $1,512.50 | 0003247485 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|---|
| 206864505 | 20110900338400 Joseph Givan 04/21/2011 | 4/3/2018 to 4/30/2018 | | $1,575.00 | 0003247486 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207946590 | 20100900645000 Alyssa Tamayo 05/14/2010 | 4/25/2018 to 4/26/2018 | | $56.25 | 0003247487 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216937930 | 20140401348600 Denis Solonovich 06/25/2001 | 6/1/2018 to 6/29/2018 | | $1,350.00 | 0003247488 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213644965 | 20071100275800 Emiliano Hernandez 08/05/2007 | 5/30/2018 to 5/31/2018 | | $162.50 | 0003247489 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207396814 | 20130900978700 Jackson Howell 07/26/2011 | 4/2/2018 to 4/27/2018 | | $450.00 | 0003247490 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207628057 | 20151201336600 Josiah O Neal 02/04/2009 | 4/2/2018 to 4/30/2018 | | $3,075.00 | 0003247491 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216957521 | 20120300507400 Luis Maldonado 10/27/2011 | 6/4/2018 to 6/15/2018 | | $800.00 | 0003247492 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207893088 | 20150300384900 Levi Sedivy 10/24/2011 | 4/11/2018 to 4/26/2018 | | $750.00 | 0003247493 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213844769 | 20060400354500 Rosario Navarro 02/18/2006 | 5/1/2018 to 5/31/2018 | | $1,750.00 | 0003247494 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213651886 | 20060400141600 Ramses Duran 01/16/2006 | 5/1/2018 to 5/31/2018 | | $2,337.50 | 0003247495 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000072

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 213708910 | 20110800788000<br>Nathan Soto<br>11/26/2008 | 5/1/2018 to<br>5/31/2018 | | $2,281.25 | 0003247496 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207440620 | 20170701356800<br>Shiloh West<br>01/07/2011 | 4/2/2018 to<br>4/30/2018 | | $2,125.00 | 0003247497 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213608175 | 20110900338400<br>Joseph Givan<br>04/21/2011 | 5/1/2018 to<br>5/3/2018 | | $675.00 | 0003247498 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213649940 | 20051100262100<br>Adriano Homa<br>09/13/2005 | 5/3/2018 to<br>5/31/2018 | | $781.25 | 0003247499 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207950561 | 201712010201<br>Skyler Torres<br>05/31/2013 | 4/5/2018 to<br>4/27/2018 | | $1,875.00 | 0003247500 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206354826 | 20170400929100<br>Kanon Aguiniga<br>02/22/2014 | 4/2/2018 to<br>4/30/2018 | | $3,225.00 | 0003247501 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213499752 | 20130801085300<br>Camila Regalado<br>02/19/2008 | 5/7/2018 to<br>5/24/2018 | | $1,612.50 | 0003247502 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207396275 | 20130700386100<br>Carlie Howell<br>11/12/2007 | 4/2/2018 to<br>4/27/2018 | | $450.00 | 0003247503 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213712476 | 20110700593700<br>Mark Maldonado<br>08/12/2000 | 5/2/2018 to<br>5/21/2018 | | $700.00 | 0003247504 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206867956 | 20161101070400<br>Lae Leona Glenn<br>02/08/2010 | 4/5/2018 to<br>4/26/2018 | | $700.00 | 0003247505 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 206348955 | 20130500017300<br>Alexis Aguilar<br>01/10/2013 | 4/2/2018 to<br>4/28/2018 | | $2,150.00 | 0003247506 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000073



**Inland Empire Health Plan**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 207567683 | 20150401668600 Grayson Minton 06/12/2014 | 4/1/2018 to 4/8/2018 | | $675.00 | 0003247507 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213616979 | 20030400046700 Neil Barron 11/26/2002 | 5/1/2018 to 5/31/2018 | | $2,812.50 | 0003247508 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213570240 | 20170501112900 Andrew Rubio 02/16/2013 | 5/1/2018 to 5/31/2018 | | $3,200.00 | 0003247509 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213647872 | 20010300151600 George Hernandez 12/07/2000 | 5/7/2018 to 5/31/2018 | | $1,275.00 | 0003247510 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213577927 | 20130600823700 Degan Ryder 02/10/2007 | 5/1/2018 to 5/31/2018 | | $1,637.50 | 0003247511 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207903650 | 201610000163 Hararadh Singh 07/19/2014 | 4/3/2018 to 4/30/2018 | | $2,162.50 | 0003247512 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206709144 | 20111200209200 Roby De Los Santos 11/05/2010 | 4/2/2018 to 4/30/2018 | | $2,200.00 | 0003247513 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 206421185 | 20060700291500 Daniel Arriaga 01/17/2006 | 4/6/2018 to 4/26/2018 | | $337.50 | 0003247514 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207456087 | 20110900527000 Emilio Lopez 07/08/2004 | 4/4/2018 to 4/17/2018 | | $825.00 | 0003247515 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 207906505 | 20070400626500 Alyssa Smith 01/04/2007 | 04/04/2018 | | $225.00 | 0003247516 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213641574 | 20150300384900 Levi Sedivy 10/24/2011 | 5/10/2018 to 5/29/2018 | | $712.50 | 0003247517 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000074

| 213649236 | 20090500315800<br>Brandon Hernandez<br>Rodriguez<br>10/24/2007 | 5/1/2018 to<br>5/30/2018 | | $1,850.00 | 0003247518 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 207710231 | 201112009670<br>Richard Perez<br>02/14/2004 | 4/1/2018 to<br>4/29/2018 | | $2,025.00 | 0003247519 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213724307 | 201712010201<br>Skyler Torres<br>05/31/2013 | 5/3/2018 to<br>5/31/2018 | | $2,543.75 | 0003247520 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213781532 | 20120700564700<br>Damian Monroy<br>05/06/2012 | 05/25/2018 | | $187.50 | 0003247521 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207621880 | 20030100320500<br>Kemish Muro<br>07/08/2002 | 4/9/2018 to<br>4/30/2018 | | $2,625.00 | 0003247522 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207559694 | 20100900890000<br>Santiago Mercado<br>07/20/2004 | 4/7/2018 to<br>4/30/2018 | | $693.75 | 0003247523 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207547638 | 20151003967700<br>Noah Mcknight<br>12/29/2008 | 4/9/2018 to<br>4/30/2018 | | $762.50 | 0003247524 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213567792 | 20020500393300<br>Adam Rossi<br>01/23/2002 | 5/1/2018 to<br>5/31/2018 | | $2,225.00 | 0003247525 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216998173 | 20130600967600<br>Nathan Vu<br>05/15/2006 | 6/5/2018 to<br>6/21/2018 | | $437.50 | 0003247527 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207542430 | 20151200338300<br>Jason Martinez<br>04/16/2010 | 4/2/2018 to<br>4/17/2018 | | $1,050.00 | 0003247528 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213582533 | 20100500632800<br>Dylan Salgado Avila<br>02/18/2010 | 5/3/2018 to<br>5/30/2018 | | $581.25 | 0003247529 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000075



Inland Empire Health Plan

| 207951981 | 20160700596700<br>William Ukpong<br>01/28/2003 | 4/2/2018 to<br>4/27/2018 | | $1,262.50 | 0003247530 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 213501951 | 20140200622600<br>Robert Rendon<br>10/01/2013 | 5/1/2018 to<br>5/31/2018 | | $1,975.00 | 0003247531 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 213644867 | 20170401453400<br>Braiden Creamer<br>08/18/2002 | 5/4/2018 to<br>5/29/2018 | | $500.00 | 0003247532 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216790414 | 20120100616700<br>Roderick Melendez<br>09/12/2008 | 6/4/2018 to<br>6/29/2018 | | $1,362.50 | 0003247534 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207711727 | 20110200507600<br>Triston Perez<br>10/14/2010 | 4/2/2018 to<br>4/27/2018 | | $2,375.00 | 0003247535 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216831464 | 20060400354500<br>Rosario Navarro<br>02/18/2006 | 6/2/2018 to<br>6/30/2018 | | $1,750.00 | 0003247536 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216795171 | 20140200622600<br>Robert Rendon<br>10/01/2013 | 6/1/2018 to<br>6/22/2018 | | $1,600.00 | 0003247537 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216214921 | 20070800077300<br>Rebecca Cano<br>02/21/2007 | 6/4/2018 to<br>6/29/2018 | | $1,212.50 | 0003247538 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216745939 | 20020600283600<br>Ismael Lopez<br>01/28/2002 | 6/5/2018 to<br>6/18/2018 | | $437.50 | 0003247539 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216885367 | 20090500676800<br>Netenel Singleton<br>04/25/2007 | 6/6/2018 to<br>6/30/2018 | | $1,500.00 | 0003247540 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216807430 | 20110700673900<br>Miguel Moncada<br>07/29/1999 | 6/2/2018 to<br>6/21/2018 | | $1,487.50 | 0003247541 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800<br>Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003<br>Office Hours: 8am - 5pm<br>www.iehp.org

MC-15-01676

REL000076

| 216745514 | 20061100297600 Alexander Lopez 09/20/2006 | 6/1/2018 to 6/28/2018 | $1,637.50 | 0003247542 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 216843716 | 20110100600700 Axel Padilla 10/12/2010 | 6/1/2018 to 6/29/2018 | $1,906.25 | 0003247543 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213864059 | 20101200843700 Karely Padilla 08/24/2008 | 5/1/2018 to 5/9/2018 | $512.50 | 0003247544 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216256468 | 20161100264300 Richard Cloutman 12/14/2010 | 6/16/2018 to 6/20/2018 | $600.00 | 0003247545 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216374171 | 20110900226000 George Dayoub 04/05/2011 | 6/1/2018 to 6/29/2018 | $2,575.00 | 0003247546 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216365105 | 20141003496100 Kaidyn Darby 11/12/2013 | 6/4/2018 to 6/19/2018 | $1,875.00 | 0003247547 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216814542 | 20141100400900 Carmen Reyes-Ramirez 08/05/2014 | 6/5/2018 to 6/27/2018 | $843.75 | 0003247548 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213732563 | 20130300412900 Michael Mendez 11/08/2010 | 5/1/2018 to 5/31/2018 | $2,062.50 | 0003247549 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216791073 | 20080800395000 Andy Melgar 09/19/2005 | 6/1/2018 to 6/29/2018 | $1,600.00 | 0003247550 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 213777906 | 20100500460200 Lauren Minger 03/28/2009 | 5/1/2018 to 5/31/2018 | $1,825.00 | 0003247551 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
| 216602450 | 20161101070400 Lae Leona Glenn 02/08/2010 | 6/4/2018 to 6/29/2018 | $1,500.00 | 0003247552 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |



Inland Empire Health Plan

| 213633143 | 20020900200800<br>Jacob Gutierrez<br>02/11/2002 | 5/1/2018 to<br>5/31/2018 | | $2,950.00 | 0003247553 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|---|
| 213733105 | 20130300412900<br>Michael Mendez<br>11/08/2010 | 5/10/2018 to<br>5/31/2018 | | $356.25 | 0003247554 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216086966 | 20170400929100<br>Kanon Aguiniga<br>02/22/2014 | 6/1/2018 to<br>6/29/2018 | | $3,675.00 | 0003247555 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216852555 | 20110200507600<br>Triston Perez<br>10/14/2010 | 6/1/2018 to<br>6/29/2018 | | $2,212.50 | 0003247556 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216805063 | 20150401668600<br>Grayson Minton<br>06/12/2014 | 6/22/2018 to<br>6/23/2018 | | $900.00 | 0003247557 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216833233 | 20101100637000<br>Rafael Roman<br>08/12/2010 | 6/14/2018 to<br>6/21/2018 | | $160.00 | 0003247558 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216802114 | 20010100295400<br>Rebecca Miller<br>02/08/2000 | 6/6/2018 to<br>6/29/2018 | | $1,525.00 | 0003247559 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216836735 | 20060900358600<br>Nicholas Norman<br>06/29/2006 | 6/4/2018 to<br>6/29/2018 | | $3,300.00 | 0003247561 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216681784 | 20051100262100<br>Adriano Horna<br>09/13/2005 | 6/7/2018 to<br>6/29/2018 | | $500.00 | 0003247562 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 207858228 | 20020500393300<br>Adam Rossi<br>01/23/2002 | 4/2/2018 to<br>4/30/2018 | | $2,225.00 | 0003247563 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216659631 | 20100200318700<br>Luke Hendrix<br>11/25/2009 | 6/1/2018 to<br>6/7/2018 | | $593.75 | 0003247564 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

MC-15-01676

REL000078

| 216886454 | 20110400716000<br>Evan Smith<br>10/02/2009 | 6/1/2018 to<br>6/29/2018 | $1,812.50 | 0003247565 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
|---|---|---|---|---|---|---|
| 216829410 | 201703010367<br>Genevieve Murrey<br>10/19/2013 | 6/5/2018 to<br>6/30/2018 | $937.50 | 0003247566 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216856717 | 200610006442<br>Robert Peterson<br>04/27/2006 | 6/4/2018 to<br>6/29/2018 | $1,875.00 | 0003247567 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216745978 | 20020600283600<br>Ismael Lopez<br>01/28/2002 | 06/26/2018 | $75.00 | 0003247568 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216848860 | 20130600823700<br>Degan Ryder<br>02/10/2007 | 6/1/2018 to<br>6/29/2018 | $1,250.00 | 0003247569 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216680454 | 20121000341900<br>Gavin Himler<br>12/15/2010 | 6/12/2018 to<br>6/28/2018 | $1,150.00 | 0003247570 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216396212 | 20160700740100<br>Joshua Duran<br>07/03/2006 | 6/1/2018 to<br>6/29/2018 | $2,950.00 | 0003247571 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216664124 | 20071100275800<br>Emiliano Hernandez<br>08/05/2007 | 6/1/2018 to<br>6/28/2018 | $912.50 | 0003247572 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216882918 | 20150600539300<br>Joeseph Shannon<br>02/17/2006 | 6/4/2018 to<br>6/27/2018 | $900.00 | 0003247573 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216746861 | 20130700435500<br>Joe Lara<br>12/24/2012 | 6/25/2018 to<br>6/29/2018 | $500.00 | 0003247574 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |
| 216831557 | 20120500828200<br>Esequiel Rojas<br>02/10/2012 | 6/1/2018 to<br>6/26/2018 | $1,500.00 | 0003247575 | 08/30/2018 | Missing/Invalid<br>Rendering NPI<br>(CMS1500 Box<br>24J) |

REL000079



Inland Empire Health Plan

| 216607481 | 20100700276100<br>Dylan Hasbach<br>04/22/2010 | 6/1/2018 to<br>6/29/2018 | $2,668.75 | 0003247576 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |
|---|---|---|---|---|---|---|
| 216678850 | 20090500315800<br>Brandon Hernandez<br>Rodriguez<br>10/24/2007 | 6/4/2018 to<br>6/27/2018 | $1,875.00 | 0003247577 | 08/30/2018 | Missing/Invalid Rendering NPI (CMS1500 Box 24J) |

For any questions regarding this notice, Please contact the IEHP Provider Call Center as (909) 890-2054 or (866) 223 -4347. Please use the claim number listed as reference.

Sincerely,
Claims Operations
Inland Empire Health Plan

P.O. Box 1800, Rancho Cucamonga, CA 91729-1800
Tel (800) 440-IEHP (4347) • TTY (800) 718-4347 • Fax (909) 890-2003
Office Hours: 8am - 5pm
www.iehp.org

MC-15-01676

REL000080

REL000081

# Exhibit 9

| | |
|---|---|
| **From:** | Stephanie Richardson <SRichardson@calpsychcare.com> |
| **Sent:** | Friday, October 26, 2018 8:15 PM |
| **To:** | Dr. Lydia Luna <Drluna@calpsychcare.com>; Timothy Dick <TDick@360bhmail.com>; Alex Krasnovskiy <Alex.Krasnovskiy@360bhmail.com> |
| **Cc:** | Dennis Kogod <dkogod@360bhmail.com>; Frank Saito <fsaito@360bhmail.com>; Theresa Koon <THowell@calpsychcare.com>; Tammy Pedersen <Tammy.Pedersen@360bhmail.com>; William Szyman <WSzyman@360bhmail.com>; Jessica Robles <JRobles@calpsychcare.com>; Eric Lo <Eric.Lo@znsmail.com> |
| **Subject:** | RE: No BCBA's |
| **Attach:** | UserHold Project 8.29.18.xlsx; IEHP 1.pdf |

Hi Dr. Luna and Alex,

Per our conversation, please see the latest spreadsheets that I had received regarding IEHP consumers. Per my understanding the hold for IEHP invoices is directly related to NO BCBA supervision which equals $663,197.

Please let me know if anything else is needed at this time.

Be Blessed!
Stephanie London

**From:** Dr. Lydia Luna
**Sent:** Friday, October 26, 2018 12:51 PM
**To:** Timothy Dick; Alex Krasnovskiy
**Cc:** Dennis Kogod; Stephanie Richardson; Frank Saito; Theresa Koon; Tammy Pedersen; William Szyman; Jessica Robles; Eric Lo
**Subject:** RE: No BCBA's

Adding Alex to the email.

**Lydia Luna, Ph.D., LCP**
**Chief Operating Officer**
360 Behavioral Health
Office: (818) 401-0661
Cell: (818) 920-8097

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Dr. Lydia Luna
**Sent:** Friday, October 26, 2018 12:43 PM
**To:** Timothy Dick
**Cc:** Dennis Kogod; Stephanie Richardson; Frank Saito; Theresa Koon; Tammy Pedersen; William Szyman; Jessica Robles; Eric Lo
**Subject:** RE: No BCBA's

Hi Tim,

Please provide an update on the ability to specify BCBA supervision in WebABA.

*Lydia Luna, PhD*
**Licensed Clinical Psychologist**
**Clinical Director**
California Psychcare, Inc.
Office: (818) 401-0661
Cell: (818) 920-8097

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Stephanie Richardson
**Sent:** Friday, October 19, 2018 2:03 PM
**To:** Frank Saito; Dr. Lydia Luna; Theresa Koon; Tammy Pedersen; William Szyman; Jessica Robles; Eric Lo
**Cc:** Dennis Kogod; Timothy Dick
**Subject:** RE: No BCBA's

Good afternoon everyone,

Frank, please see the updated information for the HP we were assigned. Please let me know if you have any further questions.

Be Blessed!
Stephanie London

**From:** Frank Saito
**Sent:** Thursday, October 18, 2018 5:57 PM
**To:** Dr. Lydia Luna; Theresa Koon; Tammy Pedersen; Stephanie Richardson; William Szyman; Jessica Robles; Eric Lo
**Cc:** Dennis Kogod; Timothy Dick
**Subject:** RE: No BCBA's

Everyone,

Can you provide and update on the research on the BCBA's assigned to the cases ?

For billing and Web Aba input purposes, we will need the names of BCBA's, NPI and which payors have credentialed them and rerun the reports for rebilling purposes.   As I had communicated to the group this week the programmers are making necessary changes to Web ABA..hopefully within the week

I heard that the BCBA's credentialed  for cases with IEHP was over 90%... Great! Stephanie.

I do need to assess the rest of the cases, so it would be very important to know where we stand with the other casesyou.

Thank your for your help and attention to this

**Frank M. Saito,  CPA, CFO**
**16946 Sherman Way**
**Van Nuys, California 91406**
**(818) 257-1429 (Cell)**
**www.leesperling.com**

**From:** Brinton Watts
**Sent:** Wednesday, October 10, 2018 1:41 PM
**To:** Dr. Lydia Luna; Theresa Koon; Tammy Pedersen; Frank Saito; Stephanie Richardson; William Szyman; Jessica Robles; Eric Lo
**Cc:** Dennis Kogod; Timothy Dick; Anthony Patane
**Subject:** No BCBA's

Hello All,

As a follow-up to our recent conversation around the $2.2M for "No BCBA" please see the following bullets outlining current knowledge and next steps:

> ➢ It was determined that many of these cases were identified by our Billers as not having a BCBA assigned due to limitations in WebABA functionality

REL000038

- o Clinical team did not have option to select from which would allow for identification of BCBA when Billers entered claim criteria during coding process
- o Technicality is known to be intermittent, meaning not enterprise-wide for all Clinical reps, thus allowing for some successful billing events
- ➢ Tim, our WebABA onsite technical resource, confirms knowledge of this system limitation
- ➢ Tim also states a need for timely updating of BCBA credentials within WebABA to allow for appropriate designation of BCBA by payor at time of billing
  - o Ownership assignment needs to be confirmed for this item
- ➢ Attached is an updated breakout of the report, Theresa confirms that she will work with Dr. Luna and team to parse and assign ownership
- ➢ Tim confirms that WebABA fix can be completed fairly quickly
- ➢ Once fix in place, Clinical Team will need to use report and re-enter BCBA assignment per case
- ➢ Once WebABA has been updated with BCBA assignment, we can then submit corrected (updated) claims to all payors and presumably collect most if not all of the $2.2M and any subsequent dollars meeting this criteria from August 2018 forward
- ➢ Brinton will speak with Frank to close any remaining loops around billing for these dollars and estimates for collectability

Best Regards,

**Brinton Watts**
Senior Director, Revenue Cycle Management
*Strategic |Responsibility |Context | Belief |Individualization*
**360 BEHAVIORAL HEALTH** | office:  (818) 401-0661 ext: 1331   cell:  (310) 755-0869
www.360behavioralhealth.com

   

# Exhibit 10

| From: | Domenic Giudice <dgiudice@hardestyllc.com> |
|---|---|
| Sent: | Friday, January 4, 2019 7:12 PM |
| To: | Dennis Kogod <dkogod@360bhmail.com> |
| Cc: | Patricia Murphy <pmurphy@360bhmail.com>; Tim De Cou <tdecou@hardestyllc.com> |
| Subject: | Project Update |

Dennis - thanks for scheduling the call today for us to provide a quick update on our meeting yesterday. Below are our key takeaways that we would like to share with you. Talk to you at 11:30AM.

General Observations

<!--[if !supportLists]-->-   <!--[endif]-->Lack of controls/metrics around processes/staff responsibilities

<!--[if !supportLists]-->-   <!--[endif]-->Lack of enforceable policies

<!--[if !supportLists]-->-   <!--[endif]-->Limited compliance to payer contracts/audit risk

<!--[if !supportLists]-->-   <!--[endif]-->Organizational silos

<!--[if !supportLists]-->-   <!--[endif]-->Multiple non-integrated systems in revenue cycle/accounting (5+)

<!--[if !supportLists]-->-   <!--[endif]-->Questionable departmental sourcing of key functions – credentialing, charge entry, A/R reconciliation

<!--[if !supportLists]-->-   <!--[endif]-->Staffing levels

<!--[if !supportLists]-->-   <!--[endif]-->No sense of urgency


Issues Identified

<!--[if !supportLists]-->-   <!--[endif]-->Inconsistency/Lack of access to local office/field processes (timely payroll, signatures, encounter notes)

<!--[if !supportLists]-->-   <!--[endif]-->Monthly charge submission billing, as opposed to daily

<!--[if !supportLists]-->-   <!--[endif]-->Charge submission 30-60 days after date of service

<!--[if !supportLists]-->-   <!--[endif]-->No follow-up on claims submitted without signature/signed charges and unsigned charges all submitted on same claim

<!--[if !supportLists]-->-   <!--[endif]-->Lack of write-off policy

<!--[if !supportLists]-->-   <!--[endif]-->Not collecting client out of pocket (copays, deductable)

REL000183

<!--[if !supportLists]-->-    <!--[endif]-->Lack of integration of payer/school contracts/reimbursement amounts in billing processes

<!--[if !supportLists]-->-    <!--[endif]-->Reconciliation of EOBs/collections to deposits done by accounting

<!--[if !supportLists]-->-    <!--[endif]-->Ineffective credentialing, inability to charge for services – contracting, certification

<!--[if !supportLists]-->-    <!--[endif]-->Have not mapped/trained new ICD10 codes for 2019

<!--[if !supportLists]-->-    <!--[endif]-->No current or historical client collections, lack of client collection policies

<!--[if !supportLists]-->-    <!--[endif]-->Lack of plan to work historical Payer and Schools A/R

<!--[if !supportLists]-->-    <!--[endif]-->Limited client eligibility/insurance verification/financial counseling process

REL000184